

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NO.:**   06 - 22920
CIV-KING

MAGISTRATE JUDGE
GARBER

WYNDHAM HOTELS AND RESORTS, LLC,
a Delaware limited liability company,

                    **Plaintiff,**

vs.

MERCO GROUP AT GB HOTEL, LC,
a Florida limited liability company, and
UNIVERSITY AT 107TH AVENUE, INC.,
a Florida corporation

                    **Defendants.**
_____/

FILED by _____ .C.
INTAKE

DEC 0 1 2006

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. – MIAMI

## COMPLAINT

Plaintiff, Wyndham Hotels and Resorts, LLC, as successor in interest to WHC Corporation ("WHR"), sues Defendants, Merco Group at GB Hotel, LC ("Merco") and University at 107th Avenue, Inc. ("University") and states:

### PARTIES AND SUBJECT MATTER JURISDICTION

1.      Plaintiff, WHR, is a limited liability company organized and existing under the laws of the State of Delaware with its principal place of business in Parsippany, New Jersey and is a citizen of the states of Delaware and New Jersey.

2.      Defendant, Merco, is a limited liability company organized and existing under the laws of the State of Florida, with its principal place of business in Miami, Miami-Dade County, Florida and is a citizen of the State of Florida.

3.     Defendant, University is a corporation organized and existing under the laws of the State of Florida, with its principal place of business in Miami, Miami-Dade County, Florida and is a citizen of the State of Florida.

4.     The amount in controversy in this matter, exclusive of interest and costs, exceeds the sum of $75,000.

5.     This Court has diversity jurisdiction over this civil action under 28 U.S.C. §1332(a).

6.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b), inasmuch as the events giving rise to the claims herein have occurred and the property that is the subject of this action is situated in this District.

### ALLEGATIONS COMMON TO ALL COUNTS

7.     WHR is one of the largest guest lodging facility franchise systems in the United States and is widely known as a provider of guest lodging facility services.

8.     WHR has the exclusive right to sublicense the use of various trade names and service marks, including Wyndham and Grand Bay Hotel (which are on the principal register of the United States Patent and Trademark Office), logos, and derivations thereof (collectively the "Wyndham Marks"), as well as the distinctive Wyndham® System, which provides hotel services to its licensees, including a centralized reservation system, advertising, publicity, and training services.

9.     WHR or its predecessors have continuously used each of the Wyndham Marks since the date of their registration and these marks are in full force and effect pursuant to 15 U.S.C. § 1065.

2

10.     WHR has given notice to the public of the registration of the Wyndham Marks as provided in 15 U.S.C. § 1111.

11.     WHR uses or has used the Wyndham Marks as abbreviations of its brand name.

12.     Through its franchise system, WHR markets, promotes, and provides services to its guest lodging franchisees throughout the United States.  In order to identify the origin of their guest lodging services, WHR allows its franchisees to utilize the Wyndham Marks and to promote the Wyndham brand name.

13.     WHR has invested substantial effort over a long period of time, including the expenditure of millions of dollars, to develop goodwill in its trade names and service marks to cause consumers throughout the United States to recognize the Wyndham Marks as distinctly designating WHR guest lodging services as originating with WHR.

14.     The value of the goodwill developed in the Wyndham Marks does not admit of precise monetary calculation, but because WHR is one of the largest guest lodging facility franchise systems in the United States and is widely known as a provider of guest lodging facility services, the value of WHR's goodwill exceeds hundreds of millions of dollars.

15.     The Wyndham Marks are indisputably among the most famous in the United States.

### THE AGREEMENTS BETWEEN THE PARTIES

16.     On or about March 23, 2005, WHR entered into a franchise agreement (the "Franchise Agreement") with W2005 GHIT Hotels. L.P. for the operation of a guest lodging facility located at 2669 South Bayshore Drive, Miami, Florida, 33131 (the "Facility").  A true copy of the Franchise Agreement is attached hereto as Exhibit "A."

3

17.     Also on March 23, 2005, WHR and W2005 GHIT Hotels. L.P. entered into an Amendment to the Franchise Agreement.  A true copy of the First Amendment to Franchise Agreement is attached hereto as Exhibit "B."

18.     Effective July 15, 2005, W2005 GHIT Hotels. L.P. transferred the Franchise Agreement with the consent of WHR to Merco.  A true copy of the Transfer Agreement and Consent is attached hereto as Exhibit "C."

19.     Pursuant to the Franchise Agreement, Merco agreed to operate a Wyndham guest lodging facility for a 10-year term, during which time Merco was permitted to use the Wyndham Marks in association with the operation and use of the Facility as part of WHR's franchise system.

20.     Pursuant to section III of the Franchise Agreement, Merco was required to make certain periodic payments to WHR for royalties, marketing fees, interest, and other fees (collectively "Recurring Fees").  Any past due Recurring Fees would bear interest at the rate of 1.5% per month or the maximum rate permitted by applicable law, whichever is less, accruing from the due date until the amount is paid.  See Franchise Agreement, section III.G.

21.     Pursuant to section XVII of the Franchise Agreement, WHR could terminate the Franchise Agreement, with notice to Merco, for various reasons, including Merco's failure to pay any amount due WHR under the Franchise Agreement within ten (10) days following receipt of a notice of default.  See Franchise Agreement, section XVII.B.7.

22.     Pursuant to section XVIII.E of the Franchise Agreement, Merco agreed that, in the event of a termination of the Franchise Agreement, it would pay liquidated damages to WHR in accordance with a formula specified in the Franchise Agreement.

4

23.     Section XVIII.A-D of the Franchise Agreement specified Merco's other obligations in the event of a termination of the Franchise Agreement, including its obligation to immediately cease using all of the Wyndham Marks.

24.     Pursuant to the section XVIII.F of the Franchise Agreement, Merco agreed to pay all costs and expenses, including reasonable attorneys' fees, incurred by WHR to enforce the Franchise Agreement or collect amounts owed under the Franchise Agreement.

25.     Effective as of the date of the Transfer Agreement and Consent, University provided WHR with a Guaranty of Merco's obligations under the Franchise Agreement ("Guaranty"). A true copy of the Guaranty is attached hereto as Exhibit "D."

**MERCO'S DEFAULTS AND TERMINATION**

26.     By letter dated April 21, 2006, WHR notified Merco that it was in default of its financial obligations under the Franchise Agreement and had 10 days to cure default. A true copy of WHR's April 21, 2006 letter is attached as Exhibit "E."

27.     By letter dated May 23, 2006, WHR notified Merco that it was in continuing default of its financial obligations under the Franchise Agreement and had 10 days to cure the continuing default. A true copy of WHR's May 23, 2006 letter is attached as Exhibit "F."

28.     On November 15, 2006, WHR again notified Merco that it was in continuing default of its financial obligations under the Franchise Agreement and had 10 days to cure the continuing default and that the Franchise Agreement was subject to termination. A true copy of WHR's November 15, 2006 letter is attached as Exhibit "G."

29.     By letter dated November 30, 2006, WHR terminated the Franchise Agreement based on Merco's continuing failure to pay WHR outstanding monies due under the terms of the

5

Franchise Agreement.  A true copy of WHR's November 15, 2006 letter is attached as Exhibit "H."

    30.    The termination letter advised Merco that:

    (a)    it had to immediately and completely de-identify the Facility as a Wyndham® guest lodging facility;

    (b)    it was to immediately discontinue any further the use of the Wyndham and Grand Bay trade names, service marks, and signs, including any form of advertising to promote the Facility as a Wyndham guest lodging facility, and to remove all other indicia of operation of a Wyndham System Facility;

    (c)    all signs and any listings in directories and similar guides in which the Facility was identified as a Wyndham System Facility had to be changed, including, but not limited to, billboards, on-premises signs, and listings in telephone directories, the internet, travel guides, hotel indices, and similar guides;

    (d)    it must return to WHR all training documents, operating manuals, and similar proprietary material;

    (e)    it was required to pay to WHR as liquidated damages for premature termination the sum of $182,961.57 as provided for in section XVIII.E of the Franchise Agreement; and

    (f)    it was to immediately pay all monies due and owing to WHR as of November 30, 2006, in the sum of $469,954.42, well as all Recurring Fees and additional monies through the date of de-identification.

BUCHANAN INGERSOLL PC .:: Bank of America Tower .:: 100 S.E. Second Street, 34th Floor .:: Miami, FL  33131-2158 .:: T  305 347 4080 .:: F  305 347 4089

## COUNT I
### RECURRING FEES

31.     WHR repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 30 of the Complaint.

32.     Under section III of the Franchise Agreement, Merco was obligated to pay the Recurring Fees to WHR.

33.     Despite its obligation to do so, Merco has failed to pay certain of the Recurring Fees due and owing under the Franchise Agreement.

34.     Pursuant to section III.G of the Franchise Agreement, past due Recurring Fees would bear interest at the rate of 1.5% per month or the maximum rate permitted by applicable law, whichever is less, accruing from the due date until the amount is paid.

35.     As of November 30, 2006, the amount of the Recurring Fees due from Merco to WHR pursuant to the Franchise Agreement is estimated to be $469,954.42.

36.     Merco's failure to pay the agreed Recurring Fees constitutes a breach of the Franchise  Agreement and has damaged WHR.

**WHEREFORE**, WHR demands judgment against Merco for damages in the amount of the Recurring Fees due and owing under the Franchise Agreement, together with interest, attorneys' fees pursuant to section XVIII.F of the Franchise Agreement, costs, and such other and further relief as this Court shall deem just and proper.

## COUNT II
### LIQUIDATED DAMAGES

37.     WHR repeats and makes a part hereof each and every allegation contained in paragraph 1 through 30 of the Complaint.

7

38.     On December 1, WHR terminated the Franchise Agreement.

39.     Section XVIII.E of the Franchise Agreement of the Franchise Agreement provides that, in the event of termination of the Franchise Agreement due to action of the Franchisee, Merco shall pay liquidated damages to WHR.

40.     As a result of the termination of the Franchise Agreement, Merco is obligated to pay WHR liquidated damages in the amount of $182,961.57.

41.     Notwithstanding WHR's demand for payment, Merco has failed to pay WHR the liquidated damages as required in section XVIII.E of the Franchise Agreement.

42.     WHR has been damaged by Merco's failure to pay liquidated damages.

**WHEREFORE**, WHR demands judgment against Merco for liquidated damages in the amount of $182,961.57, together with interest, attorneys' fees pursuant to section XVIII.F of the Franchise Agreement, costs, and such other and further relief as this Court shall deem just and proper.

## COUNT III
### ACTUAL DAMAGES

43.     WHR repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 30 of the Complaint.

44.     By virtue of the premature termination of the Franchise Agreement, WHR sustained a loss of future revenue over the remainder of the 8 year term of the Franchise Agreement.

45.     If the Court determines that Merco is not liable to pay WHR liquidated damages as required by section XVIII.E of the Franchise Agreement of the Franchise Agreement then, in

8

the alternative, Merco is liable to WHR for actual damages for the premature termination of the Franchise Agreement.

46.     WHR has been damaged by Merco's breach of its obligation to operate a Wyndham guest lodging facility for the remaining term of the Franchise Agreement.

**WHEREFORE**, WHR demands judgment against Merco for actual damages in an amount to be determined at trial, together with interest, attorneys' fees pursuant to section XVIII.F of the Franchise Agreement, costs, and such other and further relief as this Court shall deem just and proper.

### COUNT IV
### ACCOUNTING

47.     WHR repeats and makes a part hereof each and every allegation set forth in paragraphs 1 through 30 of the Complaint Franchise Agreement

48.     Under the Franchise Agreement, Merco was required to pay Recurring Fees to WHR based upon gross revenue information supplied to Merco to WHR.

49.     Merco has failed to pay Recurring Fees due and owing under the Franchise Agreement.  The exact amount of Recurring Fees due and owing WHR cannot be ascertained without an accounting of the receipts and disbursements, profit and loss statements, and other financial materials, statements and books from WHR.

50.     As such, an audit of Merco's books and records is necessary to determine the gross revenue and other financial information concerning Merco's performance to accurately calculate the amount of Recurring Fees due and owing WHR under the Franchise Agreement.

9

51.    Pursuant to sections XIII.E of the Franchise Agreement, Merco agreed to allow WHR to examine, audit, and make copies of Merco's financial information, including books, records, and accounts, relating to the operation of the Facility.

52.    The Franchise Agreement between Merco and WHR involve extensive and complicated accounts.

53.    WHR Time has no adequate remedy at law.

**WHEREFORE,** WHR demands judgment in its favor and against Merco as follows:

(a)    Compelling Merco to allow WHR to examine, audit, and make copies of Merco's books, records, and financial information to determine the amount of Recurring Fees due and owing WHR under the Franchise Agreement;

(b)    WHR shall have judgment against Merco for any sums found to be due WHR from Merco; and

(c)    an award of attorneys' fees pursuant to section XVIII.F of the Franchise Agreement, costs, and such other and further relief as may be just.

### COUNT V
#### GUARANTY

54.    WHR repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 30 of the Complaint.

55.    Pursuant to the terms of the Guaranty, University agreed, among other things, that upon a default under the Franchise Agreement, it would immediately make each payment and perform each obligation required of Merco under the Franchise Agreement.

56.    Despite its obligation to do so, University failed to make any payments or perform or cause Merco to perform each obligation required under the Franchise Agreement.

10

57.     Pursuant to the Guaranty, University is liable to WHR for Merco's outstanding balance of Recurring Fees in the estimated amount of $469,954.42.

58.     Pursuant to the Guaranty, University is liable to WHR for Merco's liquidated damages in the amount of $182,961.57, or actual damages in an amount to be determined at trial, and Merco's Recurring Fees due and owing under the Franchise Agreement and for those additional Recurring Fees attributable to the period during which Merco continued to use the Wyndham Marks following termination.

**WHEREFORE**, WHR demands judgment against University for damages in the amount of the Recurring Fees, liquidated damages or actual damages due and owing under the Franchise Agreement, together with interest, attorneys' fees pursuant to XVIII.F of the Franchise Agreement, and costs of and such other and further relief as this Court shall deem just and proper.

DATED: December _1_, 2006.

> Respectfully submitted,
> **BUCHANAN INGERSOLL
> & ROONEY, P.C.**
> Bank of America Tower
> 100 S.E. 2nd Street
> 34th Floor
> Miami, Florida 33131
> Phone: (305) 347-4080
> Fax: (305) 347-4089
>
> By: _____
> Mary Leslie Smith
> Fla. Bar No.: 774243
> leslie.smith@bipc.com
> Chalon T. Allen
> Fla. Bar No. 0573507
> chalon.allen@bipc.com

#215986-v2

BUCHANAN INGERSOLL PC :: Bank of America Tower :: 100 S.E. Second Street, 34th Floor :: Miami, FL 33131-2158 :: T 305 347 4080 :: F 305 347 4089

EXHIBIT A

WYNDHAM HOTEL
FRANCHISE AGREEMENT

BETWEEN

WHC FRANCHISE CORPORATION
(Franchisor)

and

W2005 GHIT Hotels, L.P.
(Owner Franchisee)

dated

March 23, 2005

MIAMI, FLORIDA

Form Dated:  June 1, 2004
(UFOC Dated:  June 1, 2004, as amended October 14, 2004)

—Wyndham Hotel - Miami Coconut Grove, Florida
DALLDOCS:195590 v)
7671V7-X7

11/30/2006 14:05 FAX 19737538870     WYNDHAM HOTEL GROUP     ☑018/068

**WYNDHAM HOTEL**
**FRANCHISE AGREEMENT**
**TABLE OF CONTENTS**

Page No.

| | | |
|---|---|---|
| I. | GRANT OF FRANCHISE | 1 |
| II. | TERM | 2 |
| III. | FEES | 3 |
| IV. | THE WYNDHAM ASSOCIATION | 4 |
| V. | MANAGEMENT, STAFFING AND TRAINING | 5 |
| VI. | HOTEL OPERATIONS | 7 |
| VII. | FURNISHING AND MAINTAINING THE HOTEL | 8 |
| VIII. | RESERVATION AND PROPERTY MANAGEMENT SYSTEMS | 9 |
| IX. | ADVERTISING AND MARKETING | 10 |
| X. | PROPRIETARY MARKS | 12 |
| XI. | MANUAL | 14 |
| XII. | CONFIDENTIAL INFORMATION | 15 |
| XIII. | ACCOUNTING AND RECORDS | 15 |
| XIV. | INSURANCE | 16 |
| XV. | TRANSFERABILITY OF INTEREST | 18 |
| XVI. | SECURITIES OFFERINGS | 21 |
| XVII. | DEFAULT AND TERMINATION | 21 |
| XVIII. | OBLIGATIONS UPON TERMINATION | 23 |
| XIX. | CONDEMNATION AND CASUALTY | 24 |
| XX. | TAXES, PERMITS AND INDEBTEDNESS | 25 |
| XXI. | INDEPENDENT CONTRACTOR AND INDEMNIFICATION | 25 |
| XXII. | APPROVALS AND WAIVERS | 26 |
| XXIII. | REPRESENTATIONS OF FRANCHISEE | 27 |
| XXIV. | NOTICES | 27 |
| XXV. | ENTIRE AGREEMENT | 28 |
| XXVI. | CONSTRUCTION AND SEVERABILITY | 28 |
| XXVII. | DISPUTE RESOLUTION AND GOVERNING LAW | 29 |
| XXVIII. | REMEDIES; CURRENCY | 30 |
| XXIX. | WAIVER OF JURY TRIAL AND DAMAGES | 31 |
| XXX. | FRANCHISEE ACKNOWLEDGMENTS | 31 |

Wyndham Hotel – Miami Coconut Grove, Florida
267197-83

**ATTACHMENTS**

Attachment A  –  Selected Terms

Attachment B  –  Guaranty

Attachment C  –  Management Company Rider

Attachment D      Definitions

**ADDENDA**

New Construction Addendum

Conversion Addendum

First Amendment to Franchise Agreement

—Wyndham Hotel – Miami Coconut Grove, Florida
DALLDOCS:105500.v1
267157-87

## WYNDHAM HOTEL
## FRANCHISE AGREEMENT

THIS AGREEMENT is made and entered into as of the 23rd day of March, 2005 between WHC Franchise Corporation, a Delaware corporation ("Franchisor"), and W2005 GHIT Hotels, L.P., a Delaware limited partnership ("Franchisee"). Certain terms used in this Agreement are defined in Attachment D.

### WITNESSETH:

WHEREAS, Franchisor or its Affiliates have developed and Franchisor has the right to use and license the use of a System for the establishment and operation of full-service business deluxe and resort hotels under the trade name and service mark "Wyndham" and other designated Proprietary Marks; and

WHEREAS, Franchisee is the owner of the hotel identified in Attachment A to this Agreement ("Hotel") and desires to obtain a license to use the Proprietary Marks and the System to operate the Hotel as a Wyndham Hotel; and

WHEREAS, Franchisee understands and acknowledges the importance of operating in conformity with Franchisor's standards and specifications in order to enhance public acceptance of, and demand for, all Wyndham Hotels; and

WHEREAS, in entering into this Agreement Franchisor is relying upon the business skill, financial capacity and character of Franchisee and its Principals and the guaranty of Franchisee's obligations under this Agreement by its Controlling Principals, each of whom has executed a Guaranty in the form of Attachment B to this Agreement;

NOW, THEREFORE, in consideration of the mutual undertakings and commitments set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

### I.   GRANT OF FRANCHISE

A.    Grant. As of the Effective Date, Franchisor grants to Franchisee, upon the terms and conditions contained in this Agreement, the nonexclusive right and franchise, and Franchisee undertakes the obligation, to operate the Hotel as a Wyndham Hotel in accordance with Franchisor's standards, specifications, policies and procedures at, and only at, the location specified in Attachment A ("Approved Location") and to use, solely in connection with the operation of the Hotel at the Approved Location, the Proprietary Marks and System as it may be changed, improved and further developed from time to time. This franchise and Franchisee's rights under this Agreement are granted only for the number of guest rooms specified in Attachment A. Franchisee shall not expand or change the number of guest rooms or make other structural changes to the Hotel without the prior written consent of Franchisor.

B.    Reserved Rights. Franchisee acknowledges and agrees that (i) this franchise relates solely to the Approved Location; and (ii) this Agreement does not entitle Franchisee to any protected territory, territorial rights or exclusivity. Franchisee further acknowledges and agrees that the Wyndham Companies have and retain the right to develop and operate, and to license others to develop and operate, hotels and lodging facilities (including, without limitation, business deluxe, resort and garden hotels and extended stay facilities), timeshare or vacation ownership resort properties, restaurants or other business operations of any type whatsoever, under the Wyndham name and mark or under other trade names, trademarks and service marks, at any location except the Approved Location, including locations adjacent, adjoining or proximate to the Approved Location, and that these business operations may compete directly with and adversely affect the operation of the Hotel. Franchisee agrees that the Wyndham Companies may exercise these rights from time to time without notice to Franchisee, and Franchisee covenants that

~Wyndham Hotel – Miami Coconut Grove, Florida
DALLDOCS:195590.v1
367107.87

it shall not take any action, including any action in a court of law or equity, which may interfere with the exercise of such rights by any of the Wyndham Companies.

C.    Obligations Commencing on Effective Date.  The rights and obligations of the parties derived from the grant of the franchise and the right to become part of the System (including, but not limited to, those set forth at Sections I.A., II.B., III.B.-F., IV., V. (excluding Section V.A., relating to management company and management agreement approval procedures, and V.B., with respect to initial training), VI., VII., VIII., IX., X. and XIII. of this Agreement) shall begin as of the Effective Date. All other rights and obligations of the parties (including, without limitation, those in the New Construction or Conversion Addendum attached hereto and Sections I.B.-C., V.A., V.B., VII.A.1., XI., XII., XIV., XV., XVI., XVII., XVIII., XIX., XX., XXI., XXII., XXIII., XXIV., XXV., XXVI., XXVII., XXVIII., XXIX, and XXX. of this Agreement), shall become effective as of the date set forth in the Preamble. Franchisee understands and agrees that it shall not open the Hotel for business as a Wyndham Hotel until the Effective Date, and except as expressly provided in Section 6 of the Conversion or New Construction Addendum, Franchisee has no rights to the franchise or to the use of the System or the Proprietary Marks until the Effective Date. Franchisee further understands and agrees that if Franchisee fails to comply with the construction, furnishing and pre-opening requirements set forth in the Conversion or New Construction Addendum (as applicable), in compliance with the standards and specifications of Franchisor, then Franchisor is not obligated to authorize the opening and operation of the Hotel as a Wyndham Hotel, and this Agreement may be terminated in accordance with Section XVII.C. Upon any such termination, this Agreement shall thereafter be deemed null and void, except for the post-termination obligations of Franchisee set forth in the New Construction or Conversion Addendum (as applicable) and Section XVIII. hereof.

II.    TERM

A.    Term.  Except as otherwise provided in this Agreement, the term of this Agreement shall begin on the date set forth in the Preamble and shall expire on the date set forth in Attachment A.

B.    Renewal.  Franchisee may, at Franchisee's option, renew this franchise for one additional period of ten (10) years upon compliance with the following terms and conditions:

1.    Franchisee shall not then be in default of any material provision of this Agreement, any amendment hereof or successor hereto, or any other agreement between Franchisee and Franchisor or its Affiliates and Franchisee shall have substantially complied with all the material terms and conditions of such agreements during their respective terms.

2.    Franchisee shall have satisfied all monetary obligations owed by Franchisee to Franchisor and its Affiliates and to all suppliers to the Hotel and shall have met these obligations on a timely basis throughout the term of this Agreement.

3.    Franchisee shall submit a renewal application to Franchisor not less than twenty-four (24) months nor more than thirty-six (36) months prior to the end of the initial term.

4.    The Hotel manager and other employees of Franchisee shall comply with Franchisor's then-current training requirements.

5.    Franchisee shall upgrade the Hotel, at Franchisee's expense, to conform to the then-current standards and specifications of Franchisor, including, without limitation, such structural changes, remodeling, redecoration, and modifications to existing improvements as may be necessary to do so.

6.    Franchisee shall execute a general release of any and all claims against Franchisor and its Affiliates and the officers, directors, shareholders, partners, agents, representatives, independent contractors, servants and employees of each of them, in their corporate and individual capacities, including, without limitation, claims arising under this Agreement or under federal, state or local laws, rules, regulations or orders.

- 2 -

-Wyndham Hotel – Miami Cocnaut Grove, Florida
DALLDOCS 105590.v1
267197-X7

7.       Franchisee shall execute Franchisor's then-current form of franchise agreement which shall supersede, in all respects, and the terms of which may differ from the terms of this Agreement including, without limitation, higher royalty and marketing fees. Franchisee shall not be required to pay any additional initial fee but shall pay a renewal fee in an amount equal to fifty percent (50%) of Franchisor's then-current initial franchise fee.

C.       Effect of Expiration. If Franchisee does not qualify to renew, or elects not to renew, this franchise in accordance with Section II.B., the franchise shall expire on the date determined pursuant to Section II.A. Upon the expiration of this Agreement, Franchisee shall comply with the requirements of Section XVIII. hereof.

III.     FEES

A.       Initial Franchise Fee; Expansion Fee.

1.       Upon the execution of this Agreement, Franchisee shall pay to Franchisor the initial franchise fee set forth in Attachment A, less the amount of the application fee paid by Franchisee (as set forth in Attachment A), which shall be credited against the initial franchise fee. The initial franchise fee is paid by Franchisee to Franchisor in consideration for the administrative and other expenses incurred by Franchisor in approving Franchisee's site for the Hotel and in entering into this Agreement.

2.       The initial franchise fee is based on the number of guest rooms at the Hotel initially approved by Franchisor. Franchisee shall have no right to expand the number of guest rooms at the Hotel without Franchisor's prior written consent and payment of an expansion fee in an amount equal to the then-current initial franchise fee per guest room for each additional guest room proposed to be added. Franchisee shall pay the expansion fee to Franchisor with its application for approval of the proposed expansion, which approval will be at the sole discretion of Franchisor. If Franchisee's application for expansion is approved by Franchisor, the expansion fee shall be non-refundable. If Franchisee's application for expansion is not approved by Franchisor, Franchisor will refund the expansion fee, less Franchisor's application processing charge.

B.       Royalty. In consideration for Franchisee's continuing use of the Proprietary Marks and the System, Franchisee shall pay to Franchisor a continuing monthly royalty fee beginning on the Effective Date and continuing during the term of this Agreement in an amount equal to five percent (5%) of the Gross Room Revenues of the Hotel.

C.       Marketing Fee. Beginning on the Effective Date, Franchisee shall remit to Franchisor on a monthly basis an amount equal to one and one-half percent (1.5%) of Franchisee's Gross Room Revenues of the Hotel (the "Marketing Fee") as a contribution to the Central Marketing Fund (defined in Section IX.B.), which shall be maintained and administered by Franchisor for the System as provided in Section IX.B. hereof. Each Wyndham Hotel owned or managed by Franchisor or its Affiliates shall make contributions to the Central Marketing Fund at generally the same rate required of franchisees. Franchisor may increase the Marketing Fee periodically to an amount consistent with the Central Marketing Fund allocation for all Wyndham Hotels, including hotels owned or managed by Franchisor or its Affiliates.

D.       Reservation System Fees. Franchisee shall pay to Franchisor or its designee, beginning on the Effective Date, reservation system fees in an amount equal to the allocated reservation center cost per reservation charged to all Wyndham Hotels, Wyndham Luxury Hotels, Wyndham Garden hotels, and Summerfield Suites® by Wyndham hotels, including hotels owned or managed by Franchisor or its Affiliates. Reservation center costs shall be paid or reimbursed on the basis of an initial link-up charge and on the cost for handling reservations made at the Hotel. Reservation system fees shall be subject to increase or decrease by Franchisor, provided that any increase or decrease shall apply equally to all Wyndham Hotels, Wyndham Luxury Hotels, Wyndham Garden hotels, and Summerfield Suites® by Wyndham hotels, or any or all of them, including hotels owned or managed by Franchisor or its Affiliates. Franchisor reserves the right to modify or change the reservation system and the basis for computing reservation system fees, provided the fees are computed on the same basis for all Wyndham Hotels in the same division as the Hotel.

-3-

E.    National Sales Fee.  Beginning on the Effective Date, Franchisee shall pay to Franchisor or its designee a continuing monthly national sales fee in the following amounts: (i) if the Hotel is a Wyndham Historic Hotel with one hundred eighty (180) or more guest rooms or a Wyndham Hotel, one percent (1%) of the Gross Room Revenue of the Hotel, (ii) if the Hotel is a Wyndham Historic Hotel with one hundred seventy nine (179) or fewer guest rooms, one-half percent (½%) of the Gross Room Revenues of the Hotel, (iii) if the Hotel is a Wyndham Resort, one and one-half percent (1½%) of the Gross Room Revenues of the Hotel.  The national sales fee is for national group sales services, regional convention sales services and transient business sales services provided by Wyndham's National Sales Office.

F.    Regional Marketing Fee.  Franchisee shall pay to Franchisor or its designee a continuing monthly regional marketing fee, beginning on the Effective Date and continuing during the term of this Agreement, in an amount equal to one-half percent (0.5%) of the Gross Room Revenues of the Hotel.

G.    Due Dates.  All payments required in Sections III.B, III.C, III.E, and III.F shall be paid to Franchisor by the fifteenth (15th) day of each month with respect to the Gross Room Revenues for the preceding month, and shall be submitted to Franchisor together with any reports required under Section XIII. of this Agreement.  All payments required in Section III.D, and all other invoices forwarded by Franchisor or its Affiliates to Franchisee, shall be paid as provided in the invoice or, if the invoice does not specify a date for payment, within thirty (30) days after Franchisee's receipt of the invoice.  Any payment or report not actually received by Franchisor on or before the date due shall be deemed overdue.  If any payment is overdue, Franchisee shall pay to Franchisor, in addition to the overdue amount and as a late charge, interest on such amount from the date it was due until paid, at one and one-half percent (1½%) per month or the maximum rate permitted by law, whichever is less.  Entitlement to the late charge shall be in addition to any other remedies Franchisor may have.  If Franchisor is ever deemed to have contracted for, charged, or received interest in an amount that exceeds the amount permitted under applicable law, then the excess amount shall be deemed to be, and shall be treated as, a payment of outstanding fees or other amounts due under this Agreement and, if no such amounts remain outstanding, any remaining excess shall be paid to Franchisee, as applicable.

IV.    THE WYNDHAM ASSOCIATION

A.    Establishment of Association.  During the term of this Agreement, Franchisor may, but is not obligated to, establish, or authorize the establishment of, an association ("Association") sanctioned by Franchisor to serve as an advisory council to Franchisor with respect to advertising, marketing, reservations or other appropriate matters relating to Wyndham Hotels.  If an Association is established, then all franchisees of the System, including Franchisee, and Franchisor shall be members of the Association.

B.    Dues and Assessments; Good Standing.  Franchisee shall pay to the Association all dues and assessments authorized by the Association and shall otherwise maintain its membership in the Association in good standing.  "Good standing" means that Association dues and assessments are current, Franchisor has authorized Franchisee to open and operate the Hotel as a Wyndham Hotel, and Franchisee is not in default under this Agreement.

C.    Voting.  For all matters on which members of the Association in good standing are authorized to vote under the Bylaws of the Association, each franchisee member shall be entitled to one (1) vote for each Wyndham Hotel it has in operation, and Franchisee shall be entitled to one (1) vote for each Wyndham Hotel owned or managed by Franchisor or its Affiliates.

D.    Committees; Governing Rules.  Franchisor will seek the advice and counsel of the Association, its board of directors and committees.  Committees and their functions and membership will be subject to approval in writing by Franchisor, which approval will not be unreasonably withheld.  Recognizing that the Association must function in a manner consistent with all franchises of the System, the parties will cause the governing rules of the Association to be consistent with this Agreement.

- 4 -

–Wyndham Hotel – Miami Coconut Grove, Florida
DALLAS:053593590.Y1
267197-87

V.    MANAGEMENT, STAFFING AND TRAINING

A.    Hotel Management. Franchisee will at all times retain and exercise management control over the Hotel. Any lease, management agreement or other arrangement for operating the Hotel or any part thereof (including, without limitation, food and beverage service facilities) shall be subject to Franchisor's prior written consent.

1.    If Franchisee wishes to engage a management company to manage the Hotel, Franchisee shall apply to Franchisor for its consent. In order to be approved by Franchisor, a proposed management company must be deemed by Franchisor, in its reasonable judgment, qualified to manage the Hotel. Franchisor may refuse to approve any proposed management company which, in Franchisor's reasonable judgment, is not financially capable or responsible, is inexperienced or unqualified in managerial skills or operational capacity or capability, or is otherwise unable to adhere fully to the obligations and requirements of this Agreement. Franchisor may also withhold its approval if the proposed management company does not provide Franchisor with all information that Franchisor may reasonably request in order to reach such decision. It is understood that confidential information and materials are, in the normal course of business, imparted to System franchisees and managers, and Franchisor will be under no obligation to approve any proposed management company that is a franchisor or owner, or is affiliated with the franchisor or owner, of a hotel trade name which is competitive with Franchisor or its Affiliates, regardless of the number of hotels operating under such trade name. Franchisor reserves the right, at its option and upon reasonable notice, to revoke its approval of any management company that fails to continue to meet Franchisor's standards.

2.    The management agreement between Franchisee and the management company for the management and operation of the Hotel shall be subject to the terms, conditions, and obligations of this Agreement. Prior to the execution of the management agreement, the management agreement shall be submitted to Franchisor for Franchisor's written approval, which shall not be unreasonably withheld, but which may be conditioned upon the inclusion of the following terms:

a.    The management company shall have the exclusive authority and responsibility for the day-to-day management of the Hotel; and

b.    The Hotel will be operated during the term of the management agreement in compliance with this Agreement.

c.    At Franchisor's request, Franchisor shall be named as a third party beneficiary of the management agreement with the independent right to enforce the provision described in Section V.A.2.b. above, or the management company shall execute a separate rider to this Agreement (in substantially the form of Attachment C hereto), agreeing to be bound by those terms hereof that relate to the management and operation of the Hotel and further agreeing to be bound by the covenants of confidentiality set forth herein. Further, at Franchisor's request, the management company shall cause those of its key employees that Franchisor may require to execute similar covenants of confidentiality, in a form reasonably acceptable to Franchisor.

d.    If Franchisee terminates the management agreement pursuant to its terms, then Franchisee shall give Franchisor at least thirty (30) days' prior written notice unless termination is due to extraordinary circumstances requiring that Franchisee promptly remove the management company as the manager of the Hotel.

3.    If Franchisee or any transferee permitted under Section XV. below (in either case, "Owner") terminates an approved management agreement for the operation of the Hotel pursuant to its terms, then Owner shall, within 6 months following the date of such termination, enter into a replacement management agreement with a replacement manager approved by Franchisor, as further described below. During such 6 month period, Owner shall, with Franchisor's consent, employ an interim manager to manage the Hotel under the System and the Proprietary Marks pending the execution of a new management agreement with a replacement manager.

a.      Any interim manager (as contemplated by this Section V.A.3.) must be approved in writing by Franchisor. Franchisor shall not unreasonably withhold its consent to a proposed interim manager but shall have the right to require that such interim manager (a) be experienced in the operation of quality hotels, as determined by Franchisor in its sole discretion; and (b) manage the Hotel in accordance with the terms and conditions of this Agreement under a short term agreement not to exceed six (6) months.

b.      Owner shall diligently seek to obtain a replacement manager for the Hotel throughout the period of time the Hotel is operated by any such interim manager. Any replacement manager and replacement management agreement shall be submitted to Franchisor for its written approval, which approval shall not be unreasonably withheld, but which may be conditioned on the requirements set forth in Section V.A.2.a.-d.

B.      Staffing; Training. Franchisee or its approved manager shall employ qualified personnel sufficient to staff all positions at the Hotel, as prescribed in the Manual.

1.      All personnel employed at the Hotel in those positions designated by Franchisor to receive training shall attend and successfully complete such initial and other training programs as Franchisor may from time to time require. Franchisor may also periodically make available other optional training courses to Franchisee's personnel, as well as other programs, conferences, seminars and materials. All training shall be provided at such times and locations and for such duration as Franchisor may designate. Before any employee attends any required or optional training program, Franchisee shall pay to Franchisor the applicable tuition fees specified in the Manual or otherwise in writing. Franchisee shall also be responsible for its employees' travel expenses and room, board and wages during any training program. As a condition of providing training, Franchisor reserves the right to require that personnel receiving training execute confidentiality agreements prepared by Franchisor. All persons subsequently employed in positions designated by Franchisor to receive training also must successfully complete Franchisor's training programs. Franchisor shall determine, in its sole discretion, whether any person has successfully completed training.

2.      Franchisor may provide Franchisee with on-site training at the Hotel for personnel involved in front desk, restaurant, reservations, housekeeping, engineering, and other operations, as determined by Franchisor. The number of Franchisor's personnel and the time period for which such on-site training may be provided (if any) shall be determined by Franchisor based upon its assessment of Franchisee's requirements. Franchisee shall pay or reimburse Franchisor for the wages and all direct costs (including transportation, meals and lodging) of those persons providing such on-site training.

3.      Franchisor may from time to time require certain personnel employed at the Hotel to attend periodic meetings held to address matters of general interest to the System (including, without limitation, annual sales and rooms meetings) and may require Franchisee to pay the attendance fee specified in the Manual or otherwise in writing. Such meetings shall be held at locations designated by Franchisor. Franchisee shall be responsible for the travel expenses, room, board and wages for its personnel attending any such meeting.

4.      Without limiting the foregoing, any person employed as a general manager for the Hotel shall attend and successfully complete (as determined by Franchisor in its sole discretion) Franchisor's initial training program and the general manager and director of sales for the Hotel shall attend all required sales meetings and shall devote full time to the management and operation of the Hotel.

5.      Franchisee shall cause all employees, while working at the Hotel, to wear uniforms as specified in the Manual, to present a neat and clean appearance, and to render competent and courteous service to guests of the Hotel.

C.      Nonsolicitation of Employees. Unless the employee in question first solicits Franchisee for employment, Franchisee will not employ or seek to employ any person who is employed by Franchisor, its Affiliates, another System franchisee, or any other entity operating under the System and shall not directly or indirectly induce any such person to leave his or her employment without first obtaining the written consent of Franchisor and such other employer.

- 6 -

VI.   HOTEL OPERATIONS

A.   Adherence to System Standards. Franchisee understands and acknowledges that each and every standard, specification, policy and procedure of the System is essential in order to maintain the quality and guest service of Wyndham Hotels and to enhance public acceptance of, and demand for, Wyndham Hotels. Franchisee shall conduct its operations in strict conformity with the standards, specifications, policies and procedures set forth in the Manual or otherwise in writing, which standards, specifications, policies and procedures shall be applied consistently to all Wyndham Hotels in the same division as the Hotel. Notwithstanding the foregoing, however, if in the reasonable judgment of Franchisor local conditions or special circumstances (including the market area or the physical peculiarities of a hotel) warrant a deviation from such standards, specifications, policies, or procedures, then Franchisor may allow such deviation.

B.   Restricted Use of Hotel Premises. Franchisee shall use the Hotel premises solely for the operation of a Wyndham Hotel and shall refrain from using, or allowing others to use, the premises for any other purpose or activity at any time, without obtaining the prior written consent of Franchisor, which may be withheld in Franchisor's sole discretion. Franchisee shall not provide, or allow others to provide, any guest service or offer any product at the Hotel except as prescribed in the Manual or otherwise in writing. Franchisee shall not permit any part of the Hotel premises to be used for gaming purposes without the prior written consent of Franchisor.

C.   Promotion of Other Businesses. Without the prior written consent of Franchisor, which may be withheld in Franchisor's sole discretion, Franchisee and Franchisee's manager shall ensure that no part of the Hotel or the System is used, without limitation, to further or promote a different or competing business, including advertising or promotion for hotels other than those franchised by Franchisor or its Affiliates and marketing, advertising or promoting timeshare or vacation ownership resort. In addition, except as expressly permitted in the Manual or otherwise consented to by Franchisor in writing, no part of the Hotel or the System shall be used to further or promote any other business or concession at the Hotel. Franchisee shall use every reasonable means to encourage the use of Wyndham Hotels everywhere by the traveling public; provided, however, that nothing herein shall prohibit, and Franchisee agrees to participate in, any program specified by Franchisor for referring prospective customers to other hotels when the customers cannot be accommodated by Franchisee's Hotel or any other Wyndham Hotel. Without limiting the foregoing, Franchisee shall not develop or operate a timeshare or vacation ownership resort which is integrated or shares amenities with the Hotel without Franchisor's prior written consent. Except as expressly provided herein, nothing herein shall prohibit Franchisee or an Affiliate of Franchisee from developing, operating or promoting other hotels or lodging facilities so long as Franchisee satisfies the provisions of Sections VI.A., B. and C. and Section XII. of this Agreement.

D.   Food and Beverage Standards. Franchisee shall provide food and beverage service in the Hotel in conformity with the standards and specifications prescribed in the Manual to insure the highest level of quality and service. Franchisee agrees:

1.   To use and operate the restaurant premises and lounges solely for the benefit of the franchised business to keep any restaurant and lounge open and in normal operation for such minimum hours and days as Franchisor may from time to time prescribe; and to refrain from using or allowing others to use the premises for any other purpose or activity at any time without first obtaining the written consent of Franchisor;

2.   To maintain in sufficient supply, and use at all times, only such food and beverage products and ingredients, supplies, paper goods, dinnerware and furnishings as conform to Franchisor's standards and specifications, and to refrain from deviating therefrom without Franchisor's prior written consent;

3.   To sell or offer for sale only those menu items and beverages that comply with Franchisor's standards and specifications and all applicable legal requirements (including, without limitation, all licensing and other requirements for the sale of alcoholic beverages); to sell or offer for sale all required menu and beverage items as prescribed in the Manual or otherwise in writing by Franchisor; to prepare all menu items and beverages offered in accordance with Franchisor's standards and specifications and all applicable legal requirements; and to discontinue selling and offering for sale any items which Franchisor may, in its discretion, disapprove in writing at any time; and

- 7 -

4.    To use only menus, signs, promotional displays and other materials that comply with the style, pattern and design prescribed in the Manual or otherwise approved in writing by Franchisor.

E.    Guest Services.  Franchisee shall honor at the Hotel all credit cards specified in the Manual. Franchisee also agrees to participate in and shall provide all information requested by Franchisor for the purpose of all customer surveys and guest satisfaction audits conducted by Franchisor. Franchisee shall offer all guest services, including complimentary services, that Franchisor may prescribe for Wyndham Hotels including, without limitation, programs and services for senior citizens, children and frequent guests. Additionally, Franchisee shall offer all products and services and shall participate in all programs that Franchisor may determine to be in the best interest of or may reasonably establish for the System, including, without limitation, guest-accessible high speed Internet service, guest recognition programs such as Wyndham ByRequest, in room, pay per view movies (subject to Franchisor's right to direct the type of adult movies which are offered and the time and manner in which such movies are offered) travel agent programs, complaint resolution programs and programs for the provision of complimentary rooms or refunds to guests.

F.    Quality Assurance Program; Inspections.  Franchisor shall administer a quality assurance program for the System which may include conducting periodic inspections of the Hotel and guest satisfaction audits and surveys to ensure compliance with System standards. Franchisee hereby grants to Franchisor and its representatives the right to enter upon the premises of the Hotel at all reasonable times, with or without prior notice, for the purpose of conducting inspections. Franchisee shall pay a fee for each inspection, if any, assessed; provide lodging, if available, without charge to Franchisor's representatives during such time as may reasonably be necessary to complete the inspections; cooperate fully with Franchisor's representatives during the inspections; and take all steps reasonably necessary to correct any deficiencies detected within the time specified by Franchisor.

VII.    FURNISHING AND MAINTAINING THE HOTEL.

A.    Hotel Facilities, Equipment and Furnishings.

1.    Prior to the Effective Date, Franchisee shall develop, construct, convert, equip and furnish the Hotel in accordance with the provisions of this Agreement (including, as applicable, the New Construction Addendum or the Conversion Addendum attached to this Agreement) and the Manuals. Franchisee shall comply in all respects with all policies, procedures and requirements of Franchisor for the development or conversion of the Hotel as a Wyndham Hotel.

2.    Franchisee shall, at Franchisee's expense, purchase or lease and install at the Hotel all facilities, appurtenances, furnishings, fixtures, equipment, furniture, computer terminals, hardware, software, and related equipment (including, without limitation, that required for the property management and reservation systems specified by Franchisor), telephone and other communications systems, entertainment systems, facsimile machines and copiers, signs and other items (collectively, "FF&E") specified by Franchisor for the System in the Manual or otherwise in writing. Franchisee also shall install and maintain, or arrange to have installed and maintained, at the Hotel, all coin-operated vending machines specified by Franchisor for the System.

3.    Franchisee shall refrain from installing or permitting to be installed at the Hotel, without Franchisor's prior written consent, any FF&E, electronic or video games, vending machines or any other items not previously approved by Franchisor.

4.    The size, form, color scheme, content and location of all signs, advertisements and graphic materials displayed in any public area or guest rooms at the Hotel shall be as prescribed in the Manual or otherwise approved in writing by Franchisor.

5.    At Franchisor's request, Franchisee shall install and maintain all modems, devices and equipment as Franchisor may specify in the Manual or otherwise in writing to permit Franchisor to access electronically information pertaining to the operation of the Hotel, including, without limitation, Gross Room Revenues, the source and amounts of all other revenues generated at the Hotel, room occupancy and rates, and

- 8 -

~Wyndham Hotel – Miami Coconut Grove, Florida
DALLDOCS:105590.v1
26/1107-87

reservations data. Franchisor shall have electronic access to such information at such times and in such manner as Franchisor shall from time to time specify.

B.   Sourcing.   All food products, supplies, and FF&E (excluding computer terminals, hardware, software, and related equipment for the property management and reservation systems) used at or in the Hotel may be purchased from any source, provided such products meet the specifications provided for in the Manual. Computer terminals, hardware, software and related equipment for the property management and reservations systems shall be purchased only from sources designated or approved by Franchisor. Notwithstanding the above, Franchisee acknowledges that Franchisor may specify a particular model or brand of FF&E or other items for Wyndham Hotels that may be available from only one manufacturer or supplier. Additionally, Franchisor may at any time, in its discretion, specify that certain food products, FF&E, and supplies be purchased only from designated or approved sources which have demonstrated, to the reasonable satisfaction of Franchisor, the ability to meet Franchisor's standards and specifications for those items. If Franchisor has designated or approved suppliers for any items then prior to purchasing or leasing any such item from a source which has not been previously approved by Franchisor, Franchisee shall submit to Franchisor a written request for such approval, or shall request the source itself to do so. Franchisor may require, as a condition of its approval, (i) that the source present satisfactory evidence of insurance protecting Franchisor and its franchisees against any and all claims arising from the use of such item by System franchisees, and (ii) that samples of the item be delivered by the source, at Franchisor's option and at no cost to Franchisee, to Franchisor or its designee for inspection. A charge not to exceed the cost of such inspection shall be paid to Franchisor by Franchisee or by the source seeking approval, and Franchisor shall not be liable for damage to any sample. Franchisor reserves the right, at its option, to revoke its approval as to future purchases if a source fails to continue to meet Franchisor's standards.

C.   Hotel Maintenance.   Franchisee shall maintain the Hotel, including, without limitation, all interior and exterior signs, parking areas, entrance ways, landscaping, and all other facilities and appurtenances in first-class condition. In connection therewith, Franchisee shall make, at Franchisee's sole cost and expense, all additions, alterations, repairs and replacements of signs and other FF&E as Franchisor may reasonably direct. Franchisee shall not make any material alterations to the Hotel without obtaining the prior written consent of Franchisor.

D.   Upgrades.   Franchisor shall have the right, from time to time, to require by written notice that Franchisee upgrade the Hotel at Franchisee's sole cost and expense to conform to the building decor and trade dress and FF&E required under Franchisor's then-current System standards (which standards shall be applied consistently throughout the System for hotels of similar age within the same division as the Hotel), including, without limitation, such FF&E replacements, remodeling, redecoration and modifications to existing improvements as may be necessary to do so. Upgrades to the Hotel required by Franchisor pursuant to this Section VII.D. shall be reasonable, considering the then-current System standards and requirements and the current structural design of the Hotel. Franchisee shall complete upgrading and remodeling of the Hotel as required by Franchisor pursuant to this Section VII.D. within the time reasonably specified by Franchisor, and Franchisee acknowledges that its failure to do so shall, except for delays which may be caused by the occurrence of events constituting Force Majeure, constitute a material default for which this Agreement may be terminated as provided in Section XVII.C.

E.   Purchasing Services.   Franchisor or one or more of Franchisor's Affiliates may, at Franchisor's option, provide purchasing services to Franchisee in connection with Franchisee's acquisition from third parties of some or all of the FF&E, food products, supplies and other items required in the operation of the Hotel and may offer such purchasing services to Franchisee for a reasonable fee.

VIII.   RESERVATION AND PROPERTY MANAGEMENT SYSTEMS

A.   Participation in Reservation System.   As long as Franchisee is in compliance with all material terms of this Agreement, Franchisor shall make available to Franchisee's Hotel the reservation system provided by Franchisor for all Wyndham Hotels, which system may be modified or changed from time to time by Franchisor. Franchisee acknowledges that offering the public a single, efficient reservation service is essential to the goodwill, reputation and success of the System. During the term of this Agreement, Franchisee shall participate in the reservation system, shall enter into all agreements required by Franchisor in connection therewith, and shall observe all terms and conditions of participation as determined from time to time by Franchisor. Franchisee shall honor and

~Wyndham Hotel – Miami Coconut Grove, Florida
DALLDOCS.195590.v1
267107.27

- 9 -

give first priority on available rooms to all confirmed reservations referred to the Hotel through the reservation system. Franchisee agrees that the only reservation system or service to be used in regard to outgoing reservations referred by and from the Hotel to other hotels shall be the reservation system prescribed by Franchisor. Franchisee shall be solely responsible for notifying the reservation center of any changes in Franchisee's room rates. Franchisee shall not charge any guest a rate higher than the rate specified by the rate specified by the reservation center at the time the guest's reservation was made. Such rate shall be the rate most recently provided to the reservation center by Franchisee prior to the time the reservation was made, according to the records of such center.

B.     Network Installation and Maintenance.  Franchisee, at its expense, shall install and maintain at the Hotel all computer hardware, software and related equipment necessary for participation in the reservation and property management systems required by Franchisor, including any future enhancements, additions, substitutions or other modifications specified by Franchisor. Franchisee shall cause such systems to be configured to Franchisor's specifications and shall pay all applicable installation, configuration, support and maintenance fees as and when due. Franchisee shall also be responsible for telephone line charges for connecting Franchisee's network to the wide area network designated by Franchisor, for the cost of supplies used in the operation of the equipment and for all other related expenses.

C.     Software Licenses.   Franchisee understands and acknowledges that all software and documentation for the property management and the reservation system (if any), and all related documentation provided to Franchisee under this Agreement (the "Software"), is provided under license from Franchisor or its designee and Franchisee agrees to enter into all software license agreements required by Franchisor in connection therewith. The Software shall at all times remain the sole property of Franchisor or such designee. Franchisee shall at all times treat the Software and all upgrades, enhancements and modifications thereto as confidential. Franchisee shall not at any time, without Franchisor's prior written consent, copy, duplicate, modify, reverse engineer, or otherwise duplicate the foregoing materials, in whole or in part, or otherwise make the same available to any unauthorized person.

D.     Suspension from Reservation System.  In the event Franchisee fails to pay royalties, Central Marketing Fund contributions, national sales fees, or reservation system fees when due, or is otherwise in material default under this Agreement, Franchisor may, if such default is not cured within the applicable cure period (if any) pursuant to Section XVII. of this Agreement and after written notice to Franchisee, suspend the Hotel from the reservation system for so long as Franchisee remains in default. Franchisee waives all claims against Franchisor arising from the Hotel's suspension from the reservation system pursuant to this Section VIII.D. Franchisor's right to suspend the Hotel from the reservation system under this Section VIII.D. shall be in addition to any other rights Franchisor may have.

IX.     ADVERTISING AND MARKETING

A.     Advertising Approvals.  All advertising by Franchisee in any medium shall be conducted in a dignified manner and shall conform to such standards and requirements as Franchisor may specify in the Wyndham Graphics Manual, as may be modified by Franchisor from time to time. Franchisee shall submit to Franchisor (by mail, return receipt requested), for its prior approval, samples of all advertising, promotional plans and materials and public relations programs that Franchisee wishes to use which deviate from the standards and requirements set forth in the Graphics Manual and which have not been either provided or previously approved by Franchisor. Any advertising, marketing, or sales concepts programs or materials proposed or developed by Franchisee for the Hotel and approved by Franchisor may be used by other Wyndham Hotels without compensation to Franchisee. Franchisor reserves the right to disapprove upon written notice to Franchisee any advertising materials previously provided to Franchisee by Franchisor or previously approved by Franchisor.

B.     Central Marketing Fund.  Recognizing the value of marketing and advertising to all Wyndham Hotels, Franchisee agrees that Franchisor or its designee shall administer a central marketing fund ("Central Marketing Fund") as follows:

1.     To the extent provided generally by the Franchisor for the benefit of the Hotel and other hotels operating under the name "Wyndham," Franchisor will provide for the Hotel during the term of this

~Wyndham Hotel - Miami Coconut Grove, Florida
DALLDOCA:195590.v1
267197.27

- 10 -

Agreement marketing services consisting of chain-wide and/or division level marketing programs, marketing collateral, research services, advertising, and public relations efforts.

     2.    On or before the fifteenth (15th) day of each calendar month during the term of this Agreement, Franchisee shall pay or reimburse Franchisor for the provision of the marketing services by contributing to the Central Marketing Fund an amount equal to the Marketing Fee, as defined in Section III.C. The Marketing Fee will be collected and applied to pay only the actual costs incurred and allocated by Franchisor in the provision of the marketing services as further described below. The Marketing Fee shall not be used to pay, and Franchisee shall pay separately, the costs of any reservation and National Sales Office services (as provided in Sections III.D. and III.E. of this Agreement), as well as the costs (which may include, without limitation, mileage or other direct operating costs to marketing partners) of any third party marketing partner programs (such as frequent flyer and similar programs) in which the Hotel participates that are direct-billed to participating hotels. Franchisee agrees that the Central Marketing Fund may be used to satisfy any and all costs of maintaining, administering, directing, preparing, and producing advertising and other marketing services (including, without limitation, the cost of preparing and producing television, radio, magazine and newspaper advertising campaigns; website development and maintenance; direct mail and outdoor billboard advertising; public relations activities; employing advertising agencies; and departmental and other costs of Franchisor's personnel for advertising that is internally administered or prepared by Franchisor).

     3.    Franchisor will expend the Marketing Fee at such time and in such manner as it reasonably deems appropriate for the provision of the marketing services. Franchisee acknowledges that the Central Marketing Fund is intended to maximize general public recognition, acceptance and use of the Wyndham Hotel and Wyndham Garden Hotel Systems and that Franchisor and its designees undertake no obligation in administering the Central Marketing Fund to make expenditures which are equivalent or proportionate to Franchisee's contribution, or to ensure that any particular franchisee benefits directly or pro rata from expenditures by the Central Marketing Fund. Prior to the expenditure thereof, the collected Marketing Fees may be held or maintained in one or more accounts, any of which also may include funds other than Marketing Fees, but Franchisor in any event shall provide reasonable reports to Franchisee regarding the Marketing Fee. Franchisor also will permit Franchisee access to Franchisor's records concerning the holding and expenditure of such Marketing Fee at any reasonable time or times during Franchisor's regular business hours.

    C.    National Sales Office Services.  To the extent provided generally by Franchisor for the benefit of the Hotel and other Wyndham Hotels in the same division as the Hotel, Franchisor will provide for the Hotel during the term of this Agreement, National Sales Office services, such as national and regional convention, business and sales promotion services, trade show promotional services, and group booking services. The fee for such National Sales Office services shall be paid by Franchisee as provided in Section III.E. of this Agreement.

    D.  .  Initial Opening Campaign.  In connection with the initial opening of the Hotel for business as a Wyndham Hotel, Franchisee shall conduct an advertising and marketing campaign as prescribed by Franchisor in the Manual or as otherwise agreed upon by Franchisee and Franchisor.

    E.    Wyndham Hotel Directory.  Franchisee agrees to list the Hotel in the Wyndham Hotel Directory and to furnish to Franchisor such information as Franchisor may request for that purpose. Franchisee agrees to honor the information that Franchisee causes to be published in the Directory and to comply with such other requirements with respect to the Directory as may be specified from time to time in the Manual. Franchisee understands and acknowledges that Franchisor assumes no liability for, nor shall it be deemed liable by reason of, any failure by Franchisee or other Wyndham franchisees to honor any Directory listings for the period during which each Directory is in effect.

    F.    Additional Marketing Programs.  Franchisor may establish and coordinate advertising, marketing and sales programs, customer satisfaction programs and other activities among System hotels and other lodging products of Franchisor and its Affiliates on a System-wide or local or regional basis and provide for participation therein by Franchisee. Franchisee shall participate in such programs and activities on the same basis as other participating System hotels (including hotels owned or managed by Franchisor or its Affiliates) in the same division

or region as the Hotel, and such programs and activities will be paid for outside the Central Marketing Fund in accordance with Sections III.F. and G.

G.  **Internet Website.**

1.  Franchisor has established and maintains, or may establish and maintain an Internet Website that provides information about the Wyndham Hotel System and the accommodations and services that Wyndham Hotels provide. Franchisor will have sole discretion and control over the Website (including timing, design, contents and continuation). Franchisor may use part of the Marketing Fees it collects under Section III.C. to pay or reimburse the costs associated with the development, maintenance and update of the Website.

2.  At Franchisee's request, Franchisor may (but is not required to) include at the Website an interior page containing information about Franchisee's Hotel. If Franchisor includes such information on the Website, Franchisor may require Franchisee to prepare all or a portion of the page, at Franchisee's expense, using a template that Franchisor provides. All such information will be subject to Franchisor's approval prior to posting.

3.  Franchisor also may (but is not required to) develop an Intranet network through which Franchisor and its franchisees can communicate by e-mail or similar electronic means. If Franchisor develops such an Intranet network, Franchisee agrees to use the facilities of the Wyndham Hotel Intranet in strict compliance with the standards, protocols and restrictions that Franchisor includes in the Manual (including, without limitation, standards, protocols and restrictions relating to the encryption of confidential information and prohibitions against the transmission of libelous, derogatory or defamatory statements).

X.  **PROPRIETARY MARKS**

A.  **Right to Use.** Franchisor grants Franchisee the right to use the Proprietary Marks during the term of this Agreement in accordance with the System and related standards and specifications.

B.  **Franchisee's Acknowledgments.** Franchisee understands and acknowledges the following:

1.  Due to the substantial and continuous use of the "Wyndham" name in connection with hotel services in many areas of the United States beginning in 1982, Franchisor or its Affiliates have acquired substantial common law rights in and to the "Wyndham" service mark for use in connection with hotel services. In addition, Franchisor or its Affiliates own several state registrations and have filed an application for federal registration of the "Wyndham" mark. Except in the state of New York, Franchisor is not aware of any third party with superior rights to the name "Wyndham" for use in connection with hotel services in the state in which the Hotel is located.

2.  As between Franchisor and Franchisee, Franchisor or its Affiliates are the owners of all right, title and interest in and to the Proprietary Marks and the goodwill associated with and symbolized by them.

3.  Franchisee's use of the Proprietary Marks pursuant to this Agreement shall not give the Franchisee any right, title, or interest in or to any of the Proprietary Marks or any of Franchisor's or its Affiliates' service marks, trademarks, trade names, trade dress, logos, patents, copyrights or proprietary materials, except the non-exclusive license to use the Proprietary Marks in accordance with the terms and conditions of this Agreement for the operation of the Hotel at the Approved Location. Franchisee shall not have any right to, and Franchisee shall not, under any circumstances, use or display the Proprietary Marks except as approved by the Franchisor.

4.  Franchisee understands and agrees that any and all goodwill arising from Franchisee's use of the Proprietary Marks shall inure solely and exclusively to the benefit of Franchisor or its Affiliates and upon expiration or termination of this Agreement and the license herein granted, no monetary amount shall be assigned as attributable to any goodwill associated with Franchisee's use of the Proprietary Marks.

–Wyndham Hotel – Miami Coconut Grove, Florida
DALL:DOCS:193590 v1
267197-87

5.      Franchisee shall not contest the validity of Franchisor's or its Affiliates' interest in the Proprietary Marks or assist others to contest the validity of such interest. Franchisee shall take no action that would prejudice or interfere with the validity of Franchisor's or its Affiliates' rights with respect to the Proprietary Marks.

6.      Franchisee acknowledges that any unauthorized use of the Proprietary Marks by Franchisee, and any other person or persons under its control, shall constitute an infringement of Franchisor's or its Affiliates' rights in the Proprietary Marks and a material event of default hereunder. Franchisee agrees that it shall provide to Franchisor (at no cost to Franchisee unless such action is necessitated by the wrongful acts of Franchisee or any person or persons under its control) all assignments, affidavits, documents, information and assistance Franchisor reasonably requests to fully vest in Franchisor or its Affiliates all right, title and interest in and to the Proprietary Marks, including all such items as are reasonably requested by Franchisor to register, maintain and enforce such rights in the Proprietary Marks.

7.      Franchisor reserves the right to substitute different proprietary marks for use in identifying the System if the current Proprietary Marks no longer can be used, or if Franchisor, in its sole discretion, determines that substitution of different Proprietary Marks will be beneficial to the System. Further, in the event of a sale or any other transfer or assignment of Franchisee's rights under this Agreement, Franchisor also reserves the right to require any purchaser, assignee or transferee to cease using the Proprietary Marks and substitute different names, marks, logos, insignia, slogans, emblems, designs or other identifying commercial symbols in connection with the continued operation of the business. In any such event, Franchisor may require Franchisee, at Franchisee's expense, to discontinue or modify Franchisee's use of any of the Proprietary Marks or to use one or more additional or substitute names, marks, logos, insignia, slogans, emblems, designs or other identifying commercial symbols. In that event, Franchisee shall, at its expense, discontinue or modify Franchisee's use of any of the Proprietary Marks and use such additional or substitute names, marks, logos, insignia, slogans, emblems, designs or other identifying commercial symbols as Franchisor or the purchaser, transferee or assignee may require.  Notwithstanding the foregoing provisions of this Section X.B.7., however, in the event that the proposed schedule for the discontinuation, substitution or modification of the Proprietary Marks referred to herein creates undue economic hardship for Franchisee, Franchisor and Franchisee (and, if applicable, any purchaser, transferee or assignee referred to herein) may by mutual agreement extend for a reasonable period the time for compliance with the requirements hereof.

8.      Franchisee acknowledges that Franchisor is the lawful, rightful and sole owner of the Internet domain name "*www.wyndham.com.*" and "*www.womenbusinesstravelers.com*" and any other Internet domain names registered by Franchisor, and unconditionally disclaims any ownership interest in those or any colorably similar Internet domain name. Franchisee agrees not to register any Internet domain name in any class or category that contains words used in or similar to any brand name owned by Franchisor or its Affiliates or any abbreviation, acronym, phonetic variation or visual variation of those words.

C.      Use of Proprietary Marks.  With respect to Franchisee's licensed use of the Proprietary Marks pursuant to this Agreement, Franchisee further agrees that:

1.      Unless otherwise authorized or required by Franchisor, Franchisee shall operate and advertise the Hotel only under the name "WYNDHAM HOTEL," without prefix or suffix. Franchisee shall not use the Proprietary Marks as part of its corporate or other legal name or in connection with any other business activity or venture.

2.      During the term of this Agreement, Franchisee shall identify itself as the owner of the franchised business in conjunction with any use of the Proprietary Marks including, but not limited to, uses on invoices, order forms, receipts and contracts, as well as the display of a notice in such content and form and at such conspicuous locations on the premises of the Hotel or any motor vehicle as Franchisor may designate in the Manual or otherwise in writing.

3.      Franchisee shall not use the Proprietary Marks to incur any obligation or indebtedness on behalf of Franchisor or its Affiliates.

4.      Franchisee shall comply with Franchisor's instructions in filing and maintaining the requisite trade name or fictitious name registrations, and shall execute any documents deemed necessary by Franchisor or its counsel to obtain protection of the Proprietary Marks or to maintain their continued validity and enforceability.

5.      Franchisee shall not use the Proprietary Marks or any abbreviation or other name associated with Franchisor or the System as part of any e-mail address, domain name, or other identification of Franchisee in any electronic medium. Franchisee agrees not to transmit or cause any other party to transmit advertisements or solicitations by e-mail or other electronic media without first obtaining Franchisor's written consent as to the content of such e-mail advertisements or solicitations as well as Franchisee's plan for transmitting such advertisements. In addition, Franchisee shall be solely responsible for compliance with any laws pertaining to sending e-mails including but not limited to the Controlling the Assault of Non-Solicited Pornography and Marketing Act of 2003 (the "CAN-SPAM Act of 2003").

D.      Infringement. Franchisee shall notify Franchisor immediately of any apparent infringement of or challenge to Franchisee's use of any Proprietary Mark and of any claim by any person of any rights in any Proprietary Mark. Franchisee shall not communicate with any person other than Franchisor or any designated Affiliate of Franchisor, their counsel and Franchisee's counsel in connection with any such apparent infringement, challenge or claim. Franchisor shall have complete and sole discretion to take such action as it deems appropriate in connection with the foregoing, and the right to control exclusively, or to delegate control to any of its Affiliates, of any settlement, litigation, or Patent and Trademark Office or other proceedings arising out of any such alleged infringement, challenge or claim or otherwise relating to any Proprietary Mark. Franchisee agrees to execute any and all instruments and documents, render such assistance, and do such acts or things as may, in the opinion of Franchisor, reasonably be necessary or advisable to protect and maintain the interests of Franchisor or its Affiliates in any litigation or other proceeding or to otherwise protect and maintain the interests of Franchisor or any other interested party in the Proprietary Marks, all at no cost to Franchisee unless such action is necessitated by the wrongful acts of Franchisee or any person or persons under its control.

E.      Retained Rights. The right to use the Proprietary Marks granted hereunder to Franchisee is nonexclusive, and Franchisor may use, and grant licenses to others to use the Proprietary Marks, and may establish, develop, and license other systems which use the Proprietary Marks and the System, without offering or providing Franchisee any rights in, to, or under such other systems. Franchisor or its Affiliates may also engage, directly or indirectly, through their employees, representatives, licensees, assigns, agents and others, in the production, distribution, license and sale of products and services, and may use in connection therewith the Proprietary Marks and any and all trademarks, trade names, service marks, logos, insignia, slogans, emblems, symbols, designs and other identifying characteristics as may be developed or used from time to time by Franchisor.

XI.     MANUAL.

A.      The Manual. Franchisor has provided to Franchisee on loan a current copy of Franchisor's Manual (which may be in multiple volumes). The Manual contains, among other matters, minimum standards and requirements for constructing, equipping, furnishing, staffing and supplying the Hotel and management, training and operational standards, procedures and techniques. The provisions of the Manual shall be consistently applied by Franchisor to all Wyndham Hotels in the same division as the Hotel; provided that, if in the reasonable judgment of Franchisor local conditions or special circumstances (including the market area or the physical peculiarities of a hotel in the System) warrant a deviation from such provisions, then Franchisor may allow such deviation.

B.      Compliance with Manual. To protect the reputation and goodwill of Franchisor and to maintain high standards of operation under the Proprietary Marks, Franchisee shall conduct its business in accordance with the Manual, other written directives which Franchisor may issue from time to time (whether or not such directives are included in the Manual), and any other manuals and materials created or approved for use in the operation of the Hotel. The Manual, any such written directives and any other manuals and materials issued by Franchisor, and any modifications to such materials (collectively hereafter, the "Manual") shall supplement this Agreement.

- 14 -

C.     Confidentiality of Manual.  Franchisee shall at all times treat the Manual and the information contained therein as confidential, and shall maintain such information as confidential.  Franchisee shall not at any time, without Franchisor's prior written consent, copy, duplicate, record or otherwise reproduce the Manual, in whole or in part, or otherwise make the same available to any unauthorized person.

D.     Ownership of Manual.  The Manual shall at all times remain the sole property of Franchisor and shall be returned to Franchisor immediately upon the termination or expiration of this Agreement.

E.     Revisions to Manual.  Franchisor may from time to time revise the contents of the Manual.  Franchisor shall provide to Franchisee a copy of all revisions and additions to the Manual, and Franchisee expressly agrees to comply with each new or changed standard.

F.     Master Copy of Manual.  Franchisee shall at all times ensure that Franchisee's copy of the Manual is kept current and up-to-date, and in the event of any dispute as to the contents of said Manual, the terms of the master copy of the Manual maintained by Franchisor at Franchisor's home office shall be controlling.

G.     Manual Replacement Fee.  Franchisor will charge a replacement fee of Five Hundred Dollars ($500) for any replacement Manual requested by Franchisee.

XII.   CONFIDENTIAL INFORMATION

A.     Use of Confidential Information.  Franchisee shall not, during the term of this Agreement or thereafter, without Franchisor's prior written consent, copy, duplicate, record, or otherwise reproduce, in whole or in part, the Manual, any Software and accompanying documentation developed for or used in the System, or any other confidential information, knowledge, or know-how concerning the System or the operation of the Hotel which may be communicated or provided to Franchisee, or of which Franchisee may be apprised, by virtue of Franchisee's operation under this Agreement, or otherwise make the same available to any unauthorized person.  Franchisee shall divulge such confidential information only to such of Franchisee's employees or agents as must have access to it in order to operate the Hotel.  The contents of the Manual, all Software and accompanying documentation developed for or used in the System, and all other information, knowledge, know-how or other data which Franchisor designates as confidential shall be deemed confidential for purposes of this Agreement.

B.     Customer Information.  In partial consideration for the license to use the Proprietary Marks and the System and for the training Franchisee receives under this Agreement, Franchisee assigns and transfers to Franchisor all rights or interests that Franchisee has or may have in customer lists and information relating to Hotel guests (including information obtained or used in connection with any guest recognition program), as constituted from time to time, with the result that such customer lists and guest information shall be and remain Franchisor's sole property.  Franchisor grants Franchisee the right and license to use the customer lists and guest information during the term of this Agreement for the purposes contemplated herein but for no other purpose.

The covenants in this Section XII. shall survive the expiration, termination or transfer of this Agreement or any interest herein and shall be perpetually binding upon Franchisee.

XIII.  ACCOUNTING AND RECORDS

A.     Maintenance of Books and Records.  Throughout the term of this Agreement, Franchisee shall maintain and preserve, for at least five (5) years from the dates of their preparation, full, complete and accurate books, records and accounts in accordance with generally-accepted accounting principles and in the form and manner prescribed in the Manual.  Franchisee's obligation to preserve such books, records and accounts shall survive the termination hereof.

B.     Monthly Reports.  Franchisee shall, at Franchisee's expense, submit to Franchisor by the fifteenth (15th) day of each month following the Effective Date (including the first partial month if the Effective Date is other than the first day of a month), a statement in the form prescribed by Franchisor, accurately reflecting for the immediately preceding month all Gross Room Revenues, the source and amounts of all other revenues generated at

-Wyndham Hotel   Miami Coconut Grove, Florida
DALLDOCS:193590.v1
367193-87

- 15 -

the Hotel, room occupancy and rates, reservations data, and such other data or information as Franchisor may require.

C.  Financial Statements. Within thirty (30) days following the end of each fiscal quarter during the term of this Agreement, Franchisee shall, at Franchisee's expense, submit to Franchisor a balance sheet and an unaudited quarterly profit and loss statement for the Hotel on the form prescribed by Franchisor. Each statement shall be signed by an authorized officer of Franchisee attesting that it is true and correct. In addition, Franchisee shall, at Franchisee's expense, submit to Franchisor, within ninety (90) days following Franchisee's fiscal year end, a complete annual audited financial statement, prepared in accordance with generally accepted accounting principles by an independent certified public accountant satisfactory to Franchisor, showing the result of the operations of the Hotel during such fiscal year.

D.  Additional Reports. Franchisee shall also submit to Franchisor, for review and audit, such other forms, periodic and other reports, records, information and data as Franchisor may reasonably designate, in the form and at the times and places reasonably required by Franchisor, upon request and as specified from time to time in the Manual or otherwise in writing.

E.  Audits. Franchisor or its designated agent shall have the right at all reasonable times, and upon reasonable notice to Franchisee, to examine and copy, at Franchisor's expense, all books, records, accounts and tax returns of Franchisee related to the operation of the Hotel during the preceding five (5) years. Franchisor also shall have the right, at any time, and upon reasonable notice to Franchisee, to have an independent audit made of the books, accounts and records of Franchisee related to the operation of the Hotel. Franchisee shall provide lodging, if available, without charge to Franchisor's agents during the time that may reasonably be necessary to complete such audits and shall render such other assistance as may reasonably be requested. If an inspection or audit should reveal that payments have been understated in any report to Franchisor, Franchisee shall immediately pay to Franchisor upon demand, the amount understated plus interest from the date such amount was due until paid. The rate of interest shall be one and one-half percent (1½%) per month or the maximum rate permitted by law, whichever is less. If an inspection or audit discloses an understatement in any one year of three percent (3%) or more, Franchisee shall, in addition, reimburse Franchisor for any and all costs and expenses connected with the inspection or audit (including, without limitation, reasonable accounting and attorneys' fees). The foregoing remedies shall be in addition to any other remedies Franchisor may have. If an inspection should reveal that Franchisee has made overpayments to Franchisor, the amount of any such overpayment, without interest, shall be credited against future payments due and payable to Franchisor by Franchisee hereunder.

XIV.  INSURANCE

A.  Coverage Requirements. Franchisee, at its expense, shall at all times during the term of this Agreement procure and maintain such insurance as may be required by the terms of any lease or mortgage on the premises where the Hotel is located, and in any event no less than the following:

1.  Property Insurance

a.  Property insurance (or builder's risk insurance during any period of construction) on the Hotel buildings (including improvements and betterments) and contents against loss or damage by fire, lightning and all other risks covered by the usual all risks and replacement cost policy form, all in an amount not less than one hundred percent (100%) of the replacement cost thereof.

b.  Boiler and machinery insurance against loss or damage from boilers, heating apparatus, pressure vessels and pipes, air conditioning apparatus and electrical equipment written on a standard, broad form boiler and machinery policy (on a blanket or comprehensive basis) and including repair and replacement coverage.

c.  Business interruption insurance covering at least twenty-four (24) months' loss of profits and necessary continuing expenses, including all franchise fees and related expenses, for interruptions caused by any occurrence covered by the insurance referred to in a. and b. immediately above and Franchisee's

- 16 -

royalty and Marketing Fee calculated on the basis of the Gross Room Revenues used as the basis for calculation of the business interruption insurance award. Such business interruption insurance shall be written on an all risks form, either as an endorsement to the policies described in 1.a. and b. above or on a separate policy.

    2.    Workers' compensation insurance in statutory amounts on all employees of the Hotel and employer's liability insurance in amounts not less than one million dollars ($1,000,000) per accident/disease, covering against liability in respect of employees, agents and servants not covered by workers' compensation insurance and against occupational disease benefits.

    3.    Commercial general liability insurance for any claims or losses arising or resulting from the Hotel, with combined single limits of one million dollars ($1,000,000) per each occurrence for bodily injury and property damage. The per location limit shall be not less than two million dollars ($2,000,000). and it shall apply in total to this Hotel only by specific endorsement. Such insurance shall be on an occurrence policy form and shall be limited to contractual liability, liquor legal liability, personal injury liability, and products liability.

    4.    Comprehensive automobile liability insurance including owned, non-owned and hired vehicles for combined single limits of bodily injury and property damage of not less than one million dollars ($1,000,000) each occurrence.

    5.    Innkeeper's legal liability insurance covering the property of guests in an amount not less than ten thousand dollars ($10,000) per guest and two hundred fifty thousand dollars ($250,000) per occurrence.

    6.    Safe depository insurance in an amount not less than two hundred fifty thousand dollars ($250,000) per occurrence.

    7.    Broad form umbrella excess liability which shall cover defense costs on a "first dollar" basis and shall provide coverage on a following form in respect of all underlying coverages, in an amount not less than twenty five million dollars ($25,000,000) (excess of employment liability, general liability and automobile liability required underlying limits) per location covering against excess liability over coverage provided by all primary general liability, automobile liability and employers' liability insurance policies. Franchisor shall have the right to require Franchisee to increase the amount of coverage if, in Franchisor's reasonable judgment, such an increase is appropriate, and any such increase is applied consistently to all like Wyndham hotels.

    8.    Fidelity bond coverage on all Hotel employees in an amount not less than five million dollars ($5,000,000).

    B.    General Requirements. The following general insurance requirements shall be satisfied by Franchisee.

    1.    All insurance under Sections XIV.A.3. through 7. shall by endorsement specifically name Franchisor, Franchisee, their respective Affiliates and their, and their Affiliates', respective shareholders, partners, directors, officers, employees and agents as unrestricted additional insureds. All workers' compensation and employers' liability insurance under Section XIV.A.2. shall include a waiver of subrogation in favor of Franchisor.

    2.    Any deductibles within the insurance policy or policies required hereunder shall not exceed twenty five thousand dollars ($25,000), or such higher amount as may be approved in writing in advance by Franchisor.

    3.    All insurance purchased in compliance herewith shall be placed with insurance companies reasonably acceptable to Franchisor, have a Best rating of AVIII and licensed or registered to do business in the state where the Hotel is located. Non-admitted insurers providing umbrella excess liability coverage are not required to comply with the licensing requirements under Section XIV.A.7.

- 17 -

~Wyndham Hotel – Miami Coconut Grove, Florida
DALLDOCS:195590.v1
267197.87

4.    All insurance required hereunder shall be specifically endorsed to provide that the coverages will be primary and that any insurance carried by any additional insured shall be excess and non-contributory.

5.    All insurance required hereunder shall contain an endorsement whereby the policies shall not be canceled or materially changed without at least thirty (30) days' prior written notice to Franchisee and Franchisor.

6.    All insurance required hereunder may be effected under policies of blanket insurance which cover other properties of Franchisee and its Affiliates so long as such blanket insurance fulfills the requirements herein.

7.    Prior to the date of this Agreement, Franchisee shall deliver to Franchisor a certificate of insurance or certified copy of each insurance policy evidencing the coverages required herein and setting forth deductibles and the amounts thereof, if any. Renewal certificates of insurance or certified copies of such insurance policy if requested by Franchisor shall be delivered to Franchisor not less than ten (10) days prior to their respective inception dates.

8.    Franchisee's obligation to maintain the insurance hereunder shall not relieve Franchisee of liability under the indemnity provisions set forth in Section XXI. of this Agreement, and each of the policies described in Section XIV.A.3. shall contain a contractual coverage endorsement specifically insuring the performance by Franchisee of the indemnity obligations set forth in Section XXI.

9.    All insurance shall be satisfactory to Franchisor in accordance with standards and specifications set forth in the Manual or otherwise in writing.

XV.    TRANSFERABILITY OF INTEREST

A.    Transfer by Franchisor. Franchisor shall have the right to transfer this Agreement to any person or legal entity without prior notice to, or consent of, Franchisee. Specifically, and without limitation of the foregoing, Franchisee agrees that Franchisor may sell its assets, its interest in the Proprietary Marks or the System to a third party; may offer its securities privately or publicly; may merge, acquire other entities or be acquired by another entity directly or indirectly; may undertake a refinancing, recapitalization, leveraged buyout or other economic or financial restructuring; and with regard to any or all of the above sales, assignments and dispositions, Franchisee expressly and specifically waives any claims, demands, or damages against Franchisor arising from or related to the transfer. Nothing contained in this Agreement shall require Franchisor to continue any business operating under the System or to offer any services or products, whether or not bearing the Proprietary Marks, to Franchisee if Franchisor assigns its rights in this Agreement in accordance with the provisions of this Section XV.A.

B.    Transfer by Franchisee - Franchisor's Consent Required. Franchisee understands and acknowledges that the rights and duties set forth in this Agreement are personal to Franchisee, and that Franchisor has granted this franchise in reliance on the business skill, financial capacity, and character of Franchisee and its Principals. Accordingly, except as provided in Section XV.C. (regarding certain permitted transfers) and Section XVI. (regarding transfers of interests in publicly-held franchisees) of this Agreement, neither Franchisee nor any Principal shall sell, transfer, convey, give away, pledge, exchange, lease, mortgage, or otherwise encumber any direct or indirect interest in the Hotel (including a substantial portion of the assets of the Hotel inclusive of buildings and real estate), in this Agreement (including Franchisee's obligations under this Agreement), in Franchisee, or in any person or entity that owns a controlling interest in Franchisee, without the prior written consent of Franchisor. Except as provided in this Section XV. and Section XVI. of this Agreement, any purported assignment or transfer, by operation of law or otherwise, not having the prior written consent of Franchisor shall be null and void and shall constitute a material breach of this Agreement, for which Franchisor may terminate this Agreement pursuant to Section XVII.B.3. of this Agreement and seek injunctive relief as well as monetary damages.

- 18 -

~Wyndham Hotel ~ Miami Coconut Grove, Florida
DALLDOCS:195590.v1
267197-47

C.  Permitted Transfers. Notwithstanding any other provision of this Section XV. or Section XVI.:

1.      Franchisee may transfer its interest in this Agreement to another legal entity, if (a) there is no uncured event of default under this Agreement, (b) following such transfer, Franchisee has and continues to have during the term of this Agreement a controlling interest in the transferee, (c) the transferee entity unconditionally assumes in writing all of Franchisee's past, present and future obligations under this Agreement and delivers a copy of such written assumption agreement to Franchisor, (d) Franchisee provides a guaranty of the transferee's obligations that is substantially the same as the form of Guaranty attached as Attachment B, and (e) Franchisee provides prior written notice to Franchisor.  No such transfer shall relieve or excuse the liability of Franchisee or any person or entity who guaranteed or is otherwise liable for Franchisee's performance hereunder for the past and continuing performance of this Agreement, and such liability shall extend to any subsequent amendments, renewals and modifications of this Agreement (and any extensions, adjustments or compromises of claims) which are effective between Franchisor and the then-current franchisee notwithstanding the absence of any notice to or approval by those parties who remain liable, all of whom waive all notices and agree that Franchisor may proceed directly against them without proceeding against any other person or entity who may be liable therefor.  At Franchisee's request, such persons further agree to execute or reexecute a guaranty substantially similar to the form of Guaranty attached to this Agreement.

2.      Any individual holding an interest in Franchisee may transfer all or a portion of his or her interest in Franchisee to any immediate family member, to a trust established for the benefit of any such immediate family member, or to an entity in which such individual has and maintains a controlling interest if (a) there is no uncured event of default under this Agreement, (b) the transferor provides prior written notice to Franchisor, and (c) any transferor who transfers a controlling interest executes a guaranty substantially similar to the form of Guaranty attached as Attachment B and continues to maintain the unrestricted power to direct, directly or indirectly, the management and policies of the Franchisee, including those relating to the payment of financial obligations, as reasonably determined by Franchisor.

3.      Franchisee may assign, transfer, pledge, or hypothecate all or any part of the assets of the Hotel excluding this Franchise and this Agreement (and, if Franchisee is a corporation, partnership, limited liability company or other form of entity, all and any part of the ownership interests in Franchisee) to banks or other lending institutions for purposes of any refinancing or as collateral securing a loan made directly to or for the benefit of the Hotel.

D.  Conditions to Franchisor's Consent. Franchisor shall not unreasonably withhold its consent to a transfer of any interest in the Hotel (including a substantial portion of the assets of the Hotel inclusive of buildings and real estate), in this Agreement (including Franchisee's obligations under this Agreement), in Franchisee, or in any person or entity that owns a controlling interest in Franchisee; provided, however, Franchisor may, in its sole discretion, require any or all of the following as a condition of its consent:

1.      Transferor shall deliver to Franchisor a complete and accurate copy of any purchase and sale agreement or similar document covering the transaction, together with all such other documentation relating to the transaction as Franchisor may reasonably request. Without limitation of the foregoing, if this Agreement is proposed to be the subject of a security interest, the mortgagee shall provide Franchisor with a non-disturbance agreement as to the Hotel and the franchised business at the Hotel in form and substance reasonably acceptable to Franchisor;

2.      Transferor shall satisfy all of Franchisee's accrued monetary obligations to Franchisor and its Affiliates, shall execute a general release under seal in a form prescribed by Franchisor of any and all claims against Franchisor and its Affiliates, and their respective officers, directors, agents and employees, and shall pay to Franchisor a transfer fee in an amount equal to fifty percent (50%) of Franchisor's then-current initial franchise fee;

3.      The proposed transferee shall submit to Franchisor an application, in the form prescribed by Franchisor, for a new franchise agreement to replace this Agreement for its unexpired term.  Franchisor reserves the right to reject an application for a transfer for reasons that may include, without limitation, the following: (i) if Franchisor deems the transferee's proposed debt service to be too great to permit the transferee to successfully

- 19 -

operate the Hotel under the System, or (ii) if the proposed transferee or any of its affiliated entities (other than those holding interests as limited partners only) is the franchisor or owner, or is affiliated with the franchisor or owner, of a hotel trade name which is competitive with Franchisor or its Affiliates, regardless of the number of hotels operating under such trade name;

      4.     Transferee shall demonstrate to Franchisor's satisfaction that the transferee and its shareholders, members or partners, as appropriate, meet Franchisor's then-current managerial and business standards and have the aptitude and ability to conduct the franchised business (as may be evidenced by prior related business experience or otherwise); possess good moral character, business reputation and credit rating; and have adequate financial resources and capital to operate the franchised business, and any management company to be engaged by transferee shall meet Franchisor's then-current standards;

      5.     Franchisor and the transferee will, upon approval of transferee's application, enter into a new franchise agreement which shall require transferee to upgrade the Hotel to conform to Franchisor's then-current standards, and which new franchise agreement shall contain the standard terms (except for duration) then being issued for new franchised Hotels under the System. The date of the transferee's new franchise agreement shall be the Effective Date of this Agreement, and the transferee will be required to certify in writing that: (i) Franchisor did not endorse, recommend, or otherwise concur with the terms of the transfer, (ii) Franchisor did not comment upon any financial projections submitted by Franchisee to transferee, and (iii) Franchisor did not participate in the decision of the price to be paid, which decision was made without any intervention, support or participation by Franchisor;

      6.     Transferee's general manager shall, prior to assuming management of the Hotel, successfully (as defined by Franchisor) complete the management training program then being offered by Franchisor; and

      7.     Franchisee acknowledges that Franchisor has legitimate reasons to evaluate the qualifications of potential transferees and the proposed terms of their purchase. Franchisee also acknowledges that Franchisor's contact with potential transferees for the purpose of protecting its business interests will not constitute improper or unlawful conduct. Franchisee expressly authorizes Franchisor to investigate any potential transferee's qualifications, to evaluate the proposed purchase terms, and to withhold consent to those transactions which Franchisor, in its sole judgment, determines are not consistent with its business interests, including, without limitation, economically questionable transactions. Franchisee waives any claim that any action Franchisor takes to protect its business interests in relation to a proposed transfer constitutes tortious interference with contractual or business relationships.

    E.     Death or Permanent Disability. In the event of the death or permanent disability of Franchisee or any Controlling Principal, the interest of such person may be transferred in accordance with and subject to the terms of Section XV.D., provided that (i) any such transfer shall be made within six (6) months of the date of death or permanent disability and (ii) the obligations of Franchisee under this Agreement are satisfied pending the transfer, including adequate provision for management of the Hotel.

    F.     Right of First Refusal.

      1.     If Franchisee wishes to transfer all or part of its interest in the assets of the Hotel or this Agreement or if Franchisee or a Controlling Principal of Franchisee wishes to transfer any ownership interest in Franchisee, pursuant to any bona fide offer received from a third party to purchase such interest, then such proposed seller shall promptly notify Franchisor in writing of each such offer, and shall provide such information and documentation relating to the offer as Franchisor may require. Franchisor shall have the right and option, exercisable within thirty (30) days after receipt of such written notification and copies of all documentation requested by Franchisor describing the terms of such offer, to send written notice to seller that Franchisor intends to purchase the seller's interest on the same terms and conditions offered by the third party. In the event that Franchisor elects to purchase the seller's interest, closing on such purchase must occur within the later of sixty (60) days from the date of notice to the seller of Franchisor's election to purchase, sixty (60) days after the date Franchisor receives and obtains all necessary permits and approvals, or such other date as the parties agree upon in

- 20 -

writing. Any material change in the terms of any offer prior to closing shall constitute a new offer subject to the same right of first refusal by Franchisor as in the case of an initial offer. Failure of Franchisor to exercise the option afforded by this Section XV.F. shall not constitute a waiver of any other provision of this Agreement, including all of the requirements of Section XV., with respect to a proposed transfer.

        2.     In the event an offer from a third party provides for payment of consideration other than cash or involves certain intangible benefits, Franchisee may elect to purchase the interest proposed to be sold for the reasonable cash equivalent. If the parties cannot agree within a reasonable time on the reasonable cash equivalent of the non-cash part of the offer, then such amount shall be determined by two (2) appraisers, with each party selecting one (1) appraiser, and the average of their determinations shall be binding. In the event of such appraisal, each party shall bear its own legal and other costs and shall bear the appraisal fees equally. In the event that Franchisor exercises its right of first refusal herein provided, it shall have the right to set off against any payment due the seller (i) all fees for any such independent appraiser due from the seller hereunder, and (ii) all amounts due from Franchisee or any of its Affiliates.

        3.     Failure to comply with the provisions of this Section prior to the transfer of any interest in Franchisee, the Hotel or this Agreement shall constitute a material event of default under this Agreement.

XVI.    SECURITIES OFFERINGS

    A.    Consent Requirement. Any transfer of securities in a publicly-held Franchisee or in any publicly-held entity that owns a controlling interest in Franchisee which will result in a transfer of control requires Franchisor's prior written consent, which shall be conditioned upon satisfaction of the requirements of Section XV.D. and additionally upon satisfaction of the requirements of Section XVI.B. below.

    B.    Review of Offering Materials. In connection with any public or private offering of securities relating to Franchisee or the Hotel, whether or not involving a transfer of control, Franchisee shall:

        1.     Submit to Franchisor at least forty-five (45) days before the date on which the prospectus or any other offering material (collectively, the "Prospectus") is first issued, a copy of the Prospectus for review. Franchisee shall reimburse Franchisor for its expense (including professional fees and costs) in reviewing the proposed offering;

        2.     Fully and unconditionally indemnify and hold harmless Franchisor and the Wyndham Companies in connection with the offering;

        3.     State clearly in the Prospectus and supporting materials and releases that Franchisor and the Wyndham Companies are not, in any way, participating in or endorsing the offering;

        4.     Use the Proprietary Marks in the Prospectus and in any related or supporting materials only as directed by Franchisor; and

        5.     Refrain from filing, publishing, issuing or releasing the Prospectus or any supporting or related materials without having received the prior written approval of Franchisor.

    C.    Scope of Review. Franchisor's review of any Prospectus shall be limited solely to the subject of the relationship between Franchisee and Franchisor and use of the Proprietary Marks, and its approval shall not constitute an endorsement or ratification of the offering, either express or implied. Franchisee agrees to make such changes to the Prospectus and related materials as Franchisor may reasonably request in accordance with the guidelines for its review established by this Section.

XVII.   DEFAULT AND TERMINATION

    A.    Termination - No Notice or Cure. Franchisee shall be deemed to be in default under this Agreement and all rights granted hereunder shall automatically terminate without notice from Franchisor, if

- 21 -

Franchisee shall become insolvent or make a general assignment for the benefit of creditors, or if a petition in bankruptcy is filed by Franchisee or such a petition is filed against and consented to by Franchisee, or if Franchisee is adjudicated bankrupt, or if a bill in equity or other proceeding for the appointment of a receiver of Franchisee or other custodian for Franchisee's business or assets is filed and consented to by Franchisee, or if a receiver or other custodian (permanent or temporary) of Franchisee's assets or property, or any part thereof, is appointed by any court of competent jurisdiction, or if proceedings for a compromise with creditors under any state or federal law is instituted by, against or consented to by Franchisee, or if a final judgment remains unsatisfied or of record for ninety (90) days or longer (unless supersedeas bond is filed), or if execution is levied against the Hotel or other real or personal property at the Hotel, or suit to foreclose any lien or mortgage against the Hotel or other real or personal property appurtenant thereto is initiated against Franchisee or if the real or personal property of the Hotel shall be sold after levied upon by any sheriff, marshal, or constable.

B.      Termination - Notice Only.  Franchisee shall be deemed to be in material default and Franchisor may, at its option, terminate this Agreement and all rights granted hereunder, without affording Franchisee any opportunity to cure the default, effective immediately upon Franchisee's receipt (or first refusal of delivery) of notice, upon the occurrence of any of the following:

1.      If Franchisee ceases to do business at the Hotel, or ceases to operate the Hotel under the Proprietary Marks and System, or loses ownership or possession or the right to possession of the Hotel, or otherwise forfeits the right to conduct the franchised business at the Approved Location, except as otherwise provided in Section XIX.;

2.      If a threat or danger to public health or safety results from the construction, maintenance or operation of the Hotel, and an immediate shutdown of the Hotel is reasonably determined by Franchisor to be essential to avoid substantial liability or loss of goodwill; provided, however, Franchisor shall reinstate this Agreement if, within six (6) months after termination under this Section XVII.B.2., the threat or danger to public health or safety is eliminated and Franchisor reasonably determines that reopening the Hotel would not cause a substantial loss of goodwill;

3.      If Franchisee or any Principal, officer, director or employee of Franchisee is convicted of a felony or any other crime or offense that is reasonably likely, in the reasonable opinion of Franchisor, to adversely affect the System, the Proprietary Marks, the goodwill associated therewith, or Franchisor's interest therein;

4.      If Franchisee intentionally discloses or divulges the contents of the Manual, the Software (including accompanying documentation) or other trade secret or confidential information provided Franchisee by Franchisor contrary to Sections XI. and XII. hereof or fails to exercise reasonable care to prevent such disclosure;

5.      If Franchisee or any Principal or Controlling Principal purports to transfer any rights or obligations under this Agreement or any interest in Franchisee or the franchised business to any third party contrary to the terms of Sections XV. or XVI. of this Agreement;

6.      If in an audit conducted pursuant to the provisions of this Agreement Franchisee is determined to have (i) underreported Gross Room Revenues by five percent (5%) or more for any month during the term hereof, or (ii) underreported Gross Room Revenues by more than two percent (2%) twice in any thirty-six (36) month period;

7.      If Franchisee shall default in the payment of any amounts due Franchisor or any of the Wyndham Companies and shall fail to pay the amount due within ten (10) days after receiving notice of the default; or

8.      If Franchisee fails to comply with Franchisor's quality assurance program and fails to cure any default under that program within the applicable cure period.

C.      Termination - Notice and Cure.  Except as provided in Sections XVII.A. and XVII.B. of this Agreement and except for any monetary default, Franchisee shall have thirty (30) days or such longer period as

- 22 -

specified herein after its receipt from Franchisor (or first refusal of delivery) of a written notice of default, within which to remedy any default and provide evidence thereof to Franchisor. Franchisee shall have ten (10) days after receipt of a written notice of default within which to cure any monetary default. If a default is not cured within the time set forth above, or such longer period as applicable law may require or as Franchisor may deem necessary to permit Franchisee to cure any non-monetary default (provided Franchisee immediately commences, diligently and in good faith pursues, and cures, such default), Franchisor shall have the right to terminate this Agreement upon notice to Franchisee. Franchisee shall be in default under this Agreement for any failure to comply with any of the requirements imposed by this Agreement, as it may from time to time be supplemented by the Manual, including, without limitation, if Franchisee fails to comply with the Conversion Addendum or New Construction Addendum pursuant to the requirements set forth herein or to carry out the terms of this Agreement in good faith.

## XVIII.  OBLIGATIONS UPON TERMINATION

Upon termination or expiration of this Agreement, all rights granted hereunder to Franchisee shall forthwith terminate, and Franchisee shall comply with all of the obligations applicable to the Approved Location as set forth in this Section XVIII.

A.     Cease Operation as Wyndham Hotel.  Franchisee shall immediately cease operation of the Hotel as a Wyndham Hotel and shall not thereafter, directly or indirectly, represent to the public or hold itself out as a present or former franchisee of Franchisor.

B.     Discontinue Use of Proprietary Marks.  Franchisee shall immediately and permanently cease to use, by advertising or in any other manner whatsoever, the name "Wyndham," all variations thereof and all other Proprietary Marks, any other identifying characteristics and marks of the System, and all confidential methods, procedures and techniques associated with the System. Franchisee shall forthwith remove from its place of business, and discontinue using for any purpose, any and all signs, fixtures, furniture, furnishings, equipment, advertising materials, stationery, supplies, forms or other articles which display the Proprietary Marks or any distinctive features or designs associated with the System. Any signs containing the Proprietary Marks which Franchisee is unable to remove within one day of expiration or termination of this Agreement shall be completely covered by Franchisee until the time of their removal.

C.     Deidentify.  Franchisee shall, at its expense, promptly remove all distinctive signs, emblems, amenities and other items bearing the Proprietary Marks, change directory and other listings to remove all reference to such Proprietary Marks and to any telephone or other number used generally by other Wyndham Hotels for reservation or other purposes and make such specific additional changes as Franchisor may reasonably request to prevent any possibility that the public may confuse the Hotel with a Wyndham Hotel. Until all modifications and alterations required by this Section XVIII.C. are completed, Franchisee shall take all such actions as may reasonably be required by Franchisor to advise all customers and prospective customers that the Hotel is no longer associated with the Wyndham System. Franchisee expressly acknowledges that its failure to make such alterations will cause irreparable injury to Franchisor.

D.     Cancel Assumed Name Certificate.  Franchisee shall take such action as may be necessary to cancel any assumed name or equivalent registration which contains the name "Wyndham" or any variation thereof or any other Proprietary Mark, and Franchisee shall furnish Franchisor with evidence satisfactory to Franchisor of compliance with this obligation within thirty (30) days after termination or expiration of this Agreement.

E.     Pay Liquidated Damages.  If this Agreement is terminated for any reason, Franchisee shall pay to Franchisor, as liquidated damages for the premature termination of this Agreement only and not as a penalty or as damages for breaching this Agreement or in lieu of any other payment, a lump sum equal to the total amounts required under Sections III.B. and III.C. during the thirty-six (36) full calendar months of operation preceding the termination; or if the Hotel has not been in operation as a Wyndham Hotel for thirty-six (36) full calendar months, the greater of: (i) thirty-six (36) times the monthly average of such amounts, or (ii) thirty-six (36) times such amounts as are due for the one full calendar month preceding such termination. Notwithstanding the foregoing sentence, if the number of months remaining between the date of Franchisor's written notice of default (or, in the event of termination pursuant to Section XVII.A., the occurrence of the termination event) and the date on which the

–Wyndham Hotel – Miami Coconut Grove, Florida
DALI:JXX:S:195590.v1
2671V7-87

term of this Agreement would otherwise have ended pursuant to Section II. hereof is less than thirty-six (36) months, then the time period for calculating the amount of liquidated damages shall be the number of months remaining in such term. The parties acknowledge that a precise calculation of the full extent of the damages which Franchisor will incur in the event of termination of this Agreement as a result of Franchisee's default is difficult in the extreme, and agree that the lump sum payment provided under this Section XVIII.E. is reasonable in light of the damages for premature termination which Franchisor will incur in such event. Such payment of liquidated damages shall be in addition to amounts provided immediately below in Section XVIII.F. The payment of liquidated damages hereunder shall not affect Franchisor's rights to obtain appropriate equitable relief and remedies, such as injunctive relief to enforce Section X. hereof and specific performance to enforce Section XVIII. hereof, nor shall it affect Franchisor's right to pursue any other remedies, including expectancy damages. In the event that this Agreement is terminated prior to the Effective Date, then this Section XVIII.E. shall not apply but the initial franchise fee paid by Franchisee hereunder shall be retained by Franchisor.

F.     Pay Outstanding Amounts. Franchisee shall promptly pay all sums owing to Franchisor and its Affiliates, and all suppliers. In the event of termination for any default of Franchisee, such sums shall include any payment to Franchisor required under Section XVIII.E. and all damages, costs and expenses, including reasonable attorneys' fees, incurred by Franchisor in obtaining (i) injunctive or other relief for the enforcement of any provisions of this Agreement, or (ii) contested termination of this Agreement.

G.     Return of Manual and Other Materials. Franchisee shall immediately deliver to Franchisor the Manual, instructions, Software and accompanying documentation, and all other materials provided by Franchisor related to the operation of the Hotel, and all copies thereof (all of which are acknowledged to be the Franchisor's property), and shall retain no copy or record of any of the foregoing, excepting only Franchisee's copy of this Agreement and any correspondence between the parties, and any other documents which Franchisee reasonably needs for compliance with any provision of law.

H.     Purchase of Certain Materials. Franchisor shall have the right but not the duty, to be exercised by notice of intent to do so within thirty (30) days after termination or expiration, to purchase any and all signs, advertising materials, supplies and inventory and any other item bearing Franchisor's Proprietary Marks, at Franchisor's cost. With respect to any purchase by Franchisor as provided herein, Franchisor shall have the right to set off all amounts due from Franchisee under this Agreement.

I.     Survival. The obligations of Franchisee set forth in Article XVIII. shall survive the expiration or termination of this Agreement.

XIX.   CONDEMNATION AND CASUALTY

A.     Condemnation. Franchisee shall, at the earliest possible time, give Franchisor notice of any proposed taking by eminent domain. If the Hotel is condemned, or such a substantial portion of the Hotel is condemned as to render impractical the continued operation of the Hotel in accordance with System standards, Franchisor may, in its sole discretion permit the transfer of the franchise to another location submitted by Franchisee within one hundred eighty (180) days of the taking. The new hotel must be converted or constructed and furnished in accordance with the then-current System standards and opened for business under the System within two (2) years of the closing of the condemned Hotel. Franchisee shall give Franchisor ninety (90) days advance notice of the date of such opening. In the event that Franchisee does not submit a proposed location for a new Hotel, this Agreement shall terminate upon notice by Franchisor to Franchisee, and Franchisor shall share in the condemnation award to the extent such award includes an allocation for its lost royalty income. If a non-substantial condemnation shall occur, then Franchisee shall promptly make whatever repairs and restoration may be necessary to make the Hotel conform substantially to its former condition, character and appearance, according to plans and specifications approved by Franchisor. The resumption of normal operation of the Hotel shall not be unreasonably delayed.

B.     Casualty. If the Hotel is damaged or destroyed by fire or other cause, which damage or destruction necessitates the closing of the Hotel for a period in excess of thirty (30) days and Franchisee elects not to repair or rebuild the Hotel, Franchisee shall have the right to terminate this Agreement upon written notice to Franchisor given within sixty (60) days of the closing of the Hotel; provided that Franchisee shall be obligated to

- 24 -

promptly pay to Franchisor an amount equal to the liquidated damages set forth at Section XVIII.E. of this Agreement, except that the time for calculating the amount of liquidated damages shall be the lesser of (a) thirty-six (36) months or (b) the number of months then remaining between the (i) date of Franchisee's written notice of termination and (ii) the date on which the term of this Agreement would otherwise have ended pursuant to Section II. hereof if such notice of termination had not been given. Franchisee's obligation set forth herein shall survive expiration or termination of this Agreement pursuant to this Section XIX.B.

XX.   TAXES, PERMITS AND INDEBTEDNESS

A.   Payment of Taxes and Indebtedness. Franchisee shall promptly pay when due all taxes levied or assessed by any federal, state or local tax authority, and any and all other indebtedness incurred by Franchisee in the conduct of the franchised business. Franchisee shall pay to Franchisor an amount equal to any sales tax, gross receipts tax or similar tax imposed on Franchisor with respect to any payments to Franchisor required under this Agreement, unless the tax is credited against income tax otherwise payable by Franchisor. Franchisee shall have no obligation hereunder for any tax which is based upon the net income of Franchisor.

B.   Contested Amounts. In the event of any bona fide dispute as to liability for taxes assessed or other indebtedness, Franchisee may contest the validity of the amount of the tax or indebtedness in accordance with the procedures of the taxing authority or applicable law; however, in no event shall Franchisee permit a tax sale or seizure by levy of execution or similar writ or warrant, or attachment by creditor, to occur against the premises of the Hotel or any improvement thereon.

C.   Compliance with Laws. Franchisee shall comply with all federal, state, and local laws, rules and regulations, and shall timely obtain any and all permits, certificates or licenses necessary for the operation of the Hotel and for the full and proper conduct of the franchised business including, without limitation, licenses to do business, fictitious name registrations, sales tax permits, health and sanitation permits and ratings and fire clearances. Franchisee shall obtain and maintain in full force and effect from and after the opening of the Hotel all licenses required for the sale of alcoholic beverages.

D.   Notice of Judicial and Regulatory Matters. Franchisee shall notify Franchisor in writing within five (5) days of the commencement of any action, suit or proceeding, and of the issuance of any order, writ, injunction, award or decree of any court, agency or other governmental instrumentality, which may adversely affect the operation or financial condition of the franchised business. Copies of all inspection reports, warnings, certificates and ratings issued by any governmental entity during the term of this Agreement in connection with the Hotel which indicate a failure to meet or maintain governmental standards or less than full compliance with any applicable law, rule or regulation, shall be forwarded to Franchisor by Franchisee within five (5) days of Franchisee's receipt thereof.

E.   Notice of Defaults. Franchisee shall promptly deliver to Franchisor a copy of any notice of default received from any mortgagee, trustee under any deed of trust, or ground lessor with respect to the Hotel and, upon the request of Franchisor, shall provide such additional information as may be requested in respect of any such alleged default or any subsequent action or proceeding in connection therewith.

F.   Timely Payments. Franchisee recognizes that Franchisee's failure to make or repeated delay in making prompt payment of all amounts owed in connection with the operation of the Hotel (including, without limitation, all taxes levied or assessed and all accounts and other indebtedness) in accordance with the terms of any agreements, leases, invoices or statements for purchase or lease of furniture, fixtures, equipment, inventories, supplies, ingredients, travel agent services, or other goods or services will be detrimental to the reputation and credit standing of Franchisee, Franchisor and other System franchisees. Franchisee shall pay when due all amounts owed by Franchisee in connection with operating the Hotel.

XXI.   INDEPENDENT CONTRACTOR AND INDEMNIFICATION

A.   Independent Contractor. Franchisee acknowledges that Franchisor and Franchisee are not and will not be considered as joint venturers, partners or agents of each other. Franchisee specifically acknowledges that the

- 25 -

relationship created by this Agreement is not a fiduciary, special or any other similar relationship, but rather is an arm's-length business relationship. Franchisor owes Franchisee no duties except as expressly provided in this Agreement.

1.      During the term of this Agreement (including any extensions or renewals), Franchisee shall hold itself out to the public as an independent contractor operating the business pursuant to a franchise from Franchisor and as an authorized user of the Proprietary Marks. Franchisee shall take such affirmative action as may be necessary to do so, including, without limitation, exhibiting notices of that fact at the Hotel as required under Section X, hereof.

2.      Nothing in this Agreement authorizes either party to make any contract, agreement, warranty or representation on the other's behalf, or to incur any debt or other obligation in the other's name. Neither party shall assume liability for, or be deemed liable hereunder, as a result of any such action, or by reason of any act or omission of the other party or any claim or judgment arising therefrom.

3.      Franchisor does not exercise any discretion or control over the employment policies or employment decisions of Franchisee. All employees of Franchisee are solely employees of Franchisee, not Franchisor. Franchisee is not Franchisor's agent for any purpose in regard to Franchisee's employees or otherwise.

B.      Indemnity. Throughout the term of this Agreement, Franchisee shall indemnify, defend and save harmless Franchisor, its Affiliates, their respective officers, directors, agents, representatives, employees, successors and assigns (collectively, the "Wyndham Indemnified Parties"), from and against all payments of money (including, without limitation, all losses, costs, liabilities, damages, claims, fines, settlement amounts, legal fees, costs and expenses) of every kind and description arising out of or resulting from Franchisee's breach of any representation or warranty in this Agreement or the construction, conversion, operation or use of the Hotel or Hotel premises or of any other business conducted on or in connection with the Hotel by the Franchisee, or because of any act or omission of the Franchisee or anyone associated with, employed by, or affiliated with Franchisee (even where the strict liability or negligence, whether sole, joint or concurrent, active or passive, of the Wyndham Indemnified Parties is actual or alleged). Franchisee shall promptly give written notice to Franchisor of any action, suit, proceeding, claim, demand, inquiry, or investigation related to the foregoing. Franchisor shall in any event have the right, through counsel of its choice at Franchisee's expense, to control the defense or response to any such action if it could affect the Wyndham Indemnified Parties financially, and such undertaking by Franchisor shall not, in any manner or form, diminish Franchisee's obligations to Franchisor hereunder. Franchisee shall also reimburse Franchisor for all expenses (including legal fees and court costs) reasonably incurred by Franchisor to protect itself and any of the Wyndham Indemnified Parties from, or to remedy, Franchisee's defaults under this Agreement, provided, that under no circumstances shall Franchisor be required or obligated to seek recovery from third parties or otherwise mitigate its losses in order to maintain a claim under this indemnity and against Franchisee, and the failure of Franchisor to pursue such recovery or mitigate such loss will no way reduce the amounts recoverable by Franchisor from Franchisee. This indemnification shall survive the expiration, termination, or transfer of this Agreement or any interest herein.

XXII.    APPROVALS AND WAIVERS

A.      Written Consent Required. Approvals and consents by either party will not be effective unless evidenced by a writing signed by such party. Either party's consent, wherever required, may be withheld if any default by the other party exists under this Agreement.

B.      Standards for Consents. Unless expressly stated otherwise in this Agreement, whenever the consent or approval of Franchisor is required, and whenever Franchisee is required to operate or act in accordance with standards, specifications or requirements of Franchisor, such consents and approvals shall be given or withheld, and such standards, specifications and requirements shall be promulgated and administered by Franchisor reasonably and in a manner consistent with the requirements Franchisor imposes on the management of all Wyndham Hotels in the same division as the Hotel.

- 26 -

--Wyndham Hotel – Miami Coconut Grove, Florida
DALLDOCS:195590.v)
267197-87

C.    Effects of Consents.  Except as otherwise provided in any written agreement executed by Franchisor and Franchisee, Franchisor makes no warranties or guarantees upon which Franchisee may rely. Franchisor assumes no liability or obligation to Franchisee by providing any waiver, approval, consent or suggestion to Franchisee in connection with this Agreement or by reason of any delay or denial of any request therefor.

D.    No Waiver.  No failure of a party to exercise any power reserved to it by this Agreement, or to insist upon strict compliance by the other party with any obligation or condition hereunder, and no custom or practice of the parties at variance with the terms hereof, shall constitute a waiver of such party's right thereafter to demand exact compliance with any of the terms herein. Waiver by a party of any particular default by the other party shall not affect or impair such party's rights with respect to any subsequent default of the same, similar, or different nature; nor shall any delay, forbearance, or omission of a party to exercise any power or right arising out of any breach or default by the other party of any of the terms, provisions, or covenants hereof, affect or impair such party's right to exercise the same.

## XXIII.  REPRESENTATIONS OF FRANCHISEE

A.    Information Submitted by Franchisee.  Franchisor has entered into this Agreement in reliance upon the statements and information submitted to Franchisor by Franchisee in connection with this Agreement. Franchisee represents and warrants that all such statements and information submitted by Franchisee in connection with this Agreement are true, correct and complete in all material respects. Franchisee agrees to promptly advise Franchisor of any material changes in the information or statements submitted.

B.    Anti-Terrorist Activities.  Franchisee certifies that neither Franchisee nor its owners, employees or anyone associated with Franchisee is listed in the Annex to Executive Order 13224. (The Annex is available at http://www.treasury.gov/offices/enforcement/ofac/sanctions/terrorism.html.)  Franchisee agrees not to hire or have any dealings with a person listed in the Annex. Franchisee certifies that it has no knowledge or information that, if generally known, would result in Franchisee, its owners, employees, or anyone associated with Franchisee being listed in the Annex to Executive Order 13224. Franchisee agrees to comply with and/or assist Franchisor to the fullest extent possible in Franchisor's efforts to comply with the Anti-Terrorism Laws (as defined below).  In connection with such compliance, Franchisee certifies, represents, and warrants that none of its property or interests are subject to being "blocked" under any of the Anti-Terrorism Laws and that Franchisee and its owners are not otherwise in violation of any of the Anti-Terrorism Laws.  Franchisee is solely responsible for ascertaining what actions must be taken by Franchisee to comply with all such Anti-Terrorism Laws, and Franchisee specifically acknowledges and agrees that Franchisee's indemnification responsibilities as provided in Section XXI.B of this Agreement pertain to Franchisee's obligations under this Section XXIII.B.  Any misrepresentation by Franchisee under this Section or any violation of the Anti-Terrorism Laws by Franchisee, its owners, or employees shall constitute grounds for immediate termination of this Agreement and any other agreement Franchisee has entered into with Franchisor or use of Franchisor's affiliates.  As used herein, "Anti-Terrorism Laws" means Executive Order 13224 issued by the President of the United States, the Terrorism Sanctions Regulations (Title 31, Part 595 of the U.S. Code of Federal Regulations), the Foreign Terrorist Organizations Sanctions Regulations (Title 31, Part 597 of the U.S. Code of Federal Regulations), the Cuban Assets Control Regulations (Title 31, Part 515 of the U.S. Code of Federal Regulations), the USA PATRIOT Act, and all other present and future federal, state and local laws, ordinances, regulations, policies, lists and any other requirements of any Governmental Authority (including, without limitation, the United States Department of Treasure Office of Foreign Assets Control) addressing or in any way relating to terrorist acts and acts of war.

## XXIV.  NOTICES

Any and all notices required or permitted under this Agreement shall be in writing and shall be delivered personally or mailed by a nationally recognized overnight commercial delivery service (such as Airborne Express or Federal Express) or by certified mail, return receipt requested, to the respective parties at the following addresses unless and until a different address has been designated by written notice to the other party:

Notices to Franchisor:

> WHC Franchise Corporation
> 1950 Stemmons Freeway
> Suite 6001
> Dallas, Texas 75207
> Attention: General Counsel
> Facsimile: (214) 863-1100
> Telephone: (214) 863-1000

Notices to Franchisee:

> W2005 GHIT Hotels, L.P.
> c/o Goldman Sachs Group, Inc.
> 85 Broad Street
> New York, New York 10004
> Attention: Jonathan Langer
> Facsimile: (212) 357-5505
> Telephone: (212) 902-4968

Any notice shall be deemed to have been given at the date and time of (i) receipt or first refusal of delivery if sent via certified mail, or (ii) one (1) day after posting if sent via overnight commercial delivery service.

## XXV.  ENTIRE AGREEMENT

A.      This Agreement contains the entire agreement between the parties hereto as it relates to the franchising of the Hotel at the Approved Location.  There are no representations, inducements, promises, agreements, arrangements or undertakings, oral or written, between the parties relating to the franchising of the Hotel at the Approved Location other than those set forth herein.  No agreement of any kind relating to the matters covered by this Agreement shall be binding upon either party unless and until the same has been made in writing and executed by all interested parties.

B.      This Agreement may not be amended, modified or rescinded, or any performance requirement waived, except by a written document signed by Franchisor and Franchisee. This provision does not apply to changes in the Manual, which Franchisor may modify unilaterally. The parties expressly agree that this Agreement may not be amended or modified, or any performance standard changed, by course of dealing, by special indulgences or benefits Franchisor bestows on Franchisee, or by inference from a party's conduct.

## XXVI.  CONSTRUCTION AND SEVERABILITY

A.      Severability.  Except as expressly provided to the contrary herein, each section, part, term and provision of this Agreement shall be considered severable. If, for any reason, any section, part, term or provision herein is determined to be invalid and contrary to, or in conflict with, any existing or future law or regulation by a court or agency having valid jurisdiction, such shall not impair the operation of, or have any other effect upon, such other sections, parts, terms and provisions of this Agreement as may remain otherwise intelligible, and the latter shall continue to be given full force and effect and bind the parties hereto; and said invalid sections, parts, terms or provisions shall be deemed not to be a part of this Agreement.

B.      No Third Party Beneficiary.  Nothing in this Agreement is intended, nor shall be deemed, to confer any rights or remedies under or by reason of this Agreement upon any person or legal entity other than Franchisee, Franchisor, and such of Franchisee's and Franchisor's respective successors and assigns as may be contemplated (and, as to Franchisee, permitted) by this Agreement.

C.      Maximum Duty Imposed.  Franchisee and Franchisor expressly agree to be bound by any promise or covenant imposing the maximum duty permitted by law which is subsumed within the terms of any provision hereof, as though it were separately articulated in and made part of this Agreement, that may result from striking from any of the provisions hereof portion or portions which a court may hold to be unreasonable and unenforceable in a final decision to which Franchisee or Franchisor, as applicable, is a party, or from reducing the scope of any promise or covenant to the extent required to comply with such a court order.

- 24 -

D.   Captions.  All captions in the Agreement are intended solely for the convenience of the parties, and none shall be deemed to affect the meaning or construction of any provision hereof.

E.   Construction.  All references herein to the masculine, neuter or singular shall be construed to include the masculine, feminine, neuter or plural, where applicable.  All acknowledgments, promises, covenants, agreements and obligations herein made or undertaken by Franchisee shall be deemed jointly and severally undertaken by all the parties hereto signing the Guaranty on behalf of Franchisee.

F.   Counterpart Execution.  This Agreement may be executed in counterparts and each copy so executed shall be deemed an original.

XXVII. DISPUTE RESOLUTION AND GOVERNING LAW

A.   FRANCHISOR AND FRANCHISEE AGREE TO SUBMIT ANY CLAIM, CONTROVERSY OR DISPUTE ARISING OUT OF OR RELATING TO THIS AGREEMENT (INCLUDING ALL ATTACHMENTS AND ADDENDA) OR THE RELATIONSHIP CREATED BY THIS AGREEMENT TO NON-BINDING MEDIATION PRIOR TO BRINGING SUCH CLAIM, CONTROVERSY OR DISPUTE IN A COURT OR BEFORE ANY OTHER TRIBUNAL.  THE MEDIATION SHALL BE CONDUCTED BY EITHER AN INDIVIDUAL MEDIATOR OR A MEDIATOR APPOINTED BY A MEDIATION SERVICES ORGANIZATION OR BODY, EXPERIENCED IN THE MEDIATION OF HOTEL INDUSTRY DISPUTES, AGREED UPON BY THE PARTIES AND, FAILING SUCH AGREEMENT WITHIN A REASONABLE PERIOD OF TIME (NOT TO EXCEED FIFTEEN (15) DAYS), AFTER EITHER PARTY HAS NOTIFIED THE OTHER OF ITS DESIRE TO SEEK MEDIATION BY THE AMERICAN ARBITRATION ASSOCIATION (OR ANY SUCCESSOR ORGANIZATION) IN ACCORDANCE WITH ITS RULES GOVERNING MEDIATION, AT FRANCHISOR'S PRINCIPAL PLACE OF BUSINESS.  THE COSTS AND EXPENSES OF MEDIATION, INCLUDING COMPENSATION AND EXPENSES OF THE MEDIATOR (EXCEPT FOR THE ATTORNEY'S FEES INCURRED BY EITHER PARTY), SHALL BE BORNE BY THE PARTIES EQUALLY.  IF THE PARTIES ARE UNABLE TO RESOLVE THE CLAIM, CONTROVERSY OR DISPUTE WITHIN NINETY (90) DAYS AFTER THE MEDIATOR HAS BEEN CHOSEN, THEN, UNLESS SUCH TIME PERIOD IS EXTENDED BY WRITTEN AGREEMENT OF THE PARTIES, EITHER PARTY MAY BRING A LEGAL PROCEEDING UNDER SECTION XXVII.B. BELOW TO RESOLVE SUCH CLAIM, CONTROVERSY OR DISPUTE.  NOTWITHSTANDING THE FOREGOING, FRANCHISOR MAY BRING AN ACTION (1) FOR MONIES OWED, (2) FOR INJUNCTIVE OR OTHER EXTRAORDINARY RELIEF, OR (3) INVOLVING THE POSSESSION OF OR TO SECURE OTHER RELIEF RELATING TO THE HOTEL PREMISES, IN A COURT HAVING JURISDICTION AND IN ACCORDANCE WITH SECTION XXVII.B., BELOW, WITHOUT FIRST SUBMITTING SUCH ACTION TO MEDIATION.

B.   WITH RESPECT TO ANY CLAIMS, CONTROVERSIES OR DISPUTES WHICH ARE NOT FINALLY RESOLVED THROUGH MEDIATION OR AS OTHERWISE PROVIDED ABOVE, FRANCHISEE HEREBY IRREVOCABLY SUBMITS ITSELF TO THE JURISDICTION OF THE STATE AND THE FEDERAL DISTRICT COURTS LOCATED IN THE STATE, COUNTY OR JUDICIAL DISTRICT IN WHICH THE FRANCHISOR'S PRINCIPAL PLACE OF BUSINESS IS LOCATED AND HEREBY WAIVES ALL QUESTIONS OF PERSONAL JURISDICTION FOR THE PURPOSE OF CARRYING OUT THIS PROVISION.  FRANCHISEE HEREBY AGREES THAT SERVICE OF PROCESS MAY BE MADE UPON IT IN ANY PROCEEDING RELATING TO OR ARISING OUT OF THIS AGREEMENT OR THE RELATIONSHIP CREATED BY THIS AGREEMENT BY ANY MEANS ALLOWED BY TEXAS OR FEDERAL LAW.  FRANCHISEE FURTHER AGREES THAT VENUE FOR ANY PROCEEDING RELATING TO OR ARISING OUT OF THIS AGREEMENT SHALL BE THE COUNTY OR JUDICIAL DISTRICT IN WHICH THE FRANCHISOR'S PRINCIPAL PLACE OF BUSINESS IS LOCATED; PROVIDED, HOWEVER, WITH RESPECT TO ANY ACTION (1) FOR MONIES OWED, (2) FOR INJUNCTIVE OR OTHER EXTRAORDINARY RELIEF OR (3) INVOLVING POSSESSION OR DISPOSITION OF, OR OTHER RELIEF RELATING TO, THE HOTEL PREMISES, FRANCHISOR MAY BRING SUCH ACTION IN ANY STATE OR FEDERAL DISTRICT COURT WHICH HAS JURISDICTION.

- 29 -

C.    THIS AGREEMENT TAKES EFFECT UPON ITS ACCEPTANCE AND EXECUTION BY FRANCHISOR IN THE STATE OF TEXAS AND SHALL BE INTERPRETED AND CONSTRUED UNDER TEXAS LAW (EXCEPT FOR TEXAS CHOICE OF LAW RULES).

D.    FRANCHISEE AND FRANCHISOR ACKNOWLEDGE THAT THE PARTIES' AGREEMENT REGARDING APPLICABLE STATE LAW AND FORUM SET FORTH HEREIN PROVIDE EACH OF THE PARTIES WITH THE MUTUAL BENEFIT OF UNIFORM INTERPRETATION OF THIS AGREEMENT AND ANY DISPUTE ARISING OUT OF THIS AGREEMENT OR THE PARTIES' RELATIONSHIP CREATED BY THIS AGREEMENT. FRANCHISOR AND FRANCHISEE FURTHER ACKNOWLEDGE THE RECEIPT AND SUFFICIENCY OF MUTUAL CONSIDERATION FOR SUCH BENEFIT.

E.    FRANCHISOR AND FRANCHISEE ACKNOWLEDGE THAT THE EXECUTION OF THIS AGREEMENT AND ACCEPTANCE OF THE TERMS BY THE PARTIES OCCURRED IN DALLAS, TEXAS AND FURTHER ACKNOWLEDGE THAT THE PERFORMANCE OF CERTAIN OBLIGATIONS OF FRANCHISEE ARISING UNDER THIS AGREEMENT, INCLUDING BUT NOT LIMITED TO THE PAYMENT OF MONIES DUE HEREUNDER AND THE SATISFACTION OF CERTAIN TRAINING REQUIREMENTS, SHALL OCCUR IN DALLAS, TEXAS.

F.    FRANCHISOR, FRANCHISEE AND THE CONTROLLING PRINCIPALS SIGNING THIS AGREEMENT AS GUARANTORS ACKNOWLEDGE THAT VARIOUS PROVISIONS OF THIS AGREEMENT SPECIFY CERTAIN MATTERS THAT ARE WITHIN THE DISCRETION OR JUDGMENT OF FRANCHISOR OR ARE OTHERWISE TO BE DETERMINED UNILATERALLY BY FRANCHISOR. IF THE EXERCISE OF FRANCHISOR'S DISCRETION OR JUDGMENT AS TO ANY SUCH MATTER IS SUBSEQUENTLY CHALLENGED, THE PARTIES TO THIS AGREEMENT EXPRESSLY DIRECT THE TRIER OF FACT THAT FRANCHISOR'S RELIANCE ON A BUSINESS REASON IN THE EXERCISE OF ITS DISCRETION OR JUDGMENT IS TO BE VIEWED AS A REASONABLE AND PROPER EXERCISE OF SUCH DISCRETION OR JUDGMENT, WITHOUT REGARD TO WHETHER OTHER REASONS FOR ITS DECISION MAY EXIST AND WITHOUT REGARD TO WHETHER THE TRIER OF FACT WOULD INDEPENDENTLY ACCORD THE SAME WEIGHT TO THE BUSINESS REASON.

G.    EXCEPT FOR CLAIMS BROUGHT BY FRANCHISOR WITH REGARD TO (i) ANY MISREPRESENTATION OR OMISSION MADE BY FRANCHISEE OR ITS PRINCIPALS UNDER THIS AGREEMENT OR IN ANY APPLICATION THEREFOR, (ii) FRANCHISEE'S OBLIGATIONS TO PROTECT FRANCHISOR'S CONFIDENTIAL INFORMATION, OR (iii) FRANCHISEE'S OBLIGATIONS TO INDEMNIFY FRANCHISOR PURSUANT TO SECTION XXI.B., ANY AND ALL CLAIMS ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE RELATIONSHIP OF FRANCHISEE AND FRANCHISOR PURSUANT TO THIS AGREEMENT WILL BE BARRED UNLESS AN ACTION IS COMMENCED WITHIN TWO (2) YEARS FROM THE DATE ON WHICH THE ACT OR EVENT GIVING RISE TO THE CLAIM OCCURRED, OR TWO (2) YEARS FROM THE DATE ON WHICH FRANCHISEE OR FRANCHISOR KNEW OR SHOULD HAVE KNOWN, IN THE EXERCISE OF REASONABLE DILIGENCE, OF THE FACTS GIVING RISE TO SUCH CLAIMS, WHICHEVER OCCURS FIRST.

XXVIII. REMEDIES: CURRENCY

A.    Remedies Cumulative.  No right or remedy conferred upon or reserved to Franchisor or Franchisee by this Agreement is intended to be, nor shall be deemed, exclusive of any other right or remedy herein or by law or equity provided or permitted, but each shall be cumulative of every other right or remedy.

B.    Injunctive Relief.  Nothing herein contained shall bar either party's right to obtain injunctive relief against threatened conduct that will cause it loss or damages, under the usual equity rules, including the applicable rules for obtaining restraining orders and preliminary injunctions.

C.    U.S. Currency.  All fees and payments required by this Agreement shall be paid in U.S. currency.

- 30 -

~Wyndham Hotel - Miami Coconut Grove, Florida
DALLDOCS:193590.v1
26719)-87

## XXIX.  WAIVER OF JURY TRIAL AND DAMAGES

A.      IN ANY LITIGATION BETWEEN THE PARTIES FOUNDED UPON OR ARISING FROM THIS AGREEMENT, THE PARTIES HEREBY WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL, AND THE PARTIES HEREBY STIPULATE THAT ANY SUCH TRIAL SHALL OCCUR WITHOUT A JURY.

B.      FRANCHISEE AND ITS PRINCIPALS HEREBY WAIVE, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT TO OR CLAIM OR ANY PUNITIVE, EXEMPLARY, INCIDENTAL, INDIRECT, SPECIAL, CONSEQUENTIAL OR OTHER DAMAGES (INCLUDING, WITHOUT LIMITATION, LOSS OF PROFITS) AGAINST FRANCHISOR, ITS AFFILIATES, AND THE OFFICERS, DIRECTORS, SHAREHOLDERS, PARTNERS, MEMBERS, AGENTS, REPRESENTATIVES, INDEPENDENT CONTRACTORS, SERVANTS AND EMPLOYEES OF EACH OF THEM, IN THEIR CORPORATE AND INDIVIDUAL CAPACITIES, ARISING OUT OF ANY CAUSE WHATSOEVER (WHETHER SUCH CAUSE BE BASED IN CONTRACT, NEGLIGENCE, STRICT LIABILITY, OTHER TORT OR OTHERWISE) AND AGREE THAT IN THE EVENT OF A DISPUTE, FRANCHISEE AND THE PRINCIPALS SHALL BE LIMITED TO THE RECOVERY OF ANY ACTUAL DAMAGES SUSTAINED BY THEM.  IF ANY OTHER TERM OF THIS AGREEMENT IS FOUND OR DETERMINED TO BE UNCONSCIONABLE OR UNENFORCEABLE FOR ANY REASON, THE FOREGOING PROVISIONS OF WAIVER BY AGREEMENT OF PUNITIVE, EXEMPLARY, INCIDENTAL, INDIRECT, SPECIAL, CONSEQUENTIAL OR OTHER DAMAGES (INCLUDING, WITHOUT LIMITATION, LOSS OF PROFITS) SHALL CONTINUE IN FULL FORCE AND EFFECT.

## XXX.  FRANCHISEE ACKNOWLEDGMENTS

A.      FRANCHISEE ACKNOWLEDGES THAT IT DID NOT RELY ON ANY PROMISES, REPRESENTATIONS OR AGREEMENTS ABOUT THE FRANCHISOR OR THE FRANCHISE NOT EXPRESSLY CONTAINED IN THIS AGREEMENT IN MAKING ITS DECISION TO SIGN THIS AGREEMENT. FRANCHISEE FURTHER REPRESENTS AND WARRANTS THAT FRANCHISOR AND ITS REPRESENTATIVES HAVE NOT MADE ANY PROMISES, REPRESENTATIONS OR AGREEMENTS, ORAL OR WRITTEN, EXCEPT AS EXPRESSLY CONTAINED IN THIS AGREEMENT.

B.      FRANCHISEE ACKNOWLEDGES THAT FRANCHISEE HAS CONDUCTED AN INDEPENDENT INVESTIGATION OF THE BUSINESS FRANCHISED HEREUNDER, AND RECOGNIZES THAT THE BUSINESS VENTURE CONTEMPLATED BY THIS AGREEMENT INVOLVES BUSINESS RISKS AND THAT ITS SUCCESS WILL BE LARGELY DEPENDENT UPON THE ABILITY OF FRANCHISEE AS AN INDEPENDENT BUSINESSMAN.  FRANCHISOR EXPRESSLY DISCLAIMS THE MAKING OF, AND FRANCHISEE ACKNOWLEDGES THAT FRANCHISEE HAS NOT RECEIVED, ANY WARRANTY OR GUARANTEE, EXPRESS OR IMPLIED, AS TO THE POTENTIAL VOLUME, PROFITS OR SUCCESS OF THE BUSINESS VENTURE CONTEMPLATED BY THIS AGREEMENT.

C.      FRANCHISEE ACKNOWLEDGES THAT IT HAS READ AND UNDERSTOOD THIS AGREEMENT AND THE ATTACHMENTS HERETO (IF ANY) AND THAT FRANCHISEE HAS HAD AMPLE TIME AND OPPORTUNITY TO CONSULT WITH ADVISORS OF FRANCHISEE'S OWN CHOOSING ABOUT THE POTENTIAL BENEFITS AND RISKS OF ENTERING INTO THIS AGREEMENT.

D.      ALL OF THE OBLIGATIONS OF FRANCHISOR HEREUNDER ARE TO FRANCHISEE ONLY; NO OTHER PERSON OR ENTITY IS ENTITLED TO RELY ON, ENFORCE, OR OBTAIN RELIEF FOR BREACH OF SUCH OBLIGATIONS EITHER DIRECTLY OR BY SUBROGATION.

E.      FRANCHISEE ACKNOWLEDGES THAT IT RECEIVED A COMPLETE COPY OF THIS AGREEMENT AND ALL RELATED ATTACHMENTS AND AGREEMENTS AT LEAST FIVE (5) BUSINESS DAYS PRIOR TO THE DATE ON WHICH THIS AGREEMENT WAS EXECUTED. FRANCHISEE FURTHER ACKNOWLEDGES THAT IT HAS RECEIVED THE DISCLOSURE DOCUMENT REQUIRED BY THE TRADE REGULATION RULE OF THE FEDERAL TRADE COMMISSION ENTITLED "DISCLOSURE REQUIREMENTS AND PROHIBITIONS CONCERNING FRANCHISING AND BUSINESS OPPORTUNITY

- 31 -

~Wyndham Hotel – Miami Coconut Grove, Florida
DALLDOCS:1920W.v1
267197-89

VENTURES" AT LEAST TEN (10) BUSINESS DAYS PRIOR TO THE DATE ON WHICH THIS AGREEMENT WAS EXECUTED.

IN WITNESS WHEREOF, the parties hereto have duly executed, sealed and delivered this Agreement in duplicate on the day and year first above written.

**FRANCHISOR**

ATTEST:

WHC FRANCHISE CORPORATION
a Delaware corporation

By: _____
Name: _____ **Mark M. Chloupek**
Title: _____ **Vice President**

Secretary

**FRANCHISEE**

ATTEST:

W2005 GHIT Hotels, L.P.,
a Delaware limited partnership

By: _____
Name: _____
Title: _____

Secretary

By: W2005 GHIT Hotels GenPar, L.L.C., its general partner

By: _____
Name: _____ **ROBERT BLOOM**
Title: _____ **MANAGER**

- 32 -

ATTACHMENT A

SELECTED TERMS

Effective Date:  March 23, 2005

Expiration Date:  March 22, 2015

Approved Location of the Hotel:     2669 South Bayshore Drive
Miami, Forida 33133

Number of guest rooms:   177

Initial franchise fee:  None

Application fee:  None

Franchisee's Principals (names, addresses, and percentages of ownership in Franchisee or in any person or entity that owns a controlling interest in Franchisee):

| Name | Address | Percentage of Ownership |
|------|---------|------------------------|
| W7005 WYN Realty, L.L.C. | c/o Goldman Sachs<br>85 Broad Street<br>New York, New York 10004 | 100% (limited partner) |
| W2005 GHIT GenPar, L.L.C. | c/o Goldman Sachs<br>85 Broad Street<br>New York, New York 10004 | 0% (general partner) |

Initials:

Attachment A ~ Solo Page

~Wyndham Hotel – Miami Coconut Grove, Florida
DALLDOCS:105900.v1
267197-87

[DO NOT EXECUTE]

ATTACHMENT B

GUARANTY

As an inducement to WHC Franchise Corporation ("Franchisor") to execute the Franchise Agreement dated _____, 20___, applicable to the Wyndham Hotel located at _____ the undersigned, jointly and severally, hereby unconditionally warrant to Franchisor and its successors and assigns that all of Franchisee's representations in the Franchise Agreement are true, agree to be bound by all the terms and conditions of the above Franchise Agreement including any amendments thereto whenever made (hereinafter the "Agreement"), and absolutely, unconditionally and irrevocably guaranty to Franchisor and its successors and assigns that all of Franchisee's obligations under the Agreement will be punctually paid and performed.

Upon default by Franchisee, the undersigned will immediately make each payment and perform each obligation required of Franchisee under the Agreement. Without affecting the obligations of the undersigned under this Guaranty, Franchisor may, without notice to the undersigned, extend, modify, waive, renew or release any indebtedness or obligation of Franchisee, or settle, adjust or compromise any claims against Franchisee. The undersigned waive notice of amendment of the Agreement and notice of demand for payment or performance by Franchisee.

Franchisor may pursue its rights against any of the undersigned without first exhausting its remedies against Franchisee and without joining any other guarantor. No delay on the part of the Franchisor in the exercise of any right or remedy, and no single or partial exercise by Franchisor of any right or remedy shall preclude the further exercise of such right or remedy. Upon the death of an individual guarantor, the estate of such guarantor will be bound by this Guaranty but only for defaults and obligations hereunder existing at the time of death, and the obligations of the other guarantors will continue in full force and effect.

IN WITNESS WHEREOF, each of the undersigned has signed this Guaranty as of date of the above Agreement.

ATTEST:                                          GUARANTOR

_____              _____
Witness

_____              _____
Witness

_____              _____
Witness

_____
Witness

Attachment B – Solo Page

--Wyndham Hotel - Miami Coconut Grove, Florida
DALLDOCS:193590.V1
367197.87

## ATTACHMENT C

### MANAGEMENT COMPANY RIDER
To Franchise Agreement Dated March 23, 2005
Between WBC Franchise Corporation ("Franchisor") and
W2005 GHUT Hotels, L.P. ("Franchisee")

Interstate Management Company, LLC, a Delaware limited liability company ("Management Company") has entered into a Management Agreement with Franchisee, under the terms of which Management Company will operate the Wyndham Hotel located at 2669 South Bayshore Drive, Miami, Florida 33133 (the "Hotel") in accordance with the terms and conditions of the Franchise Agreement identified above.

In consideration of being permitted to operate the Hotel, Management Company hereby acknowledges and ratifies the terms and conditions of the Franchise Agreement and agrees to fully observe and be bound by all terms, conditions and restrictions regarding the management and operation of the Hotel set forth in the Franchise Agreement as if and as though Management Company had executed the Franchise Agreement as "Franchisee" for as long as Management Company operates the Hotel; provided, however, that the foregoing does not constitute an agreement of the Management Company to pay or assume any financial obligation of Franchisee to Franchisor or to any third party. Management Company further agrees to be bound by the confidentiality covenants set forth in Article XII. of the Franchise Agreement (including all remedies available to Franchisor under the Franchise Agreement for breach thereof) during and subsequent to its tenure as manager and operator of the Hotel.

Management Company agrees that Franchisor may enforce directly against Management Company those terms and conditions of the Franchise Agreement to which Management Company has hereby agreed to be bound. The prevailing party in any cause of action brought hereunder, pursuant hereto or in connection herewith (including, without limitation, any action for declaratory or equitable relief) shall be entitled to recover from the non-prevailing party reasonable attorney's fees, expenses and costs of suit incurred by the prevailing party in such action.

MANAGEMENT COMPANY:

Interstate Management Company, LLC,
a Delaware limited liability company

ATTEST:

Witness

By: _____
Name: ___CHRISTOPHER L. BENNETT, ESQ.___
Title: ___VICE PRESIDENT, LEGAL___
AND SECRETARY

Attachment C – Solo Page

~Wyndham Hotel – Miami/ Coconut Grove, Florida
DALLDOCS:193590.V1
267197-87

**ATTACHMENT D**

**DEFINITIONS**

An "Affiliate" means, with respect to any person or entity, any other person or entity controlling, controlled by, or under common control with said person or entity.

"Control" or "controlling interest" mean the direct or indirect power to direct the management and policies of a person or entity, including those relating to the payment of financial obligations, whether through the ownership of voting securities or interests, by contract, or otherwise, each as reasonably determined by Franchisor.

The "Effective Date" of the Franchise Agreement is the date that Franchisor authorizes the opening of the Hotel as a "Wyndham Hotel." The Effective Date shall be entered on Attachment A to this Agreement.

"Force Majeure" means acts of God, strikes, lockouts or other industrial disturbances, war, terrorism, riot, epidemic, fire or other catastrophe or other forces beyond Franchisee's control.

The "Franchisee" includes the entity identified in the preamble to this Agreement and (i) the individual owner or owners of the franchise granted hereunder, if Franchisee is a natural person or persons; or (ii) collectively and individually, the general partners, if Franchisee is a partnership; or (iii) collectively and individually, the controlling shareholders or controlling members, as applicable, if Franchisee is a corporation or limited liability company.

"Franchisee's Principals" include any individual, partnership, corporation, or other legal entity which directly or indirectly owns any interest in this franchise, in Franchisee, or in any person or entity that owns a controlling interest in Franchisee. "Franchisee's Controlling Principals" include Franchisee's general partners, controlling shareholders, or controlling members, as applicable.

"Gross Room Revenues" include all gross revenues attributable to or payable for the rental of guest rooms at the Hotel, including, without limitation, all credit transactions, whether or not collected, but excluding any sales or room taxes collected by Franchisee for transmittal to the appropriate taxing authority. Gross Room Revenues also include the proceeds from any business interruption insurance applicable to loss of revenues due to the nonavailability of guest rooms and for guaranteed no-show revenue which is collected. Gross Room Revenues shall be accounted for in accordance with the Uniform System of Accounts for the Lodging Industry, Ninth Revised Edition, 1996, as published by the Hotel Association of New York City, Inc.

"Hotel" means the freehold or long-term leasehold title to the hotel located at the Approved Location, together with all improvements constructed on the Approved Location, including, without limitation, the Hotel building, and all furniture, fixtures, equipment (including computer and telephone systems), and inventories.

The "Manager" is the party identified in the Management Company Rider attached as Attachment C to the Franchise Agreement.

The "Manual" is the Wyndham Business Deluxe/Resort Hotel Operating Manual, the Wyndham Graphics Manual, and all other manuals and guides containing the standards, specifications, policies, and procedures for the establishment and operation of System hotels.

The "Proprietary Marks" are all trade names, trademarks, service marks, logos, emblems, symbols and indicia of origin that are now designated and may hereafter be designated in writing by Franchisor as part of the System for use in connection with System hotels, including the trade names and service marks "Wyndham," "Wyndham Hotel" and "Wyndham Resort." The Proprietary Marks may be modified by Franchisor from time to time.

The "System" is the collection of procedures, policies, standards, specifications, controls and other distinguishing elements which Franchisor or its Affiliates have developed in connection with the establishment and operation of Wyndham business deluxe and resort hotels.   The distinguishing characteristics of the System include, without

Attachment D - Page 1

~Wyndham Hotel - Miami Coconut Grove, Florida
DALLJKKN:195590.v1
267197-87

limitation, standards and specifications for the establishment and operation of a Wyndham Hotel; proprietary reservation and property management systems; advertising, marketing and promotional programs; a Wyndham Hotel Directory; management and personnel training programs; operational standards, policies, procedures and techniques as prescribed in the Manual and a quality assurance program known as the "Wyndham Way," all of which may be changed, improved or further developed from time to time. The Wyndham Companies have all rights in and to the System and Franchisee has only the right to use the System under the terms and conditions of this Agreement.

The "Wyndham Companies" include the Franchisor and any parent, subsidiary, division or Affiliate of the Franchisor.

A "Wyndham Hotel" is a full-service business deluxe or resort hotel operated under the trade name "Wyndham Hotel," "Wyndham Resort," or "Wyndham Historic Hotel," but does not include Wyndham Gardens® hotels, Summerfield Suites® by Wyndham hotels or any other lodging concepts or business operations.

Attachment D - Page 2

–Wyndham Hotel – Miami Coconut Grove, Florida
DALLLXX.N:195590.v1
267197-87

(DO NOT EXECUTE)

## NEW CONSTRUCTION ADDENDUM

This New Construction Addendum is entered into effective _____ _____ _____, 20__, by and between WHC Franchise Corporation ("Franchisor") and _____ ("Franchisee") with respect to the construction of a hotel to be located at _____ (the "Hotel"). Capitalized terms used, but not defined, in this Addendum shall have the meanings assigned to them in the Wyndham Hotel Franchise Agreement for the Hotel of even date ("Franchise Agreement").

### Recitals

Franchisor and Franchisee wish to enter into this Addendum to provide for the terms and conditions upon which the Hotel shall be constructed as a Wyndham Hotel ("Hotel").

Now, Therefore, in consideration of the mutual promises and covenants set forth herein and in the Franchise Agreement, the parties agree as follows:

1.      **Franchisee's Representations.** Franchisee represents that:

1.1      It owns or holds a ground lease for the property at the Approved Location, the term of which exceeds the term of the Franchise Agreement; and

1.2      It has obtained firm commitments for interim and permanent financing for the Hotel's construction that do not involve a public offering of any interest in the Hotel or in Franchisee.

2.      **Plans and Specifications.** Franchisee shall construct and equip the Hotel in accordance with Franchisor's standards and specifications, including the construction and other standards set forth in the Manual, and shall comply with the development and construction obligations set forth in this Addendum and Schedule A hereto, within the time periods specified.

2.1      Before submitting Proposed Plans (defined in Section 2.2) to Franchisor, Franchisee shall (a) retain a qualified architect, design firm, engineer and/or contractor who shall prepare the necessary plans and specifications for the Hotel and (b) submit to Franchisor such information concerning such persons' qualifications as Franchisor may request. Franchisee acknowledges and agrees that Franchisor is not, and shall not be, liable for the performance of any architect, design firm, engineer and/or contractor retained by Franchisee.

2.2      On or before the date specified in Schedule A, Franchisee shall submit to Franchisor proposed renderings, plans and specifications for the Hotel conforming to Franchisor's then-current standards ("Proposed Plans"). The Proposed Plans shall include, without limitation, architectural, mechanical, electrical, structural, civil engineering, and landscaping drawings, in such detail and containing such information as Franchisor may request. Franchisee shall have the opportunity to review and comment upon the Proposed Plans. All comments shall be delivered in writing to Franchisee on or before the date set forth in Schedule A. Revised Plans, incorporating Franchisor's comments, shall be submitted to Franchisor for approval on or before the date set forth in Schedule A.

2.2.1   Franchisee acknowledges and agrees that all Proposed Plans must be approved by Franchisor. Upon Franchisor's written approval, such Plans shall be considered Final Plans. Final Plans shall be completed and approved on or before the date set forth in Schedule A.

2.2.2   Franchisee shall cause the Hotel to be constructed in accordance with the Final Plans. Construction shall not commence until the Final Plans have been approved by Franchisor. After their approval by Franchisor, the Final Plans shall not be changed or modified without the prior written consent of Franchisor.

New Construction Addendum – Page 1

2.2.3  Franchisee acknowledges that Franchisor's approval of the Final Plans is not, and should not be considered as, any assurance or guarantee that the Final Plans satisfy all federal, state and/or local construction and/or zoning requirements, including, without limitation, compliance with the Americans with Disabilities Act. Franchisor's approval signifies only that the Final Plans are generally consistent with Franchisor's minimum standards and specifications. Franchisee shall be responsible for compliance with all federal, state and local laws. Franchisor shall not be responsible for architecture or engineering, code, zoning, or other requirements or laws, ordinances, or regulations of any state, local or federal governmental body, or for any errors, omissions, or discrepancies of any nature in any drawings or specifications used for construction of the Hotel. Franchisee shall not reproduce, use or permit the use of any of the design concepts, drawings, or specifications of a Wyndham Hotel without Franchisor's prior written approval.

3.     Construction.  Franchisee shall commence construction of the Hotel on or before the date specified in Schedule A and shall give Franchisor written notice of the actual commencement date within five (5) days thereafter.

3.1     Franchisor may extend the dates specified in Schedule A for commencement or completion of the Hotel's construction for a reasonable period (not to exceed 90 days) for no additional fee in case of delays caused by Force Majeure or other causes that Franchisor considers beyond Franchisee's reasonable control. Franchisor may, in its sole discretion, agree to grant further extensions, provided that Franchisee submits a written request for the extension, together with an extension fee in an amount equal to two thousand dollars ($2,000) per month for each month requested beyond the initial extension period. The extension fee shall be non-refundable if Franchisor grants a request for such extension.

3.2     Once construction has commenced, Franchisee shall continue the work (except for delays which may be caused by the occurrence of events constituting Force Majeure) until construction is completed in accordance with the approved Final Plans. Notwithstanding any event of Force Majeure, or any other cause, construction shall be completed and the Hotel shall be furnished, equipped and otherwise made ready to open for business in accordance with the Franchise Agreement not later than the completion date specified in Schedule A.

3.3     During construction, Franchisee shall, and shall cause its architect, engineer, contractors and subcontractors to, cooperate fully with Franchisor for the purpose of permitting Franchisor to inspect the Hotel, its premises, and the progress of the construction to determine whether construction is proceeding in accordance with the Final Plans and Franchisor's standards and specifications.  Franchisee acknowledges and agrees that inspections by Franchisor shall be for the purpose of assuring Franchisee's compliance with the minimum standards required by Franchisor, and shall not be, nor be construed as, assurances or approvals that the construction is in compliance with any federal, state or local law, or regulation, or zoning or building requirement.

3.4     Franchisee shall provide construction progress reports to Franchisor, in the form and manner, and at such times, that Franchisor may reasonably request.

4.     Furniture, Fixtures and Supplies.  Franchisee shall bear the entire cost of constructing and furnishing the Hotel, including the cost of signs, equipment, furniture, furnishings and supplies. Franchisee shall order, purchase and/or lease and install all fixtures, equipment, furnishings, furniture, signs, supplies and other items necessary to complete and open the Hotel as specified in the Final Plans and the Manual.

5.     Opening.  Except as set forth in Section 6, Franchisee shall not open the Hotel for business or advertise the Hotel as a "Wyndham Hotel" until all of the conditions of this Section 5 are satisfied:

5.1     Construction of the Hotel has been completed in accordance with the approved Final Plans, Franchisor's standards and specifications, and this Addendum;

5.2     Franchisee has submitted to Franchisor a Certificate of Occupancy and a contractor's certification that construction of the Hotel has been completed in accordance with the approved Final Plans;

~Wyndham Hotel – Miami Coconut Grove, Florida
DALLDOCS.193590.v1
267197-47

5.3    Franchisee has installed at the Hotel all furnishings, furniture, equipment, signs, computer terminals, supplies and other items required by the Final Plans and the Manual;

5.4    Franchisee has hired and trained the staff necessary to operate the Hotel and Franchisor has approved the management company and management agreement for the Hotel in accordance with the Franchise Agreement;

5.5    Franchisee has paid all amounts due Franchisor and its Affiliates;

5.6    Franchisee has given Franchisor written notice that all terms and conditions of this Addendum have been satisfied and the Hotel is ready to open for business as a Wyndham Hotel;

5.7    Franchisor has granted written approval to open and operate the Hotel as a Wyndham Hotel. Franchisor shall use its best efforts to inspect the Hotel within 14 days after receiving the notice specified in Section 5.6 and to conduct any such other investigations that Franchisor deems necessary to determine whether Franchisee has satisfied all requirements for opening the Hotel as a Wyndham Hotel. Franchisor shall not be liable for delays or loss occasioned by the inability of Franchisor to complete its investigation and to make such determination for reasons beyond Franchisor's control; and

5.8    Except as permitted by Section 6 of this Addendum, Franchisee understands and agrees that it shall not operate the Hotel as part of the Wyndham System nor shall it advertise or otherwise hold out the Hotel as being a Wyndham Hotel until it has completed, and Franchisor has approved in writing, the opening, or conditional opening, of the Hotel pursuant to this Section 5.

6.    Limited Service Mark License.

6.1    If Franchisor certifies that the improvements are being constructed in accordance with the final Plans, such certification will constitute the grant of a limited, temporary license under which Franchisee may use the Wyndham service mark to advertise the Hotel's anticipated opening. Such advertisements may appear only on signs at the Approved Location and in local print and broadcast media announcements that, in each instance, meet Franchisor's standards for design and quality.

6.2    Franchisee may, in its sole discretion, conditionally authorize Franchisee to open and operate the Hotel as a Wyndham Hotel even though Franchisee has not fully complied with the Final Plans, if Franchisee is substantially complied with the Plans and agrees to comply with all remaining terms thereof on or before the completion date specified in Schedule A. If Franchisee fails to comply with all such remaining terms on or before the completion date specified in Schedule A (or any extension thereof that may be granted by Franchisor), Franchisor may terminate the Franchise Agreement pursuant to Section XVIII.C. thereof.

7.    Termination. Upon any termination of the Franchise Agreement as a result of Franchisee's failure to comply with the terms of this New Construction Addendum, Franchisee shall comply with all post-termination obligations under the Franchise Agreement, provided, that in lieu of the lump sum payment for premature termination set forth in Section XVIII.E., Franchisee shall pay the Franchisee a lump sum equal to 2¼ times the amount of the application fee for the Hotel, based on the proposed number of guest rooms for the Hotel and irrespective of whether, in fact, any such application fee has been paid for the Hotel.

--Wyndham Hotel – Miami Coconut Grove, Florida
DALLDOCS.195590.v1
267197-87

**FRANCHISOR**

WHC FRANCHISE CORPORATION,
a Delaware corporation

By:_____
   Name: _____
   Title: _____

**FRANCHISEE**

_____

By:_____
   Name: _____
   Title: _____

New Construction Addendum – Page 4

~Wyndham Hotel – Miami Coconut Grove, Florida
DALLDOCS:193598LVI
267197-87

**Schedule A**
**to New Construction Addendum**

| Construction Requirements | By (Date) |
|---|---|
| Submission of Proposed Plans to Franchisor | _____, 20__ |
| Franchisor's comments on Proposed Plans | _____, 20__ |
| Submission of Revised Plans to Franchisor | _____, 20__ |
| Final Plans approved by Franchisor | _____, 20__ |
| Commencement of construction in conformity with approved Final Plans | _____, 20__ |
| Completion of construction | _____, 20__ |

Schedule A to New Construction Addendum – Page Solo

~Wyndham Hotel – Miami Coconut Grove, Florida
DALLDOCB:195590.v1
267107-87

[DO NOT EXECUTE]

## CONVERSION ADDENDUM

This Conversion Addendum is made and entered into effective this _____ day of _____ 20___, by and between WHC Franchise Corporation ("Franchisor"), and _____ ("Franchisee") with respect to the hotel located at _____ (the "Hotel"). Capitalized terms used, but not defined, in this Addendum shall have the meanings assigned to them in the Wyndham Hotel Franchise Agreement for the Hotel of even date ("Franchise Agreement").

### Recitals

Franchisor and Franchisee wish to enter into this Addendum to provide for the terms and conditions upon which the Hotel will be converted to a Wyndham Hotel ("Hotel").

Now, Therefore, in consideration of the mutual promises and covenants set forth herein and in the Franchise Agreement, the parties agree as follows:

1.  Conversion Requirements.

    1.1  Franchisor and Franchisee have inspected the Hotel and have determined the work needed to be completed to convert the Hotel to a Wyndham Hotel pursuant to Franchisor's standards, as evidenced by those items in the PIP attached hereto as Schedule A-2 (the "Conversion Requirements").

    1.2  Franchisee shall complete the Conversion Requirements on or before the dates specified in Schedule A-1 hereto. However, Franchisor may extend the date specified in Schedule A-1 for completion thereof for a reasonable period (not to exceed 60 days) and for no additional fee in case of delays caused by Force Majeure or other causes that Franchisor considers beyond Franchisee's reasonable control.

2.  Furniture, Fixtures and Supplies. Franchisee shall bear the entire cost of renovating and converting the Hotel, including the cost of signs, equipment, furniture, furnishings and supplies. Franchisee shall order, purchase and/or lease and install all fixtures, equipment, furnishings, furniture, signs, supplies and other items necessary to complete and open the Hotel as specified in the Conversion Requirements.

3.  Opening. Except as set forth in Section 4, Franchisee shall not operate or advertise the Hotel as a Wyndham Hotel until all of the conditions of this Section 3 are satisfied:

    3.1  Those items on Schedule A-1 and A-2 hereto marked "C" for completion on or before _____ (the "Conversion") have been completed in accordance with the Conversion Requirements;

    3.2  Franchisee has hired and trained the staff necessary to operate the Hotel;

    3.3  Franchisee has paid all amounts due Franchisor and its Affiliates;

    3.4  Franchisee has given Franchisor written notice that all terms and conditions of this Addendum, have been satisfied and the Hotel is ready to open for business as a Wyndham Hotel;

    3.5  Franchisor has granted written approval to open and operate the Hotel as a Wyndham Hotel. Franchisor shall use its best efforts to inspect the Hotel within fourteen (14) days after receiving the notice specified in Section 3.4 and to conduct any such other investigations that Franchisor deems necessary to determine whether Franchisee has satisfied all requirements for opening the Hotel as a Wyndham Hotel. Franchisor shall not be liable for delays or loss occasioned by the inability of Franchisor to complete its investigation and to make such determination for reasons beyond Franchisor's control; and

~Wyndham Hotel – Miami Coconut Grove, Florida
HALLDOCS:105590.v1
267197-87

3.6     Except as permitted by Section 4 of this Addendum, Franchisee understands and agrees that it shall not operate the Hotel as part of the Wyndham System nor shall it advertise or otherwise hold out the Hotel as being a Wyndham Hotel until it has completed, and Franchisor has approved in writing, the opening of the Hotel pursuant to this Section 3.

4.      Limited Trademark License.

4.1     If Franchisor certifies that the improvements are being made in accordance with the Conversion Requirements, such certification will constitute the grant of a limited, temporary license under which Franchisee may use the Wyndham trademark to advertise the Hotel's anticipated opening and to offer, sell and make reservations for guest rooms for guests arriving on or after the completion date for the Conversion Requirements set forth on Schedule A-1. Any advertisements may appear only on signs at the Approved Location and in print and broadcast media announcements that, in each instance, meet Franchisor's standards for design and quality.

4.2     Franchisee may, upon consultation with Franchisee, conditionally authorize Franchisee to open and operate the Hotel as a Wyndham Hotel even though Franchisee has not fully complied with the Conversion Requirements, if Franchisee has substantially complied with the Conversion Requirements and agrees to comply with all remaining terms thereof on or before the completion date specified in Schedule A-1. If Franchisee fails to comply with all such remaining terms on or before the completion date specified in Schedule A-1 (or any extension thereof that may be granted by Franchisor), Franchisor may terminate the Franchise Agreement pursuant to Section XVII.C. thereof.

5.      Termination. This Conversion Addendum shall remain in full force and effect until all items listed in Schedule A-2 have been completed. Upon any termination of the Franchise Agreement as a result of Franchisee's failure to comply with the terms of this Conversion Addendum, Franchisee shall comply with all post-termination obligations under the Franchise Agreement. With respect to any failure to complete those items in Schedule A-2 marked "C", in lieu of the lump sum payment for premature termination set forth in Section XVIII.F., Franchisee shall pay the Franchisor a lump sum equal to 2 ½ times the amount of the application fee for the Hotel.

**FRANCHISOR**

WHC FRANCHISE CORPORATION,
a Delaware corporation

By: _____
    Name: _____
    Title: _____

**FRANCHISEE**

a _____

By: _____
    Name: _____
    Title: _____

Conversion Addendum – Page 2

--Wyndham Hotel – Miami Coconut Grove, Florida
DALLIXICS:193,990.v1
267197-87

**Schedule A-1**
**to Conversion Addendum**

| Items in Schedule A-2 to be Completed | Date to be Completed |
|---|---|
| C | On or before |
| D1 | On or before ___ months from the Conversion |
| D2 | On or before ___ months from the Conversion |
| D3 | Deferred until next required renovation |

Schedule A-1 to Conversion Addendum – Page Solo

—Wyndham Hotel – Miami Coconut Grove, Florida
DALLDOCS:193590.v1
267197-87

**Schedule A-2**
**to Conversion Addendum**

Property Improvement Plan

Schedule A-2 to Conversion Addendum – Solo Page

–Wyndham Hotel · Miami Coconut Grove, Florida
DALLDOCS:105500.v1
26/1/V7-K1

### FIRST AMENDMENT TO
### FRANCHISE AGREEMENT

The Wyndham Hotel Franchise Agreement dated March 23, 2005 ("Franchise Agreement") by and between WHC Franchise Corporation ("Franchisor") and W2005 GHIT Hotels, L.P. ("Franchisee"), is hereby amended as set forth in this First Amendment to Franchise Agreement ("Amendment") of even date. The terms of this Amendment supersede any inconsistent or conflicting provisions in the Franchise Agreement and are not transferable without the prior written consent of Franchisor. Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Franchise Agreement.

    1.    <u>Grant of Franchise.</u>

        a.    Article I. of the Franchise Agreement is hereby amended by deleting Section I.B. in its entirety and replacing it with the following:

    "B. <u>Territorial Protections</u>.  During the term of this Agreement and provided that Franchisee has complied with this Agreement and all other agreements between Franchisee and Franchisor or its Affiliates relating to the Hotel, then, except as provided in Section I.C., neither Franchisor nor any of its Affiliates shall develop and/or operate, or license any person or entity other than Franchisee or its Affiliate to develop and/or operate, a Wyndham Hotel within a three (3) mile radius of the Hotel (the "Agreed Area"); provided, that the Franchisor and any of its Affiliates may continue to operate, manage, or license (and renew the agreements related to the management or licensing of) all Wyndham Hotels that are within the Agreed Area on the date of execution."

        b.    Article I. of the Franchise Agreement is hereby amended by adding the following as new Section I.C.:

    "C. <u>Reserved Rights</u>.

        1.    Franchisee acknowledges and agrees that, except as provided in Section I.B. of this Agreement, Franchisor and its Affiliates have and retain the right to develop and operate, and to license others to develop and operate, hotels and lodging facilities (including, without limitation, business deluxe, resort and garden hotels and extended stay facilities), timeshare or vacation ownership resort properties, restaurants or other business operations of any type whatsoever, under the Wyndham name and mark or under other trade names, trademarks and service marks, at any location except the Approved Location, including locations adjacent, adjoining or proximate to the Approved Location, and that these business operations may compete directly with and adversely affect the operation of the Hotel. Franchisee agrees that the Wyndham Companies may exercise these rights from time to time without notice to Franchisee, and Franchisee covenants that it shall not take any action, including any action in a court of law or equity, which may interfere with the exercise of such rights by any of the Wyndham Companies.

        2.    Without limitation of the foregoing and notwithstanding anything to the contrary in Section I.B., within the Agreed Area and outside of the Agreed Area, Franchisor and its Affiliates have and retain the right to develop and operate, and to license others to develop and operate, any hotel or lodging facility acquired as part of a Multiple Unit Acquisition under the

First Amendment to Franchise Agreement – Page 1

Wyndham Hotel – Miami Coconut Grove, Florida
DALLDOCS:193590.v1
267197-87

Wyndham name and mark, or under other trade names, trademarks and service marks, at any location, including locations within the Agreed Area and locations adjacent, adjoining or proximate to the Hotel, and such hotels and lodging facilities may compete with the Hotel. For the purposes of this Section I.C.2., a "Multiple Unit Acquisition" means the acquisition by Franchisor or its Affiliate in one (1) or a series of related transactions occurring within any twelve (12) month period during the term hereof of ten (10) or more hotels or lodging facilities. Franchisee acknowledges and agrees that if Franchisor or any of its Affiliates fails to comply with Section I.B., Franchisee's sole and exclusive remedy for such noncompliance will be to terminate this Agreement."

    c.    Current Section I.C. and all references in the Agreement thereto are re-lettered Section I.D.

2.    Renewal. The second sentence of Section II.B.7. is hereby deleted in its entirety and is replaced by the following:

"Franchisee shall not be required to pay any additional initial fee but shall pay a renewal fee in an amount equal to Franchisor's actual out of pocket costs and expenses (including, without limitation, attorneys' fees and costs) arising out of or related to the renewal."

3.    Fees.

    a.    Anything in the Franchise Agreement to the contrary notwithstanding, Franchisee will not be required to pay an initial franchise fee or application fee in connection with the execution of the Franchise Agreement.

    b.    Section III.B. is hereby deleted in its entirety and replaced by the following:

"B. Royalty. Franchisee will not be required to pay any royalty fee from the Effective Date until the tenth (10th) anniversary of the Effective Date. In consideration for Franchisee's continuing use of the Proprietary Marks and the System, Franchisee shall pay to Franchisor a continuing monthly royalty fee in the amount of two percent (2%) of Gross Room Revenues from the tenth (10th) anniversary of the Effective Date and continuing for the duration of the term of this Agreement."

4.    Capital Expenditures; Renovation Scope; Reserve.

    a.    Anything in the Franchise Agreement to the contrary notwithstanding, during the five (5) year period immediately following the Effective Date of the Franchise Agreement, Franchisor will not require Franchisee to upgrade the Hotel or complete other Capital Improvements to the Hotel except for (i) upgrades or Capital Improvements that may be required for health and safety reasons and (ii) system-wide changes to software, computer hardware, modems, devices, and related equipment or changes required by the vendors of such items, both of which Franchisor may require at any time.

    b.    Notwithstanding the foregoing, Franchisee shall complete the Renovation Scope attached hereto as Exhibit 1 to Franchisor's satisfaction and in accordance with System Standards on or before the fifth (5th) anniversary of the Effective Date of the Franchise Agreement.

    c.    (1)    Franchisee shall, from funds derived from the operation of the Hotel and in accordance with Paragraph 4.c.(2), establish the "Reserve" to cover (i) the cost of additions to and substitutions, replacements and renewals of FF&E and otherwise maintaining the physical appearance of the Hotel to comply with

First Amendment to Franchise Agreement – Page 2

System Standards and (ii) Capital Improvements to the Hotel. The Reserve shall be maintained in an interest-bearing account. All amounts in the Reserve shall be the property of Franchisee, and any interest on amounts in the Reserve shall remain a part of the Reserve. To the extent that Franchisee shall be required to pay any income taxes on any interest paid on amounts in the Reserve, the same shall be payable out of the Reserve. For the purposes of this Paragraph 4, (a) FF&E shall mean all furniture, fixtures, furnishings and specialized equipment and systems necessary or customary (now or in the future) in the reasonable opinion of Franchisor in order to operate the Hotel in accordance with the terms of this Agreement and the System Standards, including but not limited to all equipment required for the operation of kitchens, laundries, dry cleaning facilities and bars, special lighting and other equipment, signs, carpets, drapes, shades, tapestries, pictures, paintings, beds, mattresses, chairs, desks, tables, sofas, wall coverings, televisions, radios, intercoms, telephones and office equipment and machinery, and (b) Capital Improvements shall mean any and all major alterations and improvements to the Hotel and all major repairs and replacements to the structural, mechanical, electrical, HVAC, plumbing or vertical transportation elements of the Hotel other than certain non-routine repairs and maintenance to the Hotel which are normally capitalized under generally accepted accounting principles.

(2)      Beginning on the Effective Date and continuing during the remainder of the term of the Franchise Agreement, for each month (or part of a month) during the term, Franchisee shall, by the fifteenth (15th) day of the following month, deposit into the Reserve an amount equal to a four percent (4%) of the Gross Revenue of the Hotel. The amount to be contributed to the Reserve is only an estimate of amounts required for the purposes set forth in Paragraph 4.c.(1).

(3)      Nothing in this Paragraph 4.c. affects the parties rights and obligations under Paragraphs 4.a. and 4.b. above, including Franchisor's rights to require upgrades and Capital Improvements to the Hotel.

5.      **Transfer by Franchisee.**

a.      Section XV.D.2. is hereby deleted in its entirety and is replaced by the following:

"2. Transferor shall satisfy all of Franchisee's accrued monetary obligations to Franchisor and its Affiliates, shall execute a general release under seal in a form prescribed by Franchisor of any and all claims against Franchisor and its Affiliates, and their respective officers, directors, agents and employees, and shall pay to Franchisor a transfer fee in an amount equal to Franchisor's actual out of pocket costs and expenses (including, without limitation, reasonable attorneys' fees and costs) arising out of or related to the transfer;"

b.      Section XV.D.5. is hereby deleted in its entirety and is replaced by the following:

"5. Franchisor and the transferee will, upon approval of transferee's application, enter into a new franchise agreement which shall require transferee to upgrade the Hotel to conform to Franchisor's then-current standards (provided, that if such a transfer is completed within the five (5) year period immediately following the Effective Date, the transferee will not be required to complete an upgrade of the Hotel as a condition to transfer) and which new franchise agreement shall contain the standard terms (except for duration) then being issued for new franchised hotels under the System, provided, however, that Franchisee's transferee's new franchise agreement shall contain the economic terms provided for in Section III. of this Agreement, as amended by the First Amendment hereto. The date of the transferee's new franchise agreement shall be the Effective Date of this Agreement, and the transferee will be required to certify in writing that (i) Franchisor did not endorse, recommend, or otherwise concur with the terms of the transfer, (ii) Franchisor did not comment upon

–Wyndham Hotel – Miami Coconut Grove, Florida
DALLDOCS:1705901v1
2671.97-87

# EXHIBIT B

## FIRST AMENDMENT TO
## FRANCHISE AGREEMENT

The Wyndham Hotel Franchise Agreement dated March 23, 2005 ("Franchise Agreement") by and between WHC Franchise Corporation ("Franchisor") and W2005 GHIT Hotels, L.P. ("Franchisee"), is hereby amended as set forth in this First Amendment to Franchise Agreement ("Amendment") of even date. The terms of this Amendment supersede any inconsistent or conflicting provisions in the Franchise Agreement and are not transferable without the prior written consent of Franchisor. Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Franchise Agreement.

1.     Grant of Franchise.

a.     Article I. of the Franchise Agreement is hereby amended by deleting Section I.B. in its entirety and replacing it with the following:

"B. Territorial Protections.  During the term of this Agreement and provided that Franchisee has complied with this Agreement and all other agreements between Franchisee and Franchisor or its Affiliates relating to the Hotel, then, except as provided in Section I.C., neither Franchisor nor any of its Affiliates shall develop and/or operate, or license any person or entity other than Franchisee or its Affiliate to develop and/or operate, a Wyndham Hotel within a three (3) mile radius of the Hotel (the "Agreed Area"); provided, that the Franchisor and any of its Affiliates may continue to operate, manage, or license (and renew the agreements related to the management or licensing of) all Wyndham Hotels that are within the Agreed Area on the date of execution."

b.     Article I. of the Franchise Agreement is hereby amended by adding the following as new Section I.C.:

"C. Reserved Rights.

1.     Franchisee acknowledges and agrees that, except as provided in Section I.B. of this Agreement, Franchisor and its Affiliates have and retain the right to develop and operate, and to license others to develop and operate, hotels and lodging facilities (including, without limitation, business deluxe, resort and garden hotels and extended stay facilities), timeshare or vacation ownership resort properties, restaurants or other business operations of any type whatsoever, under the Wyndham name and mark or under other trade names, trademarks and service marks, at any location except the Approved Location, including locations adjacent, adjoining or proximate to the Approved Location, and that these business operations may compete directly with and adversely affect the operation of the Hotel. Franchisee agrees that the Wyndham Companies may exercise these rights from time to time without notice to Franchisee, and Franchisee covenants that it shall not take any action, including any action in a court of law or equity, which may interfere with the exercise of such rights by any of the Wyndham Companies.

2.     Without limitation of the foregoing and notwithstanding anything to the contrary in Section I.B., within the Agreed Area and outside of the Agreed Area, Franchisor and its Affiliates have and retain the right to develop and operate, and to license others to develop and operate, any hotel or lodging facility acquired as part of a Multiple Unit Acquisition under the

First Amendment to Franchise Agreement – Page 1

~Wyndham Hotel – Miami Coconut Grove, Florida
DALLDOCS:195590.v1
267197-87

Wyndham name and mark, or under other trade names, trademarks and service marks, at any location, including locations within the Agreed Area and locations adjacent, adjoining or proximate to the Hotel, and such hotels and lodging facilities may compete with the Hotel. For the purposes of this Section I.C.2., a "Multiple Unit Acquisition" means the acquisition by Franchisor or its Affiliate in one (1) or a series of related transactions occurring within any twelve (12) month period during the term hereof of ten (10) or more hotels or lodging facilities. Franchisee acknowledges and agrees that if Franchisor or any of its Affiliates fails to comply with Section I.B., Franchisee's sole and exclusive remedy for such noncompliance will be to terminate this Agreement."

c.  Current Section I.C. and all references in the Agreement thereto are re-lettered Section I.D.

2.  Renewal. The second sentence of Section II.B.7. is hereby deleted in its entirety and is replaced by the following:

"Franchisee shall not be required to pay any additional initial fee but shall pay a renewal fee in an amount equal to Franchisor's actual out of pocket costs and expenses (including, without limitation, attorneys' fees and costs) arising out of or related to the renewal."

3.  Fees.

a.  Anything in the Franchise Agreement to the contrary notwithstanding, Franchisee will not be required to pay an initial franchise fee or application fee in connection with the execution of the Franchise Agreement.

b.  Section III.B. is hereby deleted in its entirety and replaced by the following:

"B. Royalty. Franchisee will not be required to pay any royalty fee from the Effective Date until the tenth (10th) anniversary of the Effective Date. In consideration for Franchisee's continuing use of the Proprietary Marks and the System, Franchisee shall pay to Franchisor a continuing monthly royalty fee in the amount of two percent (2%) of Gross Room Revenues from the tenth (10th) anniversary of the Effective Date and continuing for the duration of the term of this Agreement."

4.  Capital Expenditures; Renovation Scope; Reserve.

a.  Anything in the Franchise Agreement to the contrary notwithstanding, during the five (5) year period immediately following the Effective Date of the Franchise Agreement, Franchisor will not require Franchisee to upgrade the Hotel or complete other Capital Improvements to the Hotel except for (i) upgrades or Capital Improvements that may be required for health and safety reasons and (ii) system-wide changes to software, computer hardware, modems, devices, and related equipment or changes required by the vendors of such items, both of which Franchisor may require at any time.

b.  Notwithstanding the foregoing, Franchisee shall complete the Renovation Scope attached hereto as Exhibit 1 to Franchisor's satisfaction and in accordance with System Standards on or before the fifth (5th) anniversary of the Effective Date of the Franchise Agreement.

c.  (1)  Franchisee shall, from funds derived from the operation of the Hotel and in accordance with Paragraph 4.c.(2), establish the "Reserve" to cover (i) the cost of additions to and substitutions, replacements and renewals of FF&E and otherwise maintaining the physical appearance of the Hotel to comply with

First Amendment to Franchise Agreement – Page 2

—Wyndham Hotel - Miami Coconut Grove, Florida
DALLDOCS:195590.v1
26719/-87

System Standards and (ii) Capital Improvements to the Hotel. The Reserve shall be maintained in an interest-bearing account. All amounts in the Reserve shall be the property of Franchisee, and any interest on amounts in the Reserve shall remain a part of the Reserve. To the extent that Franchisee shall be required to pay any income taxes on any interest paid on amounts in the Reserve, the same shall be payable out of the Reserve. For the purposes of this Paragraph 4, (a) FF&E shall mean all furniture, fixtures, furnishings and specialized equipment and systems necessary or customary (now or in the future) in the reasonable opinion of Franchisor in order to operate the Hotel in accordance with the terms of this Agreement and the System Standards, including but not limited to all equipment required for the operation of kitchens, laundries, dry cleaning facilities and bars, special lighting and other equipment, signs, carpets, drapes, shades, tapestries, pictures, paintings, beds, mattresses, chairs, desks, tables, sofas, wall coverings, televisions, radios, intercoms, telephones and office equipment and machinery, and (b) Capital Improvements shall mean any and all major alterations and improvements to the Hotel and all major repairs and replacements to the structural, mechanical, electrical, HVAC, plumbing or vertical transportation elements of the Hotel other than certain non-routine repairs and maintenance to the Hotel which are normally capitalized under generally accepted accounting principles.

      (2)      Beginning on the Effective Date and continuing during the remainder of the term of the Franchise Agreement, for each month (or part of a month) during the term, Franchisee shall, by the fifteenth (15th) day of the following month, deposit into the Reserve an amount equal to a four percent (4%) of the Gross Revenue of the Hotel. The amount to be contributed to the Reserve is only an estimate of amounts required for the purposes set forth in Paragraph 4.c.(1).

      (3)      Nothing in this Paragraph 4.c. affects the parties rights and obligations under Paragraphs 4.a. and 4.b. above, including Franchisor's rights to require upgrades and Capital Improvements to the Hotel.

5.      Transfer by Franchisee.

      a.      Section XV.D.2. is hereby deleted in its entirety and is replaced by the following:

"2.  Transferor shall satisfy all of Franchisee's accrued monetary obligations to Franchisor and its Affiliates, shall execute a general release under seal in a form prescribed by Franchisor of any and all claims against Franchisor and its Affiliates, and their respective officers, directors, agents and employees, and shall pay to Franchisor a transfer fee in an amount equal to Franchisor's actual out of pocket costs and expenses (including, without limitation, reasonable attorneys' fees and costs) arising out of or related to the transfer;"

      b.      Section XV.D.5. is hereby deleted in its entirety and is replaced by the following:

"5.  Franchisor and the transferee will, upon approval of transferee's application, enter into a new franchise agreement which shall require transferee to upgrade the Hotel to conform to Franchisor's then-current standards (provided, that if such a transfer is completed within the five (5) year period immediately following the Effective Date, the transferee will not be required to complete an upgrade of the Hotel as a condition to transfer) and which new franchise agreement shall contain the standard terms (except for duration) then being issued for new franchised hotels under the System, provided, however, that Franchisee's transferee's new franchise agreement shall contain the economic terms provided for in Section III. of this Agreement, as amended by the First Amendment hereto. The date of the transferee's new franchise agreement shall be the Effective Date of this Agreement, and the transferee will be required to certify in writing that: (i) Franchisor did not endorse, recommend, or otherwise concur with the terms of the transfer, (ii) Franchisor did not comment upon

First Amendment to Franchise Agreement – Page 3

any financial projections submitted by Franchisee to transferee, and (iii) Franchisor did not participate in the decision of the price to be paid, which decision was made without any intervention, support or participation by Franchisor;"

c.     Section XV.F., "Right of First Refusal", is hereby deleted in its entirety.

d.     Anything in the Franchise Agreement to the contrary notwithstanding, direct or indirect interests in Franchisee's Principals that are identified in Attachment A to the Franchise Agreement may be transferred without obtaining Franchisor's prior written consent; provided, however, that The Goldman Sachs Group, Inc. (or its successors by operation of law) must, at all times during the initial term and any renewal terms, have and maintain direct or indirect control over Franchisee's general partner, W2005 GHIT GenPar, L.L.C., and direct or indirect control over Franchisee.

6.     Termination by Franchisee. Section XVII. is hereby amended by the addition of the following as new Section XVII.D.:

"D. Termination by Franchisee.

1.  Franchisee may terminate this Agreement at any time after the Effective Date without any further liability for fees or liquidated damages (except for accrued fees then due and owing hereunder) upon the sale of the Hotel to an unaffiliated third party and thirty (30) days prior written notice to Franchisor.

2.  At any time after June 30, 2005, Franchisee may terminate this Agreement for any reason upon sixty (60) days prior written notice to Franchisor ("Termination Notice") and payment of a termination fee (the "Termination Fee") calculated as set forth below. The Termination Fee shall be an amount equal to the total amounts required under Sections III.B. and III.C. during the twelve (12) full calendar months of operation preceding the date of the Termination Notice, or, if the Hotel has not been in operation under this Agreement for twelve (12) full calendar months, twelve (12) times the monthly average of such amounts.

3.  Franchisee may terminate this Agreement at any time after the Effective Date without any further liability for fees or liquidated damages (except for accrued fees then due and owing hereunder) upon sixty (60) days prior written notice to Franchisor if:

a.     a petition in bankruptcy is filed by Franchisor, a petition in bankruptcy is filed against and consented to by Franchisor, or Franchisor is adjudicated bankrupt; or

b.     at any time following the Effective Date there are fewer than seventy-five (75) Wyndham Hotels, Wyndham Garden hotels, Viva Wyndham Resort hotels, and Summerfield Suites® by Wyndham hotels (collectively) operated, managed and/or franchised by Franchisor and/or its Affiliates."

7.     Indemnification by Franchisor. Section XXI. is hereby amended by the addition of the following as new Section XXI.C.

"C. Indemnification by Franchisor. Franchisor agrees to indemnify Franchisee against, and to reimburse Franchisee for, all damages for which

First Amendment to Franchise Agreement – Page 4

Franchisee is held liable as a result of a claim that Franchisee's authorized use of the Proprietary Marks pursuant to and in compliance with this Agreement infringes on the rights of another person and, except as provided herein, for all costs Franchisee reasonably incurs in defending any such claim brought against it, provided that Franchisee has timely notified Franchisor of such claim and provided further, that Franchisee is in compliance with this Agreement and with all other agreements entered into with Franchisor or any of its Affiliates. Franchisor, at its sole discretion, is entitled to prosecute, defend and/or settle any such proceeding arising out of Franchisee's use of any Proprietary Mark pursuant to this Agreement and, if Franchisor undertakes to prosecute, defend and/or settle any such matter, Franchisor has no obligation to indemnify or reimburse Franchisee for any fees or disbursements of any legal counsel retained by Franchisee."

8.    Definitions. Attachment D to the Franchise Agreement is hereby amended by the addition of the following definition of "Gross Revenues":

"Gross Revenues" shall mean all revenues, receipts and income of every kind derived directly or indirectly during such period from all or any part of the Hotel, as finally determined on an accrual basis in accordance with the Uniform System of Accounts and generally accepted accounting principles consistently applied, including, but not limited to (i) all rentals and charges for guest rooms, suites, meeting rooms, conference rooms, ballrooms and other public rooms, including but not limited to all charges for room reservations and deposits not refunded to guests; (ii) all sales of food and beverages, whether served on or off the premises, including but not limited to all charges for room service, banquets and catering fees; (iii) all sales or leases of miscellaneous and sundry merchandise and services including but not limited to laundry, valet, garage, parking, telephone, telex, telecopy, e-mail, Internet, check room, vault and other miscellaneous services, cover and minimum charges for guest entertainment, fees charged for the temporary use of facilities at the Hotel, all sales through vending machines and all other receipts from business conducted at the Hotel; (iv) all business interruption insurance awards received in respect of the Hotel; (v) condemnation awards for temporary use of the Hotel; and (vi) all rentals, fees, commissions, concessions and other payments derived from lessees, licensees and concessionaires. Gross Revenues shall not include:

(1)    Excise, sales and use taxes or similar impositions collected directly from patrons or guests or included as part of the sales price of any goods or services and paid to any governmental authority, such as gross receipts, admission or similar equivalent taxes;

(2)    Sales and other receipts of tenants, licensees and concessionaires, except to the extent payable as rent under a lease or occupancy agreement;

(3)    Insurance proceeds (subject, however, to the inclusion of business interruption insurance awards as provided in clause (iv) above);

(4)    Condemnation awards, except as provided in clause (v) above; and

(5)    Proceeds from sale of the Hotel."

–Wyndham Hotel – Miami Coconut Grove, Florida
DALLDOCS:195590.v1
267197-87

9.   Guaranty. Franchisee is the sole titleholder of the Hotel.  If at any time all or any portion of the Hotel is sold, assigned, transferred, or conveyed to another person or entity ("New Owner"), Franchisee will cause the New Owner(s) to execute the Guaranty attached to the Franchise Agreement as Attachment B ("Guaranty"). The failure by any New Owner to execute the Guaranty for any reason will be deemed an event of default under this Agreement for which Franchisor may terminate the Franchise Agreement pursuant to Section XVII.C.

10.   Construction. Except to the extent expressly set forth in this Amendment, the terms of the Franchise Agreement control.

IN WITNESS WHEREOF, Franchisor and Franchisee have executed this First Amendment to Franchise Agreement.

FRANCHISOR

WHC FRANCHISE CORPORATION,
a Delaware corporation

By: _____
    Name: _____
           **Mark M. Chtoupek**
    Title: _____
           **Vice President**

FRANCHISEE:

W2005 GHIT Hotels, L.P.,
a Delaware limited partnership

By: W2005 GHIT GenPar, L.L.C., its general partner

By: _____
    Name: _____
           **ROBERT BLOOM**
    Title: _____
           **MANAGER**

First Amendment to Franchise Agreement – Page 6

EXHIBIT C

## TRANSFER AGREEMENT AND CONSENT

THIS TRANSFER AGREEMENT AND CONSENT ("Transfer Agreement") is made and entered into effective as of July 15, 2005 (the "Effective Date") by and between WHC FRANCHISE CORPORATION, a Delaware corporation ("Franchisor"); W2005 GHIT Hotels, L.P., a Delaware limited partnership (the "Transferor"); W2005 WYN Realty, L.L.C. and W2005 GHIT GenPar, L.L.C. (collectively, "Transferor's Principals"); Merco Group at GB Hotel LC, a Florida limited liability company ("Transferee"); and University At 107th Avenue, Inc., a Florida corporation ("Transferee's Principal").

### RECITALS:

Transferor is the Franchisee under that certain Wyndham Hotel Franchise Agreement dated March 23, 2005, as amended by the First Amendment to Franchise Agreement of even date (the "Franchise Agreement") for a Wyndham Hotel (the "Hotel") located at 3669 South Bayshore Drive, Miami, Florida 33133 (the "Franchise").

Transferor desires to transfer, convey and assign to Transferee all of Transferor's interest in and to the Hotel (the "Sale") and the Franchise (the "Transfer") as provided in this Transfer Agreement and in that certain Purchase and Sale Agreement dated effective April 1, 2005, between Transferor, as seller, and Homero Meruelo ("Meruelo"), as purchaser, as assigned to Transferee by Meruelo (the "Purchase Agreement").

Transferee desires to acquire the Hotel and assume the duties and obligations of the Franchisee under the Franchise subject to the terms, conditions and covenants contained herein and in the Franchise Agreement.

Transferor and Transferee acknowledge that the aforesaid transactions are subject to and conditioned upon Franchisor's consent and have requested that the Franchisor consent to the same.

Franchisor is willing to grant its consent subject to the terms, conditions and covenants herein contained.

Transferor and Transferee have advised Franchisor that the Sale is scheduled to occur effective July 1, 2005. The date on which the Sale is consummated shall be referred to hereinafter as the "Closing Date."

NOW THEREFORE, FOR AND IN CONSIDERATION of the premises, the mutual promises and covenants herein contained, and other good and valuable consideration, the receipt, sufficiency and adequacy of which are expressly acknowledged, the parties, each intending to be legally bound, do hereby mutually agree as follows:

1.      Franchisor's Consent. Subject to (i) the full execution and delivery of this Transfer Agreement (including all Exhibits) no later than, but not before, the Effective Date, (ii) the satisfaction of the terms, conditions and covenants herein contained and (iii) the consummation of the Sale (the "Closing") occurring on or before the Effective Date, Franchisor hereby consents to the Sale and Transfer as set forth herein.  The parties hereby acknowledge and agree that Franchisor's consent applies only to the transactions described herein.  All future transfers (as defined in the Franchise Agreement) shall remain subject to Franchisor's further consent as provided in the Franchise Agreement.  In the event the conditions set forth above are not satisfied or in the event that the Closing does not take place as provided in the Recitals herein, then Transferor shall (a) continue to be responsible for all obligations under the Franchise Agreement, (b) the request for Franchisor's consent to the Sale and the Transfer contemplated by this Transfer Agreement shall be deemed withdrawn, unapproved and without any force or effect, and (c) Transferor shall continue to operate the Franchise in accordance with the terms of the Franchise Agreement.

1

-DALLDOCS:199173.v5

2.      Representations and Acknowledgments of Transferee and Transferee's Principal.

a.      Transferee represents that it has read and understands the Franchise Agreement attached hereto as Exhibit A including all related attachments and addenda and as amended by the Transfer Addendum attached hereto as Exhibit B (the "Transfer Addendum") (collectively referred to hereinafter as, the "Franchise Agreement") and acknowledges that subsequent to the Effective Date it will have all of the obligations of the "Franchisee" thereunder effective retroactively as of the Closing Date. Transferee acknowledges that it has received and has been in possession of a completed copy of the Franchise Agreement for a period of at least five (5) business days prior to the Effective Date.

b.      Transferee's Principal represents that it has read and understands the Franchise Agreement and acknowledges its obligations thereunder and under the Guaranty attached as Attachment 1 to the Transfer Addendum.

c.      Transferee represents and warrants to Franchisor that Transferee is an existing entity, duly formed in accordance with the laws of the state of its organization, and that all direct and indirect owners of Transferee (including the type and amount of their interest in Franchisee) are fully and accurately listed in Attachment 2 to the Transfer Addendum. At Franchisor's request, Transferee shall provide to Franchisor true and correct copies of Transferee's organizational documents.

d.      Transferee acknowledges that it has received and has been in possession of the Franchise Offering Circular For Prospective Franchisees of WHC Franchise Corporation dated May 12, 2005, as amended June 17, 2005, as required by the Federal Trade Commission, for a period of at least ten (10) business days prior to the Effective Date.

3.      Assignment and Assumption of Franchise Agreement.

Effective retroactively as of the Closing Date, Transferor hereby assigns to Transferee all rights and interests of Transferor as "Franchisee" under the Franchise and the Franchise Agreement and Transferee assumes full, unconditional liability for, and agrees to perform, all obligations, covenants and agreements of "Franchisee" under the Franchise and the Franchise Agreement arising on or after the Closing Date.

4.      No Current Default. Transferor represents and warrants to Franchisor and Transferee that, as of the Closing Date, it is not in default nor has there occurred any event which upon the passage of time would constitute a default of any provision contained in the Franchise Agreement or any other agreement between Transferor and Franchisor or its affiliates.

5.      Release of Transferor and Transferor's Principals.  The parties hereby acknowledge and agree that subsequent to the Effective Date, Transferor will no longer have any interest in the Franchise. Accordingly, except as expressly set forth below and effective upon the Effective Date, Franchisor hereby releases, acquits and discharges Transferor and Transferor's Principals from any and all claims, demands, accounts, actions and causes of action arising from and after the Effective Date under the Franchise Agreement or with respect to the Franchise or the Hotel. Notwithstanding the foregoing, Transferor acknowledges and agrees that after the Effective Date, Transferor and Transferor's Principals will continue to be responsible for all of their respective obligations to Franchisor arising under the Franchise Agreement and with respect to the Franchise and the Hotel prior to the Effective Date, and thereafter shall remain responsible for those obligations, and for all other obligations that survive the transfer of the Franchise, which obligations include, without limitation and by agreement of the parties hereto, the indemnification obligations and covenants against nondisclosure of confidential information set forth in the Franchise Agreement. Without limiting the foregoing, Transferor agrees to pay all royalty fees, advertising fees and any other fees or charges (including a transfer fee in an amount equal to Franchisor's actual out of pocket costs and expenses (including, without limitation, attorneys' fees and costs) incurred in connection with the Sale and the Transfer

-DALLDOCS:199173.v5

2

contemplated by this Transfer Agreement) (i) for all months prior to the month in which the Closing occurs on or before the Closing Date and (ii) for the month in which the Closing occurs as invoiced in the ordinary course of business following the Effective Date.

6.     Release of Franchisor and Related Parties; Covenant Not to Sue.

a.     Transferor, Transferee, and their respective Principals, for themselves and on behalf of all other persons acting on their behalf or claiming under them (collectively, the "Releasing Parties"), hereby release, acquit and discharge Franchisor, its subsidiaries, affiliates, successors and assigns and their respective officers, directors, shareholders, partners, employees, agents and representatives, past and present, (hereinafter collectively referred to as "Franchisor"), from any and all claims, demands, accounts, actions and causes of action, known or unknown, vested or contingent, which any of them may have, ever had, now has, or may hereafter have by reason of any event, transaction or circumstance arising out of or relating to the Franchise Agreement and with respect to the Franchise and the Hotel from the beginning of the world through the Effective Date but not with respect to any event, transaction or circumstance arising after the Effective Date.

b.     The Releasing Parties covenant and agree for themselves and their respective officers, directors, employees, successors, assigns, heirs, representatives, agents, family members, and all other persons acting on their behalf or claiming under them (collectively, the "Covenantors") not to bring or allow to be brought on behalf of any Covenantor against Franchisor (as defined in Paragraph 6.a), any action, cause of action, suit or other proceeding of any kind, which has accrued or which may ever accrue, whether based in the Constitution, common law or statute, contract, tort, or in equity, for actual or punitive damages or other relief, arising out of, resulting from, or in any manner related to (i) the Sale and the Transfer contemplated hereby and (ii) claims released under Paragraph 6.a. above.

7.     Indemnity. The parties acknowledge and agree that except for those matters relative to its consent, Franchisor has exercised no influence over and has taken no part in the Sale or Transfer. Accordingly, the Releasing Parties hereby agree to and shall, at all times, indemnify and hold Franchisor (as defined in Paragraph 6.) harmless, to the fullest extent permitted by law, from all losses and expenses (hereinafter defined) incurred in connection with any action, suit, proceeding, claim, demand, investigation or inquiry (formal or informal), or any settlement thereof (whether or not a formal proceeding or action has been instituted) which arises out of or is based upon the Sale or Transfer contemplated by this Transfer Agreement. As used herein, the phrase "losses and expenses" shall include, without limitation, all losses, compensatory, exemplary or punitive damages, fines, charges, costs, expenses, lost profits, reasonable attorneys' fees, court costs, settlement amounts, judgments, compensation for damages to Franchisor's reputation and goodwill, and other such amounts incurred in connection with the matters described.

8.     Notices. Any and all notices required or permitted under this Transfer Agreement shall be in writing and shall be delivered personally or mailed by a nationally recognized overnight commercial delivery service (such as Airborne Express or Federal Express) or by certified mail, return receipt requested, to the respective parties at the following addresses unless and until a different address has been designated by written notice to the other party:

Notices to Franchisor:     WHC Franchise Corporation
1950 Stemmons Freeway, Suite 6001
Dallas, Texas 75207
Facsimile: (214) 863-1000
Attn: General Counsel

Notices to Transferee     Merco Group at GB Hotel LLC
or Transferee's Principal:     6701 Collins Avenue
Miami Beach, Florida 33141
Attn: Chief Financial Officer

~DALLDOCS:199173.v5

3

Facsimile: (305) 779-5365

Notices to Transferor          W2005 GHIT Hotels, L.P.
or Transferor's Principals:    c/o Goldman Sachs Group, Inc.
                               85 Broad Street
                               New York, New York 10004
                               Attn: Jonathan Langer
                               Facsimile: (212) 357-5505

Any notice shall be deemed to have been given at the date and time of (i) receipt or first refusal of delivery if sent via certified mail, or (ii) one (1) day after posting if sent via overnight commercial delivery service.

9.      Dispute Resolution; Governing Law; Venue.  With respect to any disputes arising out of or related to this Transfer Agreement, the parties hereto agree to abide by Section XXVII of the Franchise Agreement relating to, among other things, dispute resolution procedures, governing law and venue.

10.     Severability.  Except as expressly provided to the contrary herein, each section, part, term and provision of this Transfer Agreement shall be considered severable. If, for any reason, any section, part, term or provision herein is determined to be invalid and contrary to, or in conflict with, any existing or future law or regulation by a court or agency having valid jurisdiction, such shall not impair the operation of, or have any other effect upon, such other sections, parts, terms and provisions of this Transfer Agreement as may remain otherwise intelligible, and the latter shall continue to be given full force and effect and bind the parties hereto; and said invalid sections, parts, terms or provisions shall be deemed not to be a part of this Transfer Agreement.

11.     Counterpart Execution; Facsimile Signatures.  This Transfer Agreement may be executed in multiple counterparts, each of which when so executed will be an original, and all of which will constitute one and the same instrument. Facsimile signatures shall be considered effective for execution purposes. Each party providing facsimile signatures shall forward to Franchisor an originally executed signature page within five (5) business days following Franchisor's receipt of the facsimile signature.

[SIGNATURE          PAGE          IMMEDIATELY          FOLLOWING]

IN WITNESS WHEREOF, the parties hereto have executed this Transfer Agreement as of the dates set forth below to be effective as of the dates specified herein.

Transferor:

W2005 GHIT HOTELS, L.P.,
a Delaware limited partnership

By: W2005 GHIT GenPar, L.L.C., its general partner
By: _____
Name: _____
Title: VICE PRESIDENT
Date: _____

Transferor's Principals:

W2005 GHIT GENPAR, L.L.C.
By: _____
Name: _____
Title: VICE PRESIDENT
Date: _____

W2005 WYN REALTY, L.L.C.
By: _____
Name: _____
Title: VICE PRESIDENT
Date: _____

Transferee:

MERCO GROUP AT GB HOTEL LC
a Florida limited liability company

By:      University At 107ᵗʰ Avenue, Inc.,
         a Florida corporation, its sole member

         By: _____
         Name: _____
         Title: _____
         Date: _____

Transferee's Principal:

UNIVERSITY AT 107ᵀᴴ AVENUE, INC.,
a Florida corporation

By: _____
Name: _____
Title: _____
Date: _____

Consent to the Sale and Transfer described
above given as of the Effective Date:

WHC FRANCHISE CORPORATION,
a Delaware corporation
By: _____
Name: Mark M. Chloupek
Title: Vice President

IN WITNESS WHEREOF, the parties hereto have executed this Transfer Agreement as of the dates set forth below to be effective as of the dates specified herein.

**Transferor:**

W2005 GHIT HOTELS, L.P.,
a Delaware limited partnership

By: W2005 GHIT GenPar, L.L.C., its general partner

By: _____
Name: _____
Title: _____
Date: _____

**Transferor's Principals:**

W2005 GHIT GENPAR, L.L.C.

By: _____
Name: _____
Title: _____
Date: _____

W2005 WYN REALTY, L.L.C.

By: _____
Name: _____
Title: _____
Date: _____

**Consent to the Sale and Transfer described above given as of the Effective Date:**

WHC FRANCHISE CORPORATION,
a Delaware corporation

By: _____
Name: _____
Title: _____

**Transferee:**

MERCO GROUP AT GB HOTEL LC
a Florida limited liability company

By:      University at 107th Avenue, Inc.,
         a Florida corporation, its sole member

By: _____
Name: Hamaro Mercuelo
Title: President
Date: July 15, 2005

**Transferee's Principal:**

UNIVERSITY AT 107TH AVENUE, INC.,
a Florida corporation

By: _____
Name: Hamaco Merciula
Title: President
Date: July 15, 2005

~DALLDOCS:199173.v5

5

**EXHIBIT A**
**TO TRANSFER AGREEMENT AND CONSENT**

**FRANCHISE AGREEMENT**

EXHIBIT B
TO TRANSFER AGREEMENT AND CONSENT

TRANSFER ADDENDUM

## TRANSFER ADDENDUM
## TO FRANCHISE AGREEMENT

This Transfer Addendum to Franchise Agreement (this "Addendum") is made and entered into 15th day of July 2005, to be effective as of July 1, 2005, by and between, WHC FRANCHISE CORPORATION, a Delaware corporation ("Franchisor") and Merco Group at GB Hotel LC, a Florida limited liability company ("Franchisee"). This Addendum forms an integral part of the Franchise Agreement (hereinafter defined), this Addendum being appended thereto and fully incorporated therein. Initially capitalized terms used, but not otherwise defined, in this Addendum shall have the meanings set forth in the Franchise Agreement.

### RECITALS:

A.      Effective March 23, 2005, W2005 OHIT Hotels, L.P. ("Original Franchisee") executed a certain franchise agreement, as amended (the "Franchise Agreement"), for a franchised Wyndham Hotel located at 2669 South Bayshore Drive, Miami, Florida 33133 (the "Hotel"). The arrangement represented by the Franchise Agreement is referred to herein as the "Franchise."

B.      Concurrently with the execution of this Addendum, the Franchise is being transferred and assigned by the Original Franchisee to Franchisee pursuant to that certain Transfer Agreement and Consent dated effective July 1$^5$, 2005, and Franchisee is succeeding to and assuming all of Original Franchisee's rights and obligations related to the Franchise effective retroactively as of July 1, 2005.

C.      In recognition of the above-described transfer, Franchisor and Franchisee wish to modify certain terms of the Franchise Agreement.

NOW, THEREFORE, the parties, in consideration of the mutual undertakings and commitments set forth herein, the receipt and sufficiency of which are hereby acknowledged, agree as follows:

1.      Guaranty.  The Franchise Agreement is hereby amended by the replacement of the Guaranty attached to the Franchise Agreement as Attachment B with the Guaranty attached to this Addendum as Attachment 1. The Guaranty has been duly executed by the Franchisee's Principal.

2.      Ownership of Franchise.  The Franchise Agreement is hereby amended by the replacement of the Selected Terms attached to the Franchise Agreement as Attachment A with the Selected Terms attached to this Addendum as Attachment 2, which, among other things, lists the principals of Franchisee and their respective ownership interests in Franchisee. The Selected Terms have been fully and accurately completed and initialed by Franchisee and Franchisor.

3.      Termination by Franchisor.  Section XVII. of the Franchise Agreement is hereby amended by the addition of the following as new Section XVII.E.

> "E.      Additional Franchisor Termination Right.  Franchisor may terminate this Agreement for any reason and at any time upon sixty (60) days prior written notice to Franchisee. Franchisor shall have no liability for termination fees or any damages to Franchisee, including, without limitation, liquidated, actual, consequential, or punitive damages, arising out of, related to, or in connection with such termination."

4.      Construction; Facsimile Signatures.

-DALLDOCS:199173.v5

(b)    Facsimile signatures shall be considered effective for execution purposes. Each party providing facsimile signatures shall forward to Franchisor an originally executed signature page within five (5) business days following Franchisor's receipt of the facsimile signature.

IN WITNESS WHEREOF, the parties hereto have executed this Transfer Addendum as of the day and year first written above.

FRANCHISOR:

WHC FRANCHISE CORPORATION,
a Delaware corporation

By: _____
Name: __Mark M. Chloupek__
Title: __Vice President__

FRANCHISEE:

MERCO GROUP AT GB HOTEL LC,
a Florida limited liability company

By:    University At 107th Avenue, Inc.,
        a Florida corporation, its sole member

        By: _____
        Name: _____
        Title: _____

-DALLDOCS:190173.v5

(a)      Except as expressly set forth herein, all terms and conditions of the Franchise Agreement shall be and remain in full force and effect. This Addendum may be executed in several counterparts, each of which shall serve as an original for all purposes, but all of which shall constitute but one and the same Addendum.

(b)      Facsimile signatures shall be considered effective for execution purposes. Each party providing facsimile signatures shall forward to Franchisor an originally executed signature page within five (5) business days following Franchisor's receipt of the facsimile signature.

IN WITNESS WHEREOF, the parties hereto have executed this Transfer Addendum as of the day and year first written above.

FRANCHISOR:

WHC FRANCHISE CORPORATION,
a Delaware corporation

By:_____
Name:_____
Title:_____


FRANCHISEE:

MERCO GROUP AT GB HOTEL LC
a Florida limited liability company

By:      University At 107th Avenue, Inc.,
         a Florida corporation, its sole member

         By:_____
         Name:_____
         Title:_____

ATTACHMENT 1
TO TRANSFER ADDENDUM

GUARANTY

~DALLDOCS:199173.v5

**ATTACHMENT B**
**TO FRANCHISE AGREEMENT**

### GUARANTY

As an inducement to WHC Franchise Corporation ("Franchisor") to execute the Transfer Agreement and Consent dated effective July 15, 2005 (the "Transfer Agreement"), relating to that certain Wyndham Hotel Franchise Agreement dated March 23, 2005 (the "Franchise Agreement") and applicable to the Wyndham Hotel located at 2669 South Bayshore Drive, Miami, Florida 33133, the undersigned, jointly and severally, hereby unconditionally warrant to Franchisor and its successors and assigns that all of Franchisee's representations in the Transfer Agreement and the Franchise Agreement are true, agree to be bound by all the terms and conditions of the Franchise Agreement including any amendments thereto whenever made (hereinafter, the "Agreement"), and absolutely, unconditionally and irrevocably guaranty to Franchisor and its successors and assigns that all of Franchisee's obligations under the Agreement arising from and after July 1, 2005 will be punctually paid and performed.

Upon default by Franchisee under the Agreement, the undersigned will immediately make each payment and perform each obligation required of Franchisee under the Agreement. Without affecting the obligations of the undersigned under this Guaranty, Franchisor may, without notice to the undersigned, extend, modify, waive, renew or release any indebtedness or obligation of Franchisee, or settle, adjust or compromise any claims against Franchisee. The undersigned waive notice of amendment of the Agreement and notice of demand for payment or performance by Franchisee.

Franchisor may pursue its rights against any of the undersigned without first exhausting its remedies against Franchisee and without joining any other guarantor. No delay on the part of the Franchisor in the exercise of any right or remedy, and no single or partial exercise by Franchisor of any right or remedy shall preclude the further exercise of such right or remedy. Upon the death of an individual guarantor, the estate of such guarantor will be bound by this Guaranty but only for defaults and obligations hereunder existing at the time of death, and the obligations of the other guarantors will continue in full force and effect.

In WITNESS WHEREOF, each of the undersigned has signed this Guaranty as of the effective date of the Transfer Agreement.

ATTEST:                                          **GUARANTOR**

_Susan K. Rob____                     UNIVERSITY AT 2107th AVENUE, INC.,
Witness                                          a Florida corporation

                                                 By:
                                                 Name: Homero Maruela
                                                 Title: President
                                                 Date: July 15, 2005

-DAL1DOCS:199173.v5

**ATTACHMENT 2**
**TO TRANSFER ADDENDUM**

**SELECTED TERMS**

## ATTACHMENT A
## TO FRANCHISE AGREEMENT

### SELECTED TERMS

Effective Date: March 23, 2005

Expiration Date: March 22, 2015

Approved Location of the Hotel:   2669 South Bayshore Drive
Miami, Florida 33133

Number of guest rooms: 177

Initial franchise fee: None

Application fee: None

Franchisee's Principals (names, addresses, and percentages of ownership in Franchisee or in any person or entity that owns a controlling interest in Franchisee):

| Name | Address | Percentage of Ownership |
|------|---------|------------------------|
| University At 107th Avenue, Inc. | 6701 Collins Avenue Miami Beach, Florida 33141 | 100% |

*Designates Franchisee's controlling shareholders, controlling members or general partners signing the Guaranty as Controlling Principals.

Initial

–DALLDOCS:199173.v5

# EXHIBIT D

## ATTACHMENT B
## TO FRANCHISE AGREEMENT

### GUARANTY

As an inducement to WHC Franchise Corporation ("Franchisor") to execute the Transfer Agreement and Consent dated effective July 15, 2005 (the "Transfer Agreement"), relating to that certain Wyndham Hotel Franchise Agreement dated March 23, 2005 (the "Franchise Agreement") and applicable to the Wyndham Hotel located at 2669 South Bayshore Drive, Miami, Florida 33133, the undersigned, jointly and severally, hereby unconditionally warrant to Franchisor and its successors and assigns that all of Franchisee's representations in the Transfer Agreement and the Franchise Agreement are true, agree to be bound by all the terms and conditions of the Franchise Agreement including any amendments thereto whenever made (hereinafter, the "Agreement"), and absolutely, unconditionally and irrevocably guaranty to Franchisor and its successors and assigns that all of Franchisee's obligations under the Agreement arising from and after July 1, 2005 will be punctually paid and performed.

Upon default by Franchisee under the Agreement, the undersigned will immediately make each payment and perform each obligation required of Franchisee under the Agreement. Without affecting the obligations of the undersigned under this Guaranty, Franchisor may, without notice to the undersigned, extend, modify, waive, renew or release any indebtedness or obligation of Franchisee, or settle, adjust or compromise any claims against Franchisee. The undersigned waive notice of amendment of the Agreement and notice of demand for payment or performance by Franchisee.

Franchisor may pursue its rights against any of the undersigned without first exhausting its remedies against Franchisee and without joining any other guarantor. No delay on the part of the Franchisor in the exercise of any right or remedy, and no single or partial exercise by Franchisor of any right or remedy shall preclude the further exercise of such right or remedy. Upon the death of an individual guarantor, the estate of such guarantor will be bound by this Guaranty but only for defaults and obligations hereunder existing at the time of death, and the obligations of the other guarantors will continue in full force and effect.

In WITNESS WHEREOF, each of the undersigned has signed this Guaranty as of the effective date of the Transfer Agreement.

ATTEST:                                                          **GUARANTOR**

_Susan L. Rob___                                         UNIVERSITY AT 107ᵗʰ AVENUE, INC.,
Witness                                                          a Florida corporation

                                                                     By:
                                                                     Name: Homero Macuela
                                                                     Title: President
                                                                     Date: July 15, 2005

-DALLDOCS:199173.v5

# EXHIBIT E

**CENDANT**

```
22445X    APR 21, 2006    AC__T  0.6 LBS    #PK 1
SERVICE 1DA                BILL WT 1 LBS
TRACKING# 1Z22445X0157548014    ALL CURRENCY USD
COST CENTER: 0065069
REF 2:

HANDLING CHARGE 0.00
                                        SERVICE    8-18 USD
```

April 21, 2006

```
22445X    APR 21, 2006    ACT WT  0.6 LBS    #PK 1
SERVICE 1DA                BILL WT 1 LBS
TRACKING# 1Z22445X0155730007    ALL CURRENCY USD
COST CENTER: 0065069
REF 2:

HANDLING CHARGE 0.00
REFERENCE RATE CHARGES:
DV 0.00                         SERVICE   8.18 USD
DC 0.00         COD   0.00      RS        0.00
AH 0.00         HZMT  0.00      SD        0.00
TOT REF CHG  8.18  NTFY  0.00   SP        0.00
                               REF+HANDLING  8.18
17529-
```

**VIA OVERNIGHT COURIER**

Merco Group at GB Hotel LLC
6701 Collins Avenue
Miami Beach, FL 33141
Attn: Chief Financial Officer

Re:   **NOTICE OF MONETARY DEFAULT AND NOTICE OF NON-COMPLIANCE relating to Wyndham® Unit #17529-60413-1 located in Coconut Grove, FL (the "Facility")**

Dear Sir:

I write on behalf of Wyndham Hotels and Resorts, LLC ("we," "our," or "us") regarding the Franchise Agreement dated March 23, 2005 and transferred on July 15, 2005 between Merco Group at GB Hotel LLC ("you" or "your") and us (the "Agreement"). We write to give you formal notice that you are in default under the Agreement because you have not complied with your financial obligations under the Agreement and you are in non-compliance with the Agreement as you have been unresponsive to guest complaints.

The Agreement requires you to timely pay us the continuing monthly fees and other charges relating to your operation of the Facility under the System. Our Financial Services Department advises us that as of April 14, 2006 your account is past due in the amount of $221,397.49. We have enclosed an itemized statement detailing the fees past due. Under the Agreement, you have ten (10) days to pay this amount to us in order to cure your default. If you do not pay this amount within the time permitted, pursuant to Section VIII (D) of the Agreement, we may suspend the Facility from reservation service and or terminate the Agreement.

Furthermore, we have received information that you have been unresponsive to guest complaints, related to the Expert Meeting on PMS from February 14-15th, 2006. As you are aware, these guest complaints involve such items as room standards as well as food and beverage. Pursuant to Section VI (E) of the Agreement, you must participate in all guest complaint resolution programs. If we receive information that you continue to be unresponsive to the complaints of the guests, we will have no alternative but to send you a notice of default pursuant to Section VIII (D) of the Agreement, which may result in suspension of your access to the central reservation system and or termination of the Agreement.

This Notice does not modify, replace or affect any default under the Agreement, or any other default and termination notices, if any, from us or any of our affiliates regarding the Facility. We also reserve the right to take any interim steps permitted under the Agreement because of your default, such as suspending the Facility's access to our central reservation system. We reserve all rights under the terms of the Agreement including but not limited to termination of the

---

Cendant Hotel Group, Inc. 1 Sylvan Way, Parsippany, NJ 07054. Tel: 1-866-582-9104. Fax: 973-496-5345.

Page two
Merco Group at GB Hotel LLC
6701 Collins Avenue
Miami Beach, FL 33141
Attn: Chief Financial Officer

Agreement and your right to operate in the Wyndham System. By copy of this letter, we are notifying your guarantor of this default.

We hope you will take this opportunity to restore your good standing under the Agreement. If you have any questions regarding your default or how it can be timely cured, please call Dean Matz, Director of Financial Services, at (973) 496-5112.

Sincerely yours,

Richard Saltzman
Vice President
Franchise Administration

Enclosure

cc:     Peter Strebel
        Dean Matz
        Jeff Smith
        Homero Meruelo (guarantor)
        6701 Collins Avenue
        Miami Beach, FL 33141

EXHIBIT F

11/30/2006  14:28 FAX  1973753              WYNDHAM HOTEL GROUP                              ☒014/025

**CENDANT**

```
22445X      MAY 23, 2006        ACT WT   0.9 LBS    #PK 1
SERVICE 1DA                     BILL WT  1 LBS
TRACKING# 1Z22445X0155468417              ALL CURRENCY USD
COST CENTER: 0065069
REF 2:

HANDLING CHARGE 0.00                       SERVICE     8.18 USD
REFERENCE RATE CHARGES:                    RS          0.00
                              0.00                     0.00
```

```
22445X      MAY 23, 2006        ACT WT   LTR         #PK 1
SERVICE 1DA                     BILL WT  LTR
TRACKING# 1Z22445X0156866404              ALL CURRENCY USD
COST CENTER: 0065069
REF 2:

HANDLING CHARGE 0.00
REFERENCE RATE CHARGES:                    SERVICE     5.91 USD
DV 0.00                    COD  0.00        RS          0.00
DC 0.00                    HZMT 0.00        SD          0.00
AH 0.00                    NTFY 0.00        SP          0.00
TOT REF CHG  5.91               REF+HANDLING            5.91
```

May 23, 2006

**VIA OVERNIGHT COURIER**

Antonio Castro
Chief Financial Officer
6701 Collins Avenue
Miami Beach, FL 33141

RE:    **Franchise Agreement, dated March 23, 2005 (the "Agreement") between Merco Group at GB Hotel, LLC ("you" or "your") and Wyndham Hotels and Resorts, LLC ("we," "our" or "us") for the Wyndham® Hotel facility located at 2669 South Bayshore Drive, Coconut Grove, Florida #17529 (the "Facility")**

Dear Mr. Castro:

We write again to give you formal notice of your default (the "Notice") under the Agreement for the Facility. The default arises from your failure to meet your financial obligations under the Agreement. The amount (the "Trial Balance") we believe is outstanding as of May 23, 2006 is $290,670.58. The Trial Balance is described in more detail on the statement attached to this Notice. The Trial Balance includes the following: (i) actual unpaid Recurring Fees calculated according to the Agreement based on your filed monthly revenue reports; (ii) estimated unpaid Recurring Fees calculated according to the Agreement for all months in which you did not submit to us a monthly revenue report (this amount is subject to change when you submit such reports); (iii) other unpaid fees and charges calculated according to the Agreement for travel agent commissions, Internet fees, and the like, all as accrued through the date of this Notice; and (iv) interest on the unpaid balances calculated according to the Agreement. We will revise the Trial Balance accordingly when you submit to us all information we need to compute, reverse or verify your Recurring Fees and other charges, and we apply any payments that have been sent to us in good funds but not applied to the account of the Facility. When corrected, the Trial Balance shall be the "Current Balance."

By June 5, 2006, you must pay us the Current Balance and submit to us all additional information, such as monthly revenue reports and cancellation/reconciliation forms for travel agent and other commissions, in addition to all other fees or payments that subsequently accrue and come due under the Agreement from the date of this Notice until June 5, 2006, such as Recurring Fees, additional interest and other amounts. We refer to such additional amounts and the Current Balance collectively as the "Account Balance."

If you pay the Account Balance to us by check, the payment date will not be the date we receive the check but the date your bank confirms to us that funds are immediately available in the amount of the check. Consequently, we recommend that you submit payment to us by bank, cashier's or certified check, or by wire transfer or you allow at least five business days before

Mr. Antonio Castro
May 23, 2006
Page Two

June 5, 2006, for your check to clear. Please know that your partial payment of the Account Balance, even if we accept this payment, does not cure your default under the Agreement.

If your License terminates, the Facility will be permanently removed from the central reservation system on the termination date and you will also lose your right to continue to use the seamless interface version of the property management system. You must then make your own arrangements with the software vendor for a new license.

Moreover, if your License is terminated, you will be obligated to pay us Liquidated Damages and pay us any outstanding Recurring Fees and other charges incurred through the termination date. Further, you will be required to perform your post-termination obligations such as removal of all Wyndham identification ("de-identification") at the Facility. This de-identification process must commence immediately upon termination of the License. By copy of this letter, we are also informing your guarantors of your default

This Notice does not modify, replace or affect any current or future default and termination notices, if any, from us or any of our affiliates regarding the Facility.

If you have any questions, please contact Dean Matz, Senior Director of Financial Services, at (973) 496-5112.

Sincerely,

Richard M. Saltzman
Vice President
Franchise Administration

Enclosure

cc:      Homero Meruelo
         Peter Strebel
         Jeff Smith
         Alicia Kabiri
         Dean Matz

**Wyndham Coconut Grove, FL - 2478**
  **5/23/2006**

Doc.no.     Text                                                           Pstg date

| Doc.no. | Text | Pstg date |
|---|---|---|
| 1000000112 | *Awards - Gold 09/23-26/05 Inv 21065 | 10/14/2005 |
| 1000000112 | Duplicate Payment - 05/2005 ISIS | 10/14/2005 |
| 1000000112 | Duplicate Payment - 04/2005 ISIS | 10/14/2005 |
| 1000000112 | Duplicate Payment - 03/2005 ISIS | 10/14/2005 |
| 1000000112 | *RVS ACCR rcrd 08/17/05-08/31/05 Sprint WAN | 10/14/2005 |
| 1000000112 | *RVS ACCR rcrd 08/01/05-08/16/05 Sprint WAN | 10/14/2005 |
| 1000000112 | *HT31755 REF #A37436 (Transhotel 08/03/05) | 10/14/2005 |
| 1000000112 | *HT31755 REF #37230 (Transhotel 07/02/05) | 10/14/2005 |
| 1000000112 | *HT31755 REF #A37314 (Transhotel 07/17/05) | 10/14/2005 |
| 1000000112 | *RCRD 08/17-31/05 GO Leads - Beatrice Abuzeid - lg | 10/14/2005 |
| 1000000112 | *True up 06/05 Sprint WAN /doc#1000070951 | 10/14/2005 |
| 1000000112 | *Accr true up 08/17/05-08/31/05 Sprint WAN | 10/14/2005 |
| 1000000112 | *HT31755 REF #A37315 (Transhotel 07/17/05) | 10/14/2005 |
| 1000000112 | *8/1-3/05 Delta - Dup charges | 10/14/2005 |
| 1000000112 | *09/05 AmericaWest - Airline Miles | 10/14/2005 |
| 1000000112 | *06/05 Airline Miles - Continental /doc#1000071071 | 10/14/2005 |
| 1000000112 | *06/05 Airline Miles - United /doc#1000071075 | 10/14/2005 |
| 1000000112 | *06/05 Airline Miles - US Airways /doc#1000071077 | 10/14/2005 |
| 1000000112 | *09/05 AmericanExpress - Airline Miles | 10/14/2005 |
| 1000000112 | *Aug 17th - 31st Purchasing Fees-Wynsource/SAP ord | 10/14/2005 |
| 1000000112 | *LUNCH EXPENSE AGENCY VIS /doc#1900099243 | 10/14/2005 |
| 1000000112 | *RVS ACCR true up 08/17/05-08/31/05 Sprint WAN | 10/14/2005 |
| 1000000112 | *RVS ACCR true up 08/01/05-08/16/05 Sprint WAN | 10/14/2005 |
| 1000000112 | *Billout 08/17/05 - 08/31/05 Customer Svce & Comme | 10/14/2005 |
| 1000000112 | *Barbara Birkitt guest recov stay certA9012 /doc#1 | 10/14/2005 |
| 1000000112 | *Carolyn Cordell guest recov stay certA9013 /doc#1 | 10/14/2005 |
| 1000000112 | *Carolyn Cordell guest recov stay certA9014 /doc#1 | 10/14/2005 |
| 1000000112 | *Barbara Birkitt guest recov stay certA9011 /doc#1 | 10/14/2005 |
| 1000000112 | *Joe Stephan guest recov stay certA10028 | 10/14/2005 |
| 1000000112 | *06/05 Airline Miles - Delta /doc#1000071072 | 10/14/2005 |
| 1000000112 | *09/05 US Airways - Airline Miles | 10/14/2005 |
| 1000000112 | *A/N 0042138277-4 /doc#1900100572 | 10/14/2005 |
| 1000000112 | /doc#1900099539 | 10/14/2005 |
| 1000000112 | *09/05 United - Airline Miles | 10/14/2005 |
| 1000000112 | *June 05 Purchasing Fees-Wynsource/SAP orders /doc | 10/14/2005 |
| 1000000112 | xfer a/r balances to 7998 | 10/14/2005 |
| 1000000112 | *09/05 Continental - Airline Miles | 10/14/2005 |
| 1000000112 | *Billout 07/05 Customer Svce & Comment Card Progra | 10/14/2005 |
| 1000000112 | *Billout 10/05 Customer Svce & Comment Card Progra | 10/14/2005 |
| 1000000112 | *Billout 09/05 Customer Svce & Comment Card Progra | 10/14/2005 |
| 1000000112 | *ASP SDD Fees 8/17-8/31 Coconut Grove - Miami | 10/14/2005 |
| 1000000112 | *RCRD 08/17-31/05 GO Leads - Beatrice Abuzeid - lg | 10/14/2005 |
| 1000000112 | *06/05 Airline Miles - American /doc#1000071065 | 10/14/2005 |
| 1000000112 | *LUNCH EXPENSE AGENCY VIS /doc#1900099292 | 10/14/2005 |
| 1000000112 | *MIS Fees 08/05 2478 Dallas Park Central | 10/14/2005 |
| 1000000112 | *09/05 Delta - Airline Miles | 10/14/2005 |

| | |
|---|---|
| 1000000112 *ASP SDD Fees 07/05 Coconut Grove - Miami /doc#100 | 10/14/2005 |
| 1000000112 *ASP SDD Fees 9/05 Coconut Grove - Miami | 10/14/2005 |
| 1000000112 *ASP SDD Fees 10/05 Coconut Grove - Miami | 10/14/2005 |
| 1000000112 *CostCo-July YTD Trueup (prorated) | 10/14/2005 |
| 1000000112 *09/05 American - Airline Miles | 10/14/2005 |
| 1000000112 *Accr rcrd 08/01/05-08/16/05 Sprint WAN /doc#10000 | 10/14/2005 |
| 1000000112 *BYREQUEST PROG 08/17/05-08/31/05 : GUEST RECOG | 10/14/2005 |
| 1000000112 *MIS Fees 06/05 2478 Dallas Park Central /doc#1000 | 10/14/2005 |
| 1000000112 *MIS Fees 09/05 2478 Dallas Park Central | 10/14/2005 |
| 1000000112 *MIS Fees 10/05 2478 Dallas Park Central | 10/14/2005 |
| 1000000112 *RCRD 06/05 REGIONAL COOP ADV FEE - WH - Coconut G | 10/14/2005 |
| 1000000112 *RCRD 8/05 Sprint WAN | 10/14/2005 |
| 1000000112 *ACCR 9/05 Sprint WAN | 10/14/2005 |
| 1000000112 *RCRD 08/17/05 - 08/31/05 REGIONAL COOP ADV FEE - | 10/14/2005 |
| 1000000112 *Rcrd 06/05 Sprint WAN /doc#1000070945 | 10/14/2005 |
| 1000000112 *RCRD 06/05 GO Leads - Sherry Antaya - Wall Street | 10/14/2005 |
| 1000000112 *BYREQUEST PROG 07/05 : GUEST RECOG /doc#100007124 | 10/14/2005 |
| 1000000112 *BYREQUEST PROG 10/05 : GUEST RECOG | 10/14/2005 |
| 1000000112 *BYREQUEST PROG 09/05 : GUEST RECOG | 10/14/2005 |
| 1000000112 *RCRD 09/05 REGIONAL COOP ADV FEE - WH - Coconut G | 10/14/2005 |
| 1000000112 *RCRD 06/05 SALES ALLOC FEE - WH - Coconut Grove / | 10/14/2005 |
| 1000000112 *RCRD 08/17/05 - 08/31/05 SALES ALLOC FEE - WH - C | 10/14/2005 |
| 1000000112 *RCRD 09/05 SALES ALLOC FEE - WH - Coconut Grove | 10/14/2005 |
| 1000000112 *RCRD 06/05 MARKETING FEE - WH - Coconut Grove /do | 10/14/2005 |
| 1000000112 *RCRD 08/17/05 - 08/31/05 MARKETING FEE - WH - Coc | 10/14/2005 |
| 1000000112 *RCRD 09/05 MARKETING FEE - WH - Coconut Grove | 10/14/2005 |
| 1000000112 *ISIS Coconut Grove  08/2005 | 10/14/2005 |
| 1000000112 *ISIS Coconut Grove  09/2005 | 10/14/2005 |
| 1000000114 *HT31755 REF #A37713 (Transhotel 10/20/05) | 10/16/2005 |
| 1000000114 *HT31755 REF #200907 (Transhotel 10/05/05) | 10/16/2005 |
| 1000000114 *HT31755 REF #A37762 (Transhotel 10/20/05) | 10/16/2005 |
| 1000000114 *HT31755 REF #A37722 (Transhotel 10/20/05) | 10/16/2005 |
| 1000000114 *Sept 05 Purchasing Fees-Wynsource/SAP orders | 10/16/2005 |
| 1000000114 * | 10/16/2005 |
| 1000000047 *9/05 SPRINT WAN TRUE-UP | 10/31/2005 |
| 1000000058 *10/05 AmericaWest Airline Miles | 10/31/2005 |
| 1000000055 *10/05 Alaska Airline Miles | 10/31/2005 |
| 1000000057 *10/05 AMEX Airline Miles | 10/31/2005 |
| 1000000054 *10/05 AirCanada Airline Miles | 10/31/2005 |
| 1000000059 *10/05 Continental Airline Miles | 10/31/2005 |
| 1000000062 *10/05 United Airline Miles | 10/31/2005 |
| 1000000064 *10/05 US Airways Airline Miles | 10/31/2005 |
| 1000000060 *10/05 Delta Airline Miles | 10/31/2005 |
| 1000000050 *Amex Travel commission true up | 10/31/2005 |
| 1000000056 *10/05 American Airline Miles | 10/31/2005 |
| 1000000078 *RCRD 10/01/05 - 10/11/05 REGIONAL COOP ADV FEE - | 10/31/2005 |
| 1000000095 *RCRD 10/12/05 - 10/31/05 REGIONAL COOP ADV FEE - | 10/31/2005 |
| 1000000078 *RCRD 10/01/05 - 10/11/05 SALES ALLOC FEE - WH - C | 10/31/2005 |
| 1000000053 *ACCR 10/31 Sprint WAN | 10/31/2005 |
| 1000000095 *RCRD 10/12/05 - 10/31/05 SALES ALLOC FEE - WH - C | 10/31/2005 |
| 1000000078 *RCRD 10/01/05 - 10/11/05 MARKETING FEE - WH - Coc | 10/31/2005 |
| 1000000095 *RCRD 10/12/05 - 10/31/05 MARKETING FEE - WH - Coc | 10/31/2005 |

| | |
|---|---|
| 1000000052 *CRO Coconut Grove 10/2005 | 10/31/2005 |
| 1000000209 *Oct 05 Purchasing Fees-Wynsource/SAP orders | 11/01/2005 |
| 1000000234 *Billout 11/05 Customer Svce & Comment Card Progra | 11/01/2005 |
| 1000000210 *RCRD Oct 05 GO Leads - Roxana Leon - Banco Intern | 11/14/2005 |
| 1000000210 *RCRD Oct 05 GO Leads - Roxana Leon - Banco Intern | 11/14/2005 |
| 1000000212 *BYREQUEST PROG 11/05 : GUEST RECOG | 11/15/2005 |
| 1000000297 *10/05 SPRINT WAN TRUE-UP | 11/30/2005 |
| 1000000288 *09/05 Cost Co Comm-not paid thru Pegasus | 11/30/2005 |
| 1000000371 *Cendant CRO- Coconut Grove 11/2005 | 11/30/2005 |
| 1000000155 *ASP SDD Fees 11/05 Coconut Grove - Miami | 11/30/2005 |
| 1000000136 *MIS Fees 11/05 2478 Dallas Park Central | 11/30/2005 |
| 1000000299 *ACCR 11/30 Sprint WAN | 11/30/2005 |
| 1000000283 *ISIS Coconut Grove 11/2005 | 11/30/2005 |
| 1000000395 *Billout 12/05 Customer Svce & Comment Card Progra | 12/13/2005 |
| 1000000413 *Nov 05 Purchasing Fees-Wynsource/SAP orders | 12/14/2005 |
| 1000000404 *ASP SDD Fees 12/05 Coconut Grove - Miami | 12/14/2005 |
| 1000000397 *MIS Fees 12/05 2478 Dallas Park Central | 12/14/2005 |
| 1000000419 *CRO Coconut Grove 12/2005 | 12/15/2005 |
| 1900000146 | 12/15/2005 |
| 1900000145 * | 12/15/2005 |
| 1000000422 *RCRD Nov 05 GO Leads - Stephanie Bowers - SHRM - | 12/15/2005 |
| 1000000415 *BYREQUEST PROG 12/05 : GUEST RECOG | 12/15/2005 |
| 1000000430 *11/05 SPRINT WAN TRUE-UP | 12/30/2005 |
| 1000000431 *ACCR 12/05 Sprint WAN | 12/30/2005 |
| 1000000500 *CRO Cendant Coconut Grove 12/2005 | 12/30/2005 |
| 1000000526 *Awards - Rayna Katz 11/13/05 Inv 38490 | 12/31/2005 |
| 1000000520 *12/05 - Midwest | 12/31/2005 |
| 1000000511 *12/05 - AirCanada | 12/31/2005 |
| 1000000512 *12/05 - Alaska | 12/31/2005 |
| 1000000514 *12/05 - AmericanExpress | 12/31/2005 |
| 1000000516 *12/05 - Continental | 12/31/2005 |
| 1000000521 *12/05 - United | 12/31/2005 |
| 1000000522 *12/05 - USAir | 12/31/2005 |
| 1000000501 *ISIS Coconut Grove 12/2005 | 12/31/2005 |
| 1000000517 *12/05 - Delta | 12/31/2005 |
| 1000000513 *12/05 - American | 12/31/2005 |
| 1000000497 *ISIS Coconut Grove 12/2005 | 12/31/2005 |
| 100000695  *SEIB 3rd Qtr Closures WH Coconut Grove | 01/03/2006 |
| 1000000591 *2006-TA comm-Mega agencies-(WY)-Grand Bay-Coconut | 01/12/2006 |
| 1000000606 *ASP SDD Fees 01/06 Coconut Grove - Miami | 01/14/2006 |
| 1000000609 *MIS Fees 01/06 2478 Miami Coconut Grove | 01/14/2006 |
| 1000000612 *BYREQUEST PROG 1/06 : GUEST RECOG | 01/15/2006 |
| 1000000614 *RCRD DEC 05 GO Leads - Irene Rodriguez-Chomat - H | 01/16/2006 |
| 1000000614 *RCRD DEC 05 GO Leads - Irene Rodriguez-Chomat - H | 01/16/2006 |
| 1000000608 *Billout 01/06 Customer Svce & Comment Card Progra | 01/17/2006 |
| 1000000621 *Dec 05 Purchasing Fees-Wynsource/SAP orders | 01/20/2006 |
| 1000000705 *CRO Cendant Coconut Grove 12/05 Correction | 01/31/2006 |
| 1000000683 *CRO Correction 12/05 invoice | 01/31/2006 |
| 1000000715 *12/05 Cost Co Comm-not paid thru Pegasus | 01/31/2006 |
| 1000000714 *12/05 SPRINT WAN TRUE-UP | 01/31/2006 |
| 1000000653 *Jan 2006 - Midwest | 01/31/2006 |
| 1000000647 *Jan 2006 - Alaska | 01/31/2006 |

| | |
|---|---|
| 1000000649 *Jan 2006 - AmericanExpress | 01/31/2006 |
| 1000000651 *Jan 2006 - Continental | 01/31/2006 |
| 1000000654 *Jan 2006 - United | 01/31/2006 |
| 1900000526 | 01/31/2006 |
| 1000000652 *Jan 2006 - Delta | 01/31/2006 |
| 1000000655 *Jan 2006 - USAir | 01/31/2006 |
| 1000000648 *Jan 2006 – American | 01/31/2006 |
| 1000000712 *ACCR 1/06 Sprint WAN | 01/31/2006 |
| 1000000694 *CRO Cendant Coconut Grove  01/2006 | 01/31/2006 |
| 1000000778 *Brad Helicher guest recov stay certA10171 | 02/13/2006 |
| 1000000784 *RCRD 12/05 REGIONAL COOP ADV FEE - WH - Coconut G | 02/13/2006 |
| 1000000784 *RCRD 11/05 REGIONAL COOP ADV FEE - WH - Coconut G | 02/13/2006 |
| 1000000784 *RCRD 12/05 SALES ALLOC FEE - WH - Coconut Grove | 02/13/2006 |
| 1000000784 *RCRD 11/05 SALES ALLOC FEE - WH - Coconut Grove | 02/13/2006 |
| 1000000784 *RCRD 12/05 MARKETING FEE - WH - Coconut Grove | 02/13/2006 |
| 1000000784 *RCRD 11/05 MARKETING FEE - WH - Coconut Grove | 02/13/2006 |
| 1000000785 *ASP SDD Fees 02/06 Coconut Grove - Miami | 02/14/2006 |
| 1000000801 *MIS Fees 02/06 2478 Miami Coconut Grove | 02/14/2006 |
| 1000000787 RCRD 01/06 REGIONAL COOP ADV FEE - WH - Coconut Gr | 02/14/2006 |
| 1000000787 RCRD 01/06 SALES ALLOC FEE - WH - Coconut Grove | 02/14/2006 |
| 1000000787 RCRD 01/06 MARKETING FEE - WH - Coconut Grove | 02/14/2006 |
| 1000000751  *SEIB 3rd Qtr Rebates WH Coconut Grove | 02/15/2006 |
| 1000000802 *Billout 02/06 Customer Svce & Comment Card Progra | 02/15/2006 |
| 1000000804 *BYREQUEST PROG 2/06 : GUEST RECOG | 02/15/2006 |
| 1000000827 *Jan 06 Purchasing Fees-Wynsource/SAP orders | 02/23/2006 |
| 1000000913 *Guest J Flanagan reimb. | 02/28/2006 |
| 1000000870 *1/06 SPRINT WAN TRUE-UP | 02/28/2006 |
| 1000000894 *Feb 2006 - Alaska | 02/28/2006 |
| 1000000896 *Feb  2006 - AmericanExpress | 02/28/2006 |
| 1000000902 *Feb 2006 - United | 02/28/2006 |
| 1000000898 *Feb 2006 - Continental | 02/28/2006 |
| 1000000903 *Feb 2006 - USAir | 02/28/2006 |
| 1000000899 *Feb 2006 - Delta | 02/28/2006 |
| 1000000895 *Feb 2006 - American | 02/28/2006 |
| 1000000869 *ACCR 2/06 Sprint WAN | 02/28/2006 |
| 1000000847 *RCRD JAN 06 GO Leads - Ken Beck - Intertek Sales | 02/28/2006 |
| 1000000881 *CRO Cendant Coconut Grove  02/2006 | 02/28/2006 |
| 1000000951 *Billout 03/06 Customer Svce & Comment Card Progra | 03/09/2006 |
| 1000000965 *ASP SDD Fees 03/06 Coconut Grove - Miami | 03/14/2006 |
| 1000000963 *MIS Fees 03/06 2478 Miami Coconut Grove | 03/14/2006 |
| 1000000972 *BYREQUEST PROG 3/06 : GUEST RECOG | 03/15/2006 |
| 1000000993 SYSCO Q3 & Q4 2005 PURCHASE REBATES  Wyndham Cocon | 03/23/2006 |
| 1000000989 RCRD 02/06 REGIONAL COOP ADV FEE - WH - Coconut Gr | 03/23/2006 |
| 1000000989 RCRD 02/06 SALES ALLOC FEE - WH - Coconut Grove | 03/23/2006 |
| 1000000989 RCRD 02/06 MARKETING FEE - WH - Coconut Grove | 03/23/2006 |
| 1000001009 Rvs 03/06 MIS Fees Miami Coconut Grove | 03/30/2006 |
| 1000001050 *3/06 SPRINT WAN TRUE-UP | 03/31/2006 |
| 1000001089 *03/06 - AmericaWest | 03/31/2006 |
| 1000001095 *03/06 - Midwest | 03/31/2006 |
| 1000001072 *03/06 - Alaska | 03/31/2006 |
| 1000001070 *03/06 - AirCanada | 03/31/2006 |
| 1000001088 *03/06 - American Express | 03/31/2006 |



| | | |
|---|---|---|
| 1000001054 | *RCRD FEB 06 GO Leads - Keala Griffin - Meeting | 03/31/2006 |
| 1000001062 | *Feb 06 Purchasing Fees-Wynsource/SAP orders | 03/31/2006 |
| 1000001096 | *03/06 - United | 03/31/2006 |
| 1000001098 | *03/06 - USAirways | 03/31/2006 |
| 1000001091 | *03/06 - Continental | 03/31/2006 |
| 1000001055 | *RCRD MAR 06 GO Leads - Melissa Cothern - P&G May | 03/31/2006 |
| 1000001077 | *03/06 - American | 03/31/2006 |
| 1000001092 | *03/06 - Delta | 03/31/2006 |
| 1000001056 | *ACCR 3/06 Sprint WAN | 03/31/2006 |
| 1000001054 | *RCRD FEB 06 GO Leads - Christian Hobbs - Q2Q Quin | 03/31/2006 |
| 1000001102 | *CRO Cendant Coconut Grove  03/2006 | 03/31/2006 |
| 1000001251 | Commissions-Pegasus 08Apr-21 Apr 2006 | 04/02/2006 |
| 1000001068 | Commissions-Pegasus 11-24 Mar 2006 | 04/04/2006 |
| 1000001127 | *ASP SDD Fees 04/06 Coconut Grove - Miami | 04/14/2006 |
| 1000001134 | *MIS Fees 04/06 2478 Miami Coconut Grove | 04/14/2006 |
| 1000001130 | *BYREQUEST PROG 4/06 : GUEST RECOG | 04/15/2006 |
| 1000001154 | *Billout 04/06 Customer Svce & Comment Card Progra | 04/17/2006 |
| 1000001167 | *RCRD 03/06 REGIONAL COOP ADV FEE - WH - Coconut G | 04/18/2006 |
| 1000001167 | *RCRD 03/06 SALES ALLOC FEE - WH - Coconut Grove | 04/18/2006 |
| 1000001167 | *RCRD 03/06 MARKETING FEE - WH - Coconut Grove | 04/18/2006 |
| 1000001169 | Commissions-Pegasus 25 Mar-7 Apr 2006 | 04/19/2006 |
| 1000001186 | *Mar 06 Purchasing Fees-Wynsource/SAP orders | 04/21/2006 |
| 1000001268 | *4/06 SPRINT WAN TRUE-UP | 04/30/2006 |
| 1000001270 | *ACCR 4/06 Sprint WAN | 04/30/2006 |
| 1000001245 | *CRO Cendant Coconut Grove  04/2006 | 04/30/2006 |
| 1000001323 | *Billout 005/06 Customer Svce & Comment Card Progr | 05/12/2006 |
| 1000001324 | *ASP SDD Fees 05/06 Coconut Grove - Miami | 05/12/2006 |
| 1000001331 | *BYREQUEST PROG 5/06 : GUEST RECOG | 05/12/2006 |
| 1000001348 | *April 06 Purchasing Fees-Wynsource/SAP orders | 05/15/2006 |
| 100001272 | *MIS Fees 05/06 2478 Miami Coconut Grove | 05/15/2006 |
| 1000001364 | *RCRD 04/06 REGIONAL COOP ADV FEE - WH - Coconut G | 05/15/2006 |
| 1000001364 | *RCRD 04/06 SALES ALLOC FEE - WH - Coconut Grove | 05/15/2006 |
| 1000001364 | *RCRD 04/06 MARKETING FEE - WH - Coconut Grove | 05/15/2006 |
| 1000001374 | Commissions-Pegasus 08Apr-21 Apr 2005 | 05/16/2006 |

Amt in loc.cur.

```
-7,876.00
-6,603.25
-5,984.25
-2,191.00
 -670.97
 -670.97
 -433.92
 -289.28
 -216.96
 -152.60
  -79.94
  -75.75
  -72.32
  -10.25
   10.25
   20.50
   20.50
   30.75
   30.75
   33.87
   37.29
   75.75
   75.75
   99.92
  100.00
  100.00
  100.00
  100.00
  100.00
  112.75
  153.75
  156.45
  159.95
  164.00
  172.05
  173.62
  194.75
  206.50
  206.50
  206.50
  216.00
  218.00
  276.75
  286.68
  420.02
  430.50
```

450.00
450.00
450.00
501.76
553.50
670.97
706.57
868.04
868.04
868.04
1,184.73
1,198.07
1,200.00
1,225.75
1,300.00
1,428.60
1,460.25
1,460.25
1,460.25
1,712.54
2,369.46
2,451.49
3,425.07
3,554.19
3,677.24
5,137.61
5,507.50
7,224.25
-506.24
-267.81
-144.64
-72.32
131.30
193.24
2.07
10.25
10.25
20.50
20.50
71.75
92.25
102.50
143.50
211.81
276.75
590.22
786.20
1,180.43
1,200.00
1,572.39
1,770.65
2,358.59

```
        8,329.00
           81.99
          206.50
         -606.90
          867.00
        1,460.25
           91.08
          235.20
          356.50
          450.00
          868.04
        1,200.00
        8,432.25
          206.50
            6.15
          450.00
          868.04
       -1,766.00
          182.19
          190.02
        1,428.60
        1,460.25
          -22.31
        1,200.00
        3,717.25
         -314.14
           10.25
           10.25
           10.25
           51.25
           92.25
          153.75
          205.00
          240.75
          461.25
          594.50
        2,147.75
         -104.01
        6,210.00
          450.00
          868.04
        1,460.25
         -700.00
        1,000.00
           95.88
           69.02
         -382.50
          -26.75
          -14.10
            0.93
           10.25
           20.50
```

```
        51.25
        71.75
       153.75
       188.03
       266.50
       266.50
       533.00
     1,200.00
    13,522.00
       100.00
     2,626.74
     3,038.40
     5,253.47
     6,076.80
     7,880.21
     9,115.20
       450.00
       868.04
     3,824.69
     7,649.36
    11,474.06
       -10.55
        95.88
     1,460.25
       103.33
      -405.67
         4.57
        10.25
        10.25
        61.50
        71.75
        82.00
       123.00
       225.50
     1,200.00
     1,428.60
    10,642.25
        95.88
       450.00
       868.04
     1,460.25
       -16.93
     3,988.30
     7,976.60
    11,964.90
      -868.04
         3.86
        10.25
        20.50
        20.50
        30.75
        51.25
```

```
        69.50
        72.65
       205.00
       205.00
       215.25
       385.60
       553.50
       902.00
     1,200.00
     1,428.60
    11,773.50
     2,738.31
     3,624.95
       450.00
       868.04
     1,460.25
        95.88
     4,132.58
     8,265.16
    12,397.74
     1,992.16
        79.22
        -4.55
     1,200.00
     5,972.25
        95.88
       450.00
     1,460.25
        85.46
       868.04
     4,132.58
     8,265.16
    12,397.74
     1,870.94

   290,670.58
```

EXHIBIT G

11/30/2006 14:25 FAX  19737538  0      WYNDHAM HOTEL GROUP                      ☑001/025



Wyndham Hotel Group
1 Sylvan Way
Parsippany NJ 07054
866 582 2104 telephone
800 643 2107 facsimile

```
22445X       NOV 15, 2006
SERVICE 1DA                   ACT WT  LTR
TRACKING# 1Z22445X0156956065  BILL WT LTR      #PK 1
COST CENTER: 0065069                 ALL CURRENCY USD
REF 2:

HANDLING CHARGE 0.00
REFERENCE RATE CHARGES:
DV 0.00
DC 0.00           COD   0.00    SERVICE   6.12 USD
AH 0.00
TOT REF  22445X       NOV 15, 2006      ACT WT  LTR      #PK 1
         SERVICE 1DA                    BILL WT LTR
         TRACKING# 1Z22445X0155037878          ALL CURRENCY USD
         COST CENTER: 0065069
         REF 2:

HANDLING CHARGE 0.00
REFERENCE RATE CHARGES:                 SERVICE    6.12 USD
DV 0.00                   COD   0.00    RS         0.00
DC 0.00                   HZMT  0.00    SD         0.00
AH 0.00                   NTFY  0.00    SP         0.00
TOT REF CHG  6.12                REF+HANDLING      6.12
```

November 15, 2006

## VIA OVERNIGHT COURIER

Antonio Castro
Chief Financial Officer
6701 Collins Avenue
Miami Beach, FL 33141

RE:    **Franchise Agreement, dated March 23, 2005 (the "Agreement") between Merco Group at GB Hotel, LLC ("you" or "your") and Wyndham Hotels and Resorts, LLC ("we," "our" or "us") for the Wyndham® Hotel facility located at 2669 South Bayshore Drive, Coconut Grove, Florida #17529 (the "Facility")**

Dear Mr. Castro:

We write again to give you continuing notice of your default (the "Notice") under the Agreement for the Facility. The default arises from your failure to meet your financial obligations under the Agreement. The amount (the "Current Balance) we believe is outstanding as of November 15, 2006 is $451,783.29. The Current Balance is described in more detail on the statement attached to this Notice. The Current Balance includes the following: (i) actual unpaid Recurring Fees calculated according to the Agreement based on your filed monthly revenue reports; (ii) other unpaid fees and charges calculated according to the Agreement for travel agent commissions, Internet fees, and the like, all as accrued through the date of this Notice; and (iii) interest on the unpaid balances calculated according to the Agreement.

By November 27, 2006 you must pay us the Current Balance in addition to all other fees or payments that subsequently accrue and come due under the Agreement from the date of this Notice until November 27, 2006, such as Recurring Fees, additional interest and other amounts. We refer to such additional amounts and the Current Balance collectively as the "Account Balance."

If you pay the Account Balance to us by check, the payment date will not be the date we receive the check but the date your bank confirms to us that funds are immediately available in the amount of the check. Consequently, we recommend that you submit payment to us by bank, cashier's or certified check, or by wire transfer or you allow at least five business days before **November 27, 2006** for your check to clear. Please know that your partial payment of the Account Balance, even if we accept this payment, does not cure your default under the Agreement.

Please be advised that we reserve the right to take any interim steps permitted under the Agreement because of your default, such as suspending the Facility's access to our central

reservation system. In addition, we reserve all rights under the terms of the Agreement including but not limited to termination of the Agreement and your right to operate in the Wyndham System. If your License terminates, the Facility will be permanently removed from the central reservation system on the termination date and you will also lose your right to continue to use the seamless interface version of the property management system. You must then make your own arrangements with the software vendor for a new license.

Moreover, if your License is terminated, you will be obligated to pay us Liquidated Damages and pay us any outstanding fees and other charges incurred through the termination date.    Further, you will be required to perform your post-termination obligations such as removal of all items bearing the Wyndham trade name, trade marks and service marks ("de-identification") at the Facility.  This de-identification process must commence immediately upon termination of the Agreements. By copy of this letter, we are also informing your guarantors of your default

This Notice does not modify, replace or affect any current or future default and termination notices, if any, from us or any of our affiliates regarding the Facility.

If you have any questions, please contact me at (973) 753-7240.

Sincerely,

Richard M. Saltzman
Vice President
Franchise Administration

Enclosure

cc:      Homero Meruelo
         Peter Strebel
         Jeff Smith
         Korin Neff
         Dean Matz

# EXHIBIT H



Wyndham Hotel Group
1 Sylvan Way
Parsippany, NJ 07054
(973) 753-8800 telephone
(800) 643-2107 facsimile

Franchise Administration

VIA OVERNIGHT COURIER

November 30, 2006

Antonio Castro
Chief Financial Officer
Merco Group
6701 Collins Avenue
Miami Beach, FL 33141

RE:   **License Agreement, dated March 23, 2005, as amended, (the "Agreement") between
      Merco Group at GB Hotel, LLC ("you" or "your") and Wyndham Hotels and Resorts,
      LLC ("we", "our" or "us") as successor in interest to WHC Corporation  for the
      Wyndham® lodging facility located at 2669 South Bayshore Drive, Coconut Grove,
      Florida #17529 (the "Facility")**

Dear Mr. Castro:

We write to give you formal notice of the termination of the Agreement to operate the Facility as
part of the Wyndham System (the "Notice"). This termination, pursuant to Sections XVII.B.7 and
XVII.C of the Agreement, is because you did not timely cure your financial default under the
Agreement.   The termination of your Agreement is effective as of December 1, 2006 (the
"Termination Date").

Your letter of November 27, 2006 purporting to terminate the Agreement pursuant to Section
XVII.D.2 of the Agreement is ineffective as you failed to tender the requisite Termination Fee with
the termination notice. In addition, please be advised that contrary to the assertions contained in
your letter, there is no right to "off-set" any alleged damages under the Agreement. Moreover, you
subsequently attempted to remove the Facility from WynWeb which is in direct violation of the
Agreement.  This action also contradicts your assertion that you would remain in the system for
sixty (60) days.

Accordingly, because your Agreement is terminated you must immediately perform your post-
termination obligations in accordance with Section XVIII.C of the Agreement.  In addition to other
obligations specified in the Agreement, you are required to immediately (a) remove all signage and
other items bearing the Wyndham and Grand Bay trade name, trade Marks and Service Marks
("Wyndham Marks"); (b) cease operations of the Facility as a Wyndham brand guest lodging
facility; (c) remove all distinctive signs, billboards, emblems, amenities and other items bearing the
Wyndham Marks, change directories, and other listings in telephone directories, travel guides, hotel
indexes and similar materials in which the Facility is identified as a Wyndham facility; (d) remove
the Wyndham Marks from any advertising or promotional activities on, around or directed towards

NOV-30-2006  07:15                                                                    P.03/03

the Facility, including any web sites, web pages, meta tags or search engines (e) cancel any assumed name or equivalent registration which contains the name "Wyndham" or any variation thereof or any other Mark, including the use of "Grand Bay" and any variation thereof; and (f) return the Manual, instructions, Software and accompanying documentation and all other materials provided by us related to the operation of the Facility, and all other copies thereof. You must cooperate fully with us regarding any post-termination inspections by us to verify that the Facility has been properly de-identified. You must immediately return to us all training documents, operating manuals and other proprietary material.

Furthermore, you must pay us any outstanding Recurring Fees and any other fees and charges through the date you complete the de-identification of the Facility. We estimate that, as of November 30, 2006 you owe us $469,954.42 in such fees and charges. Please pay us this amount immediately. In addition, pursuant to Section XVIII.E of the Agreement, you must pay us liquidated damages in the amount of $182,961.57. This figure is calculated as the lump sum equal to the total amounts required under Sections III.B. and III.C during the thirty-six (36) full calendar months of operation preceding the termination.

If you do not timely complete each of these post-termination obligations, we will refer this matter to our legal department to ensure that we recover from you all amounts owed and that all of your post-termination obligations to us are performed.

This Notice does not modify, replace or affect any default under the Agreement, or any other default and termination notices, if any, from us or any of our affiliates regarding the Facility. Please consider this letter to be a notice and demand for payment under any Guaranty of the Agreement, directed to all of your guarantors.

If you have any questions regarding your obligations under this letter, please contact me at (973) 753-7240.

Sincerely,

Richard M. Saltzman
Vice President
Franchise Administration
Enclosures

cc:     Homero Meruelo
        Peter Strebel
        Jeff Smith
        Korin Neff
        Dean Matz
        Charlene Martin

# EXHIBIT I

WYNDHAM Coconut Grove - 2478
11/30/2006

| Doc.no. | Text | Pstg date | Amt in loc.cur. |
|---|---|---|---|
| 1000000112 | *Awards - Gold 09/23-26/05 Inv 21065 | 10/14/2005 | -7,876.00 |
| 1000000112 | Duplicate Payment - 05/2005 ISIS | 10/14/2005 | -6,603.25 |
| 1000000112 | Duplicate Payment - 04/2005 ISIS | 10/14/2005 | -5,984.25 |
| 1000000112 | Duplicate Payment - 03/2005 ISIS | 10/14/2005 | -2,191.00 |
| 1000000112 | *RVS ACCR rcrd 08/17/05-08/31/05 Sprint WAN | 10/14/2005 | -670.97 |
| 1000000112 | *RVS ACCR rcrd 08/01/05-08/16/05 Sprint WAN | 10/14/2005 | -670.97 |
| 1000000112 | *HT31755 REF #A37436 (Transhotel 08/03/05) | 10/14/2005 | -433.92 |
| 1000000112 | *HT31755 REF #37230 (Transhotel 07/02/05) | 10/14/2005 | -289.28 |
| 1000000112 | *HT31755 REF #A37314 (Transhotel 07/17/05) | 10/14/2005 | -216.96 |
| 1000000112 | *RCRD 08/17-31/05 GO Leads - Beatrice Abuzeid - lg | 10/14/2005 | -152.60 |
| 1000000112 | *True up 06/05 Sprint WAN /doc#1000070951 | 10/14/2005 | -79.94 |
| 1000000112 | *Accr true up 08/17/05-08/31/05 Sprint WAN | 10/14/2005 | -75.75 |
| 1000000112 | *HT31755 REF #A37315 (Transhotel 07/17/05) | 10/14/2005 | -72.32 |
| 1000000112 | *8/1-3/05 Delta - Dup charges | 10/14/2005 | -10.25 |
| 1000000112 | *09/05 AmericaWest - Airline Miles | 10/14/2005 | 10.25 |
| 1000000112 | *06/05 Airline Miles - United /doc#1000071075 | 10/14/2005 | 20.50 |
| 1000000112 | *06/05 Airline Miles - Continental /doc#1000071071 | 10/14/2005 | 20.50 |
| 1000000112 | *09/05 AmericanExpress - Airline Miles | 10/14/2005 | 30.75 |
| 1000000112 | *06/05 Airline Miles - US Airways /doc#1000071077 | 10/14/2005 | 30.75 |
| 1000000112 | *Aug 17th - 31st Purchasing Fees-Wynsource/SAP ord | 10/14/2005 | 33.87 |
| 1000000112 | *LUNCH EXPENSE AGENCY VIS /doc#1900099243 | 10/14/2005 | 37.29 |
| 1000000112 | *RVS ACCR true up 08/01/05-08/16/05 Sprint WAN | 10/14/2005 | 75.75 |
| 1000000112 | *RVS ACCR true up 08/17/05-08/31/05 Sprint WAN | 10/14/2005 | 75.75 |
| 1000000112 | *Billout 08/17/05 - 08/31/05 Customer Svce & Comme | 10/14/2005 | 99.92 |
| 1000000112 | *Joe Stephan guest recov stay certA10028 | 10/14/2005 | 100.00 |
| 1000000112 | *Carolyn Cordell guest recov stay certA9013 /doc#1 | 10/14/2005 | 100.00 |
| 1000000112 | *Barbara Birkitt guest recov stay certA9012 /doc#1 | 10/14/2005 | 100.00 |
| 1000000112 | *Barbara Birkitt guest recov stay certA9011 /doc#1 | 10/14/2005 | 100.00 |
| 1000000112 | *Carolyn Cordell guest recov stay certA9014 /doc#1 | 10/14/2005 | 100.00 |
| 1000000112 | *06/05 Airline Miles - Delta /doc#1000071072 | 10/14/2005 | 112.75 |
| 1000000112 | *09/05 US Airways - Airline Miles | 10/14/2005 | 153.75 |
| 1000000112 | *A/N 0042138277-4 /doc#1900100572 | 10/14/2005 | 156.45 |
| 1000000112 | /doc#1900099539 | 10/14/2005 | 159.95 |
| 1000000112 | *09/05 United - Airline Miles | 10/14/2005 | 164.00 |
| 1000000112 | *June 05 Purchasing Fees-Wynsource/SAP orders /doc | 10/14/2005 | 172.05 |
| 1000000112 | xfer a/r balances to 7998 | 10/14/2005 | 173.62 |
| 1000000112 | *09/05 Continental - Airline Miles | 10/14/2005 | 194.75 |
| 1000000112 | *Billout 09/05 Customer Svce & Comment Card Progra | 10/14/2005 | 206.50 |
| 1000000112 | *Billout 10/05 Customer Svce & Comment Card Progra | 10/14/2005 | 206.50 |
| 1000000112 | *Billout 07/05 Customer Svce & Comment Card Progra | 10/14/2005 | 206.50 |
| 1000000112 | *ASP SDD Fees 8/17-8/31 Coconut Grove - Miami | 10/14/2005 | 216.00 |
| 1000000112 | *RCRD 08/17-31/05 GO Leads - Beatrice Abuzeid - lg | 10/14/2005 | 218.00 |
| 1000000112 | *06/05 Airline Miles - American /doc#1000071065 | 10/14/2005 | 276.75 |
| 1000000112 | *LUNCH EXPENSE AGENCY VIS /doc#1900099292 | 10/14/2005 | 286.68 |
| 1000000112 | *MIS Fees 08/05 2478 Dallas Park Central | 10/14/2005 | 420.02 |
| 1000000112 | *09/05 Delta - Airline Miles | 10/14/2005 | 430.50 |
| 1000000112 | *ASP SDD Fees 9/05 Coconut Grove - Miami | 10/14/2005 | 450.00 |
| 1000000112 | *ASP SDD Fees 10/05 Coconut Grove - Miami | 10/14/2005 | 450.00 |
| 1000000112 | *ASP SDD Fees 07/05 Coconut Grove - Miami /doc#100 | 10/14/2005 | 450.00 |

| | | | |
|---|---|---|---|
| 1000000112 | *CostCo-July YTD Trueup (prorated) | 10/14/2005 | 501.76 |
| 1000000112 | *09/05 American - Airline Miles | 10/14/2005 | 553.50 |
| 1000000112 | *Accr rcrd 08/01/05-08/16/05 Sprint WAN /doc#10000 | 10/14/2005 | 670.97 |
| 1000000112 | *BYREQUEST PROG 08/17/05-08/31/05 : GUEST RECOG | 10/14/2005 | 706.57 |
| 1000000112 | *MIS Fees 09/05 2478 Dallas Park Central | 10/14/2005 | 868.04 |
| 1000000112 | *MIS Fees 10/05 2478 Dallas Park Central | 10/14/2005 | 868.04 |
| 1000000112 | *MIS Fees 06/05 2478 Dallas Park Central /doc#1000 | 10/14/2005 | 868.04 |
| 1000000112 | *RCRD 06/05 REGIONAL COOP ADV FEE - WH - Coconut G | 10/14/2005 | 1,184.73 |
| 1000000112 | *RCRD 8/05 Sprint WAN | 10/14/2005 | 1,198.07 |
| 1000000112 | *ACCR 9/05 Sprint WAN | 10/14/2005 | 1,200.00 |
| 1000000112 | *RCRD 08/17/05 - 08/31/05 REGIONAL COOP ADV FEE - | 10/14/2005 | 1,225.75 |
| 1000000112 | *Rcrd 06/05 Sprint WAN /doc#1000070945 | 10/14/2005 | 1,300.00 |
| 1000000112 | *RCRD 06/05 GO Leads - Sherry Antaya - Wall Street | 10/14/2005 | 1,428.60 |
| 1000000112 | *BYREQUEST PROG 09/05 : GUEST RECOG | 10/14/2005 | 1,460.25 |
| 1000000112 | *BYREQUEST PROG 10/05 : GUEST RECOG | 10/14/2005 | 1,460.25 |
| 1000000112 | *BYREQUEST PROG 07/05 : GUEST RECOG /doc#100007124 | 10/14/2005 | 1,460.25 |
| 1000000112 | *RCRD 09/05 REGIONAL COOP ADV FEE - WH - Coconut G | 10/14/2005 | 1,712.54 |
| 1000000112 | *RCRD 06/05 SALES ALLOC FEE - WH - Coconut Grove / | 10/14/2005 | 2,369.46 |
| 1000000112 | *RCRD 08/17/05 - 08/31/05 SALES ALLOC FEE - WH - C | 10/14/2005 | 2,451.49 |
| 1000000112 | *RCRD 09/05 SALES ALLOC FEE - WH - Coconut Grove | 10/14/2005 | 3,425.07 |
| 1000000112 | *RCRD 06/05 MARKETING FEE - WH - Coconut Grove /do | 10/14/2005 | 3,554.19 |
| 1000000112 | *RCRD 08/17/05 - 08/31/05 MARKETING FEE - WH - Coc | 10/14/2005 | 3,677.24 |
| 1000000112 | *RCRD 09/05 MARKETING FEE - WH - Coconut Grove | 10/14/2005 | 5,137.61 |
| 1000000112 | *ISIS Coconut Grove  08/2005 | 10/14/2005 | 5,507.50 |
| 1000000112 | *ISIS Coconut Grove  09/2005 | 10/14/2005 | 7,224.25 |
| 1000000114 | *HT31755 REF #A37713 (Transhotel 10/20/05) | 10/16/2005 | -506.24 |
| 1000000114 | *HT31755 REF #200907 (Transhotel 10/05/05) | 10/16/2005 | -267.81 |
| 1000000114 | *HT31755 REF #A37762 (Transhotel 10/20/05) | 10/16/2005 | -144.64 |
| 1000000114 | *HT31755 REF #A37722 (Transhotel 10/20/05) | 10/16/2005 | -72.32 |
| 1000000114 | *Sept 05 Purchasing Fees-Wynsource/SAP orders | 10/16/2005 | 131.30 |
| 1000000114 | * | 10/16/2005 | 193.24 |
| 1000000047 | *9/05 SPRINT WAN TRUE-UP | 10/31/2005 | 2.07 |
| 1000000055 | *10/05 Alaska Airline Miles | 10/31/2005 | 10.25 |
| 1000000058 | *10/05 AmericaWest Airline Miles | 10/31/2005 | 10.25 |
| 1000000054 | *10/05 AirCanada Airline Miles | 10/31/2005 | 20.50 |
| 1000000057 | *10/05 AMEX Airline Miles | 10/31/2005 | 20.50 |
| 1000000059 | *10/05 Continental Airline Miles | 10/31/2005 | 71.75 |
| 1000000062 | *10/05 United Airline Miles | 10/31/2005 | 92.25 |
| 1000000064 | *10/05 US Airways Airline Miles | 10/31/2005 | 102.50 |
| 1000000060 | *10/05 Delta Airline Miles | 10/31/2005 | 143.50 |
| 1000000050 | *Amex Travel commission true up | 10/31/2005 | 211.81 |
| 1000000056 | *10/05 American Airline Miles | 10/31/2005 | 276.75 |
| 1000000078 | *RCRD 10/01/05 - 10/11/05 REGIONAL COOP ADV FEE - | 10/31/2005 | 590.22 |
| 1000000095 | *RCRD 10/12/05 - 10/31/05 REGIONAL COOP ADV FEE - | 10/31/2005 | 786.20 |
| 1000000078 | *RCRD 10/01/05 - 10/11/05 SALES ALLOC FEE - WH - C | 10/31/2005 | 1,180.43 |
| 1000000053 | *ACCR 10/31 Sprint WAN | 10/31/2005 | 1,200.00 |
| 1000000095 | *RCRD 10/12/05 - 10/31/05 SALES ALLOC FEE - WH - C | 10/31/2005 | 1,572.39 |
| 1000000078 | *RCRD 10/01/05 - 10/11/05 MARKETING FEE - WH - Coc | 10/31/2005 | 1,770.65 |
| 1000000095 | *RCRD 10/12/05 - 10/31/05 MARKETING FEE - WH - Coc | 10/31/2005 | 2,358.59 |
| 1000000052 | *CRO Coconut Grove  10/2005 | 10/31/2005 | 8,329.00 |
| 1000000209 | *Oct 05 Purchasing Fees-Wynsource/SAP orders | 11/01/2005 | 81.99 |
| 1000000234 | *Billout 11/05 Customer Svce & Comment Card Progra | 11/01/2005 | 206.50 |

| | | |
|---|---|---|
| 1000000210 *RCRD Oct 05 GO Leads - Roxana Leon - Banco Intern | 11/14/2005 | -606.90 |
| 1000000210 *RCRD Oct 05 GO Leads - Roxana Leon - Banco Intern | 11/14/2005 | 867.00 |
| 1000000212 *BYREQUEST PROG 11/05 : GUEST RECOG | 11/15/2005 | 1,460.25 |
| 1000000297 *10/05 SPRINT WAN TRUE-UP | 11/30/2005 | 91.08 |
| 1000000288 *09/05 Cost Co Comm-not paid thru Pegasus | 11/30/2005 | 235.20 |
| 1000000371 *Cendant CRO- Coconut Grove  11/2005 | 11/30/2005 | 356.50 |
| 1000000155 *ASP SDD Fees 11/05 Coconut Grove - Miami | 11/30/2005 | 450.00 |
| 1000000136 *MIS Fees 11/05 2478 Dallas Park Central | 11/30/2005 | 868.04 |
| 1000000299 *ACCR 11/30 Sprint WAN | 11/30/2005 | 1,200.00 |
| 1000000283 *ISIS Coconut Grove  11/2005 | 11/30/2005 | 8,432.25 |
| 1000000395 *Billout 12/05 Customer Svce & Comment Card Progra | 12/13/2005 | 206.50 |
| 1000000413 *Nov 05 Purchasing Fees-Wynsource/SAP orders | 12/14/2005 | 6.15 |
| 1000000404 *ASP SDD Fees 12/05 Coconut Grove - Miami | 12/14/2005 | 450.00 |
| 1000000397 *MIS Fees 12/05 2478 Dallas Park Central | 12/14/2005 | 868.04 |
| 1000000419 *CRO Coconut Grove  12/2005 | 12/15/2005 | -1,766.00 |
| 1900000146 | 12/15/2005 | 182.19 |
| 1900000145 * | 12/15/2005 | 190.02 |
| 1000000422 *RCRD Nov 05 GO Leads - Stephanie Bowers - SHRM - | 12/15/2005 | 1,428.60 |
| 1000000415 *BYREQUEST PROG 12/05 : GUEST RECOG | 12/15/2005 | 1,460.25 |
| 1000000430 *11/05 SPRINT WAN TRUE-UP | 12/30/2005 | -22.31 |
| 1000000431 *ACCR 12/05 Sprint WAN | 12/30/2005 | 1,200.00 |
| 1000000500 *CRO Cendant Coconut Grove  12/2005 | 12/30/2005 | 3,717.25 |
| 1000000526 *Awards - Rayna Katz 11/13/05 Inv 38490 | 12/31/2005 | -314.14 |
| 1000000512 *12/05 - Alaska | 12/31/2005 | 10.25 |
| 1000000511 *12/05 - AirCanada | 12/31/2005 | 10.25 |
| 1000000520 *12/05 - Midwest | 12/31/2005 | 10.25 |
| 1000000514 *12/05 - AmericanExpress | 12/31/2005 | 51.25 |
| 1000000516 *12/05 - Continental | 12/31/2005 | 92.25 |
| 1000000521 *12/05 - United | 12/31/2005 | 153.75 |
| 1000000522 *12/05 - USAir | 12/31/2005 | 205.00 |
| 1000000501 *ISIS Coconut Grove  12/2005 | 12/31/2005 | 240.75 |
| 1000000517 *12/05 - Delta | 12/31/2005 | 461.25 |
| 1000000513 *12/05 - American | 12/31/2005 | 594.50 |
| 1000000497 *ISIS Coconut Grove  12/2005 | 12/31/2005 | 2,147.75 |
| 100000695  *SEIB 3rd Qtr Closures WH Coconut Grove | 01/03/2006 | -104.01 |
| 1000000591 *2006-TA comm-Mega agencies-(WY)-Grand Bay-Coconut | 01/12/2006 | 6,210.00 |
| 1000000606 *ASP SDD Fees 01/06 Coconut Grove - Miami | 01/14/2006 | 450.00 |
| 1000000609 *MIS Fees 01/06 2478 Miami Coconut Grove | 01/14/2006 | 868.04 |
| 1000000612 *BYREQUEST PROG 1/06 : GUEST RECOG | 01/15/2006 | 1,460.25 |
| 1000000614 *RCRD DEC 05 GO Leads - Irene Rodriguez-Chomat - H | 01/16/2006 | -700.00 |
| 1000000614 *RCRD DEC 05 GO Leads - Irene Rodriguez-Chomat - H | 01/16/2006 | 1,000.00 |
| 1000000608 *Billout 01/06 Customer Svce & Comment Card Progra | 01/17/2006 | 95.88 |
| 1000000621 *Dec 05 Purchasing Fees-Wynsource/SAP orders | 01/20/2006 | 69.02 |
| 1000000706 *CRO Cendant Coconut Grove  12/05 Correction | 01/31/2006 | -382.50 |
| 1000000683 *CRO Correction 12/05 invoice | 01/31/2006 | -26.75 |
| 1000000715 *12/05 Cost Co Comm-not paid thru Pegasus | 01/31/2006 | -14.10 |
| 1000000714 *12/05 SPRINT WAN TRUE-UP | 01/31/2006 | 0.93 |
| 1000000653 *Jan 2006 - Midwest | 01/31/2006 | 10.25 |
| 1000000647 *Jan 2006 - Alaska | 01/31/2006 | 20.50 |
| 1000000649 *Jan 2006 - AmericanExpress | 01/31/2006 | 51.25 |
| 1000000651 *Jan 2006 - Continental | 01/31/2006 | 71.75 |
| 1000000654 *Jan 2006 - United | 01/31/2006 | 153.75 |

| | | | |
|---|---|---|---|
| 1900000526 | | 01/31/2006 | 188.03 |
| 1000000652 | *Jan 2006 - Delta | 01/31/2006 | 266.50 |
| 1000000655 | *Jan 2006 - USAir | 01/31/2006 | 266.50 |
| 1000000648 | *Jan 2006 - American | 01/31/2006 | 533.00 |
| 1000000712 | *ACCR 1/06 Sprint WAN | 01/31/2006 | 1,200.00 |
| 1000000694 | *CRO Cendant Coconut Grove  01/2006 | 01/31/2006 | 13,522.00 |
| 1000000778 | *Brad Helicher guest recov stay certA10171 | 02/13/2006 | 100.00 |
| 1000000784 | *RCRD 12/05 REGIONAL COOP ADV FEE - WH - Coconut G | 02/13/2006 | 2,626.74 |
| 1000000784 | *RCRD 11/05 REGIONAL COOP ADV FEE - WH - Coconut G | 02/13/2006 | 3,038.40 |
| 1000000784 | *RCRD 12/05 SALES ALLOC FEE - WH - Coconut Grove | 02/13/2006 | 5,253.47 |
| 1000000784 | *RCRD 11/05 SALES ALLOC FEE - WH - Coconut Grove | 02/13/2006 | 6,076.80 |
| 1000000784 | *RCRD 12/05 MARKETING FEE - WH - Coconut Grove | 02/13/2006 | 7,880.21 |
| 1000000784 | *RCRD 11/05 MARKETING FEE - WH - Coconut Grove | 02/13/2006 | 9,115.20 |
| 1000000785 | *ASP SDD Fees 02/06 Coconut Grove - Miami | 02/14/2006 | 450.00 |
| 1000000801 | *MIS Fees 02/06 2478 Miami Coconut Grove | 02/14/2006 | 868.04 |
| 1000000787 | RCRD 01/06 REGIONAL COOP ADV FEE - WH - Coconut Gr | 02/14/2006 | 3,824.69 |
| 1000000787 | *RCRD 01/06 SALES ALLOC FEE - WH - Coconut Grove | 02/14/2006 | 7,649.36 |
| 1000000787 | RCRD 01/06 MARKETING FEE - WH - Coconut Grove | 02/14/2006 | 11,474.06 |
| 100000751 | *SEIB 3rd Qtr Rebates WH Coconut Grove | 02/15/2006 | -10.55 |
| 1000000802 | *Billout 02/06 Customer Svce & Comment Card Progra | 02/15/2006 | 95.88 |
| 1000000804 | *BYREQUEST PROG 2/06 : GUEST RECOG | 02/15/2006 | 1,460.25 |
| 1000000827 | *Jan 06 Purchasing Fees-Wynsource/SAP orders | 02/23/2006 | 103.33 |
| 1000000913 | *Guest J Flanagan reimb. | 02/28/2006 | -405.67 |
| 1000000870 | *1/06 SPRINT WAN TRUE-UP | 02/28/2006 | 4.57 |
| 1000000896 | *Feb  2006 - AmericanExpress | 02/28/2006 | 10.25 |
| 1000000894 | *Feb 2006 - Alaska | 02/28/2006 | 10.25 |
| 1000000902 | *Feb 2006 - United | 02/28/2006 | 61.50 |
| 1000000898 | *Feb 2006 - Continental | 02/28/2006 | 71.75 |
| 1000000903 | *Feb 2006 - USAir | 02/28/2006 | 82.00 |
| 1000000899 | *Feb 2006 - Delta | 02/28/2006 | 123.00 |
| 1000000895 | *Feb 2006 - American | 02/28/2006 | 225.50 |
| 1000000869 | *ACCR 2/06 Sprint WAN | 02/28/2006 | 1,200.00 |
| 1000000847 | *RCRD JAN 06 GO Leads - Ken Beck - Intertek Sales | 02/28/2006 | 1,428.60 |
| 1000000881 | *CRO Cendant Coconut Grove  02/2006 | 02/28/2006 | 10,642.25 |
| 1000000951 | *Billout 03/06 Customer Svce & Comment Card Progra | 03/09/2006 | 95.88 |
| 1000000965 | *ASP SDD Fees 03/06 Coconut Grove - Miami | 03/14/2006 | 450.00 |
| 1000000963 | *MIS Fees 03/06 2478 Miami Coconut Grove | 03/14/2006 | 868.04 |
| 1000000972 | *BYREQUEST PROG 3/06 : GUEST RECOG | 03/15/2006 | 1,460.25 |
| 1000000993 | SYSCO Q3 & Q4 2005 PURCHASE REBATES  Wyndham Cocon | 03/23/2006 | -16.93 |
| 1000000989 | RCRD 02/06 REGIONAL COOP ADV FEE - WH - Coconut Gr | 03/23/2006 | 3,988.30 |
| 1000000989 | RCRD 02/06 SALES ALLOC FEE - WH - Coconut Grove | 03/23/2006 | 7,976.60 |
| 1000000989 | RCRD 02/06 MARKETING FEE - WH - Coconut Grove | 03/23/2006 | 11,964.90 |
| 1000001009 | Rvs 03/06 MIS Fees Miami Coconut Grove | 03/30/2006 | -868.04 |
| 1000001050 | *3/06 SPRINT WAN TRUE-UP | 03/31/2006 | 3.86 |
| 1000001089 | *03/06 - AmericaWest | 03/31/2006 | 10.25 |
| 1000001095 | *03/06 - Midwest | 03/31/2006 | 20.50 |
| 1000001072 | *03/06 - Alaska | 03/31/2006 | 20.50 |
| 1000001070 | *03/06 - AirCanada | 03/31/2006 | 30.75 |
| 1000001088 | *03/06 - American Express | 03/31/2006 | 51.25 |
| 1000001054 | *RCRD FEB 06 GO Leads - Keala Griffin - Meeting | 03/31/2006 | 69.50 |
| 1000001062 | *Feb 06 Purchasing Fees-Wynsource/SAP orders | 03/31/2006 | 72.65 |
| 1000001098 | *03/06 - USAirways | 03/31/2006 | 205.00 |

| | | | |
|---|---|---|---|
| 1000001096 | *03/06 - United | 03/31/2006 | 205.00 |
| 1000001091 | *03/06 - Continental | 03/31/2006 | 215.25 |
| 1000001055 | *RCRD MAR 06 GO Leads - Melissa Cothern - P&G May | 03/31/2006 | 385.60 |
| 1000001077 | *03/06 - American | 03/31/2006 | 553.50 |
| 1000001092 | *03/06 - Delta | 03/31/2006 | 902.00 |
| 1000001056 | *ACCR 3/06 Sprint WAN | 03/31/2006 | 1,200.00 |
| 1000001054 | *RCRD FEB 06 GO Leads - Christian Hobbs - Q2Q Quin | 03/31/2006 | 1,428.60 |
| 1000001102 | *CRO Cendant Coconut Grove  03/2006 | 03/31/2006 | 11,773.50 |
| 1000001251 | Commissions-Pegasus 08Apr-21 Apr 2006 | 04/02/2006 | 2,738.31 |
| 1000001068 | Commissions-Pegasus 11-24 Mar 2006 | 04/04/2006 | 3,624.95 |
| 1000001127 | *ASP SDD Fees 04/06 Coconut Grove - Miami | 04/14/2006 | 450.00 |
| 1000001134 | *MIS Fees 04/06 2478 Miami Coconut Grove | 04/14/2006 | 868.04 |
| 1000001130 | *BYREQUEST PROG 4/06 : GUEST RECOG | 04/15/2006 | 1,460.25 |
| 1000001154 | *Billout 04/06 Customer Svce & Comment Card Progra | 04/17/2006 | 95.88 |
| 1000001167 | *RCRD 03/06 REGIONAL COOP ADV FEE - WH - Coconut G | 04/18/2006 | 4,132.58 |
| 1000001167 | *RCRD 03/06 SALES ALLOC FEE - WH - Coconut Grove | 04/18/2006 | 8,265.16 |
| 1000001167 | *RCRD 03/06 MARKETING FEE - WH - Coconut Grove | 04/18/2006 | 12,397.74 |
| 1000001169 | Commissions-Pegasus 25 Mar-7 Apr 2006 | 04/19/2006 | 1,992.16 |
| 1000001186 | *Mar 06 Purchasing Fees-Wynsource/SAP orders | 04/21/2006 | 79.22 |
| 1000001268 | *4/06 SPRINT WAN TRUE-UP | 04/30/2006 | -4.55 |
| 1000001270 | *ACCR 4/06 Sprint WAN | 04/30/2006 | 1,200.00 |
| 1000001245 | *CRO Cendant Coconut Grove  04/2006 | 04/30/2006 | 5,972.25 |
| 1000001323 | *Billout 005/06 Customer Svce & Comment Card Progr | 05/12/2006 | 95.88 |
| 1000001324 | *ASP SDD Fees 05/06 Coconut Grove - Miami | 05/12/2006 | 450.00 |
| 1000001331 | *BYREQUEST PROG 5/06 : GUEST RECOG | 05/12/2006 | 1,460.25 |
| 1000001348 | *April 06 Purchasing Fees-Wynsource/SAP orders | 05/15/2006 | 85.46 |
| 100001272 | *MIS Fees 05/06 2478 Miami Coconut Grove | 05/15/2006 | 868.04 |
| 1000001364 | *RCRD 04/06 REGIONAL COOP ADV FEE - WH - Coconut G | 05/15/2006 | 4,132.58 |
| 1000001364 | *RCRD 04/06 SALES ALLOC FEE - WH - Coconut Grove | 05/15/2006 | 8,265.16 |
| 1000001364 | *RCRD 04/06 MARKETING FEE - WH - Coconut Grove | 05/15/2006 | 12,397.74 |
| 1000001374 | Commissions-Pegasus 08Apr-21 Apr 2006 | 05/16/2006 | 1,870.94 |
| 1000001442 | *Edward Lanzara guest recov stay certA10906 | 05/26/2006 | 100.00 |
| 1000001442 | *Jennifer Lezeska guest recov certA10905 | 05/26/2006 | 100.00 |
| 1000001442 | *Carl Myer guest recov stay certA10904 | 05/26/2006 | 100.00 |
| 1000001442 | *Steven Low guest recov stay certA10862 | 05/26/2006 | 100.00 |
| 1000001442 | *Lindsay Lauren guest recov stay certA10763 | 05/26/2006 | 100.00 |
| 1000001443 | Commissions-Pegasus 21Apr-19 May2006 | 05/31/2006 | 1,991.41 |
| 1000001470 | *CRO Cendant Coconut Grove  05/2006 | 05/31/2006 | 6,831.00 |
| 1000001536 | *MIS Fees 06/06 2478 Miami Coconut Grove | 06/12/2006 | 868.04 |
| 1000001546 | *May 06 Purclasing Fees-Wynsource/SAP orders | 06/13/2006 | 58.13 |
| 1000001548 | *Billout 6/06 Customer Svce & Comment Card Program | 06/13/2006 | 95.88 |
| 1000001544 | *ASP SDD Fees 06/06 Coconut Grove - Miami | 06/13/2006 | 450.00 |
| 1000001543 | *BYREQUEST PROG 6/06 : GUEST RECOG | 06/13/2006 | 1,460.25 |
| 1000001575 | *06/06 Cost Co Comm-not paid thru Pegasus | 06/15/2006 | 64.10 |
| 1000001565 | *RCRD 05/06 REGIONAL COOP ADV FEE - WH - Coconut G | 06/15/2006 | 3,306.53 |
| 1000001565 | *RCRD 05/06 SALES ALLOC FEE - WH - Coconut Grove | 06/15/2006 | 6,613.06 |
| 1000001565 | *RCRD 05/06 MARKETING FEE - WH - Coconut Grove | 06/15/2006 | 9,919.59 |
| 1000001626 | Commissions-Pegasus 17June-23June 2006 | 06/21/2006 | 485.15 |
| 1000001583 | Commissions-Pegasus 26May-02Jun 2006 | 06/21/2006 | 1,465.77 |
| 1000001605 | Commissions-Pegasus 09Jun-16Jun 2006 | 06/26/2006 | 1,210.13 |
| 1000001611 | *TripRewards - Carmen Sandoval 3/27/06 Cert.#57316 | 06/27/2006 | -169.46 |
| 1000001653 | *5/06 SPRINT WAN TRUE-UP | 06/30/2006 | 9.79 |

| | | |
|---|---|---|
| 1000001655 *June 06 Airline Miles - US Airways | 06/30/2006 | 10.25 |
| 1000001661 *Rcrd 01/06 - 06/06 SDD Jazz Call Accg - Coconut G | 06/30/2006 | 477.90 |
| 1000001659 *ACCR 5/06 Sprint WAN | 06/30/2006 | 1,200.00 |
| 1000001658 *ACCR 6/06 Sprint WAN | 06/30/2006 | 1,200.00 |
| 1000001678 *CRO Cendant Coconut Grove  06/2006 | 06/30/2006 | 6,628.25 |
| 1000001739 Commissions-Pegasus 24 June-30 June 2006 | 07/01/2006 | 485.15 |
| 1900001522 | 07/10/2006 | 79.13 |
| 1000001705 *BYREQUEST PROG 7/06 : GUEST RECOG | 07/10/2006 | 1,460.25 |
| 1900001534 | 07/12/2006 | 273.54 |
| 1000001736 *June 06 Purclasing Fees-Wynsource/SAP orders | 07/13/2006 | 34.13 |
| 1000001738 *Billout 07/06 Customer Svce & Comment Card Progra | 07/13/2006 | 95.88 |
| 1000001731 *MIS Fees 07/06 2478 Miami Coconut Grove | 07/13/2006 | 868.04 |
| 1000001746 *Maricela Pepe guest recov stay certA11610 | 07/14/2006 | 100.00 |
| 1000001746 *Amy Straus guest recov stay certA11606 | 07/14/2006 | 100.00 |
| 1000001746 *LORRAINE VALDES guest recov stay certA11530 | 07/14/2006 | 100.00 |
| 1000001746 *Toni McCall guest recov stay certA11642 | 07/14/2006 | 100.00 |
| 1000001746 *Toni McCall guest recov stay certA11645 | 07/14/2006 | 100.00 |
| 1000001746 *Toni McCall guest recov stay certA11644 | 07/14/2006 | 100.00 |
| 1000001746 *Toni McCall guest recov stay certA11643 | 07/14/2006 | 100.00 |
| 1000001835 Commissions-Pegasus 01July-14July2006 | 07/14/2006 | 290.65 |
| 1000001741 *ASP SDD Fees 07/06 Coconut Grove - Miami | 07/14/2006 | 450.00 |
| 1000001757 *RCRD 06/06 REGIONAL COOP ADV FEE - WH - Coconut G | 07/17/2006 | 1,702.88 |
| 1000001757 *RCRD 06/06 SALES ALLOC FEE - WH - Coconut Grove | 07/17/2006 | 3,405.76 |
| 1000001757 *RCRD 06/06 MARKETING FEE - WH - Coconut Grove | 07/17/2006 | 5,108.64 |
| 1000001801 *07/06 Cost Co Comm-not paid thru Pegasus | 07/24/2006 | 304.35 |
| 1000001824 *F&B credit Q4 | 07/26/2006 | -16.93 |
| 1000001829 Commissions-Pegasus 17June-23June 2006 | 07/27/2006 | -485.15 |
| 1000001900 Commissions-Pegasus 15July-28July2006 | 07/28/2006 | 3,820.60 |
| 1000001830 *RCRD MAY 06 GO Leads - Tina Goodnough - GO GO WOR | 07/30/2006 | 550.00 |
| 1000001873 *JULY 06 Airline Miles - American | 07/31/2006 | 10.25 |
| 1000001876 *JULY 06 Airline Miles - Delta | 07/31/2006 | 20.50 |
| 1000001857 *ACCR JULY 2006 Sprint WAN - Grand Bay Coconut | 07/31/2006 | 1,200.00 |
| 1000001882 *CRO Cendant Grand Bay Coconut Grove 07/2007 | 07/31/2006 | 6,451.50 |
| 1900001615 | 08/01/2006 | 14.36 |
| 1900001673 | 08/07/2006 | 14.67 |
| 1000001949 *Billout 08/06 Customer Svce & Comment Card Progra | 08/07/2006 | 95.88 |
| 1000001960 *ASP SDD Fees 8/06 Coconut Grove - Miami | 08/09/2006 | 450.00 |
| 1000001959 *MIS Fees 8/06 2478 Miami Coconut Grove | 08/09/2006 | 868.04 |
| 1000001957 *BYREQUEST PROG 8/06 : GUEST RECOG | 08/09/2006 | 1,460.25 |
| 1000001967 *john virga guest recov stay certA11705 | 08/10/2006 | 100.00 |
| 1000001967 *john virga guest recov stay certA11704 | 08/10/2006 | 100.00 |
| 1000001967 *Brian Caldwell guest recov stay certA11703 | 08/10/2006 | 100.00 |
| 1000001967 *Corey Zemelman guest recov stay certA11702 | 08/10/2006 | 100.00 |
| 1000001967 *Celia Zamora guest recov stay certA11730 | 08/10/2006 | 100.00 |
| 1000002031 Commissions-Pegasus 29July-11August2006 | 08/14/2006 | 1,190.66 |
| 1000002003 *RCRD 07/06 REGIONAL COOP ADV FEE - WH - Coconut G | 08/15/2006 | 1,842.21 |
| 1000002003 *RCRD 07/06 SALES ALLOC FEE - WH - Coconut Grove | 08/15/2006 | 3,684.42 |
| 1000002003 *RCRD 07/06 MARKETING FEE - WH - Coconut Grove | 08/15/2006 | 5,526.63 |
| 1900001749 | 08/17/2006 | 14.17 |
| 1900001726 | 08/17/2006 | 14.36 |
| 1900001770 | 08/18/2006 | 14.36 |
| 1900001789 | 08/22/2006 | 79.39 |

| | | | |
|---|---|---|---|
| 1000002090 | *August 06 Airline Miles - Midwest | 08/31/2006 | 10.25 |
| 1000002089 | *August 06 Airline Miles - Iceland Air | 08/31/2006 | 10.25 |
| 1000002125 | *July 2006 SPRINT WAN TRUE-UP | 08/31/2006 | 19.51 |
| 1000002084 | *August 06 Airline Miles - Alaska | 08/31/2006 | 20.50 |
| 1000002083 | *August 06 Airline Miles - AirCanada | 08/31/2006 | 41.00 |
| 1000002086 | *August 06 Airline Miles - AmericanExpress | 08/31/2006 | 194.75 |
| 1000002128 | Commissions-Pegasus 12August-25August2006 | 08/31/2006 | 322.92 |
| 1000002087 | *August 06 Airline Miles - Continental | 08/31/2006 | 420.25 |
| 1000002112 | *August 06 Airline Miles - United | 08/31/2006 | 440.75 |
| 1000002096 | *August 06 Airline Miles - US Airways | 08/31/2006 | 676.50 |
| 1000002074 | *Smith Travel | 08/31/2006 | 740.74 |
| 1000002088 | *August 06 Airline Miles - Delta | 08/31/2006 | 1,168.50 |
| 1000002124 | *ACCR AUG 2006 Sprint WAN - Grand Bay Coconut | 08/31/2006 | 1,200.00 |
| 1000002085 | *August 06 Airline Miles - American | 08/31/2006 | 1,578.50 |
| 1000002110 | *CRO Wyndham Worldwide Coconut Grove  08/2006 | 08/31/2006 | 5,274.00 |
| 1000002134 | *09/06 Cost Co Comm-not paid thru Pegasus | 09/07/2006 | 60.70 |
| 1900001860 | | 09/07/2006 | 79.39 |
| 1000002211 | Commissions-Pegasus 26August-08September2006 | 09/08/2006 | 182.63 |
| 1000002148 | *BYREQUEST PROG 9/06 : GUEST RECOG | 09/11/2006 | 1,460.25 |
| 1900001884 | | 09/12/2006 | 69.61 |
| 1000002155 | *ASP SDD Fees 9/06 Coconut Grove - Miami | 09/12/2006 | 450.00 |
| 1000002157 | *MIS Fees 9/06 2478 Miami Coconut Grove | 09/12/2006 | 868.04 |
| 1900001901 | | 09/13/2006 | 514.45 |
| 1000002166 | *Billout 09/06 Customer Svce & Comment Card Progra | 09/14/2006 | 95.88 |
| 1900001905 | | 09/18/2006 | 46.90 |
| 1900001913 | | 09/20/2006 | 22.40 |
| 1000002281 | Commissions-Pegasus 09September-22September2006 | 09/22/2006 | 2,586.71 |
| 1900002035 | | 09/29/2006 | 14.80 |
| 1000002268 | *AUG 2006 SPRINT WAN TRUE-UP | 09/30/2006 | 20.75 |
| 1000002266 | *ACCR SEPT 2006 Sprint WAN - Grand Bay Coconut | 09/30/2006 | 1,200.00 |
| 1000002244 | *CRO Wyndham Worldwide Coconut Grove  09/2006 | 09/30/2006 | 7,813.00 |
| 1900002039 | | 10/03/2006 | 2,200.00 |
| 1000002301 | *Tonya Crane guest recov stay certA12081 | 10/04/2006 | 100.00 |
| 1000002301 | *Victor Broceaux guest recov stay certA12235 | 10/04/2006 | 100.00 |
| 1000002301 | *Veronica Sanders guest recov stay certA12234 | 10/04/2006 | 100.00 |
| 1000002301 | *Reynalda Ochoa guest recov stay certA12192 | 10/04/2006 | 100.00 |
| 1000002301 | *Rich SanFillipo guest recov stay certA12143 | 10/04/2006 | 100.00 |
| 1900002043 | | 10/05/2006 | 101.63 |
| 1000002325 | *BYREQUEST PROG 10/06 : GUEST RECOG | 10/09/2006 | 1,460.25 |
| 1000002319 | *RCRD 08/06 REG COOP ADV Fee - Coconut Grove | 10/09/2006 | 2,327.65 |
| 1000002319 | *RCRD 08/06 Sales Allocation - Coconut Grove | 10/09/2006 | 4,655.30 |
| 1000002319 | *RCRD 08/06 Marketing Fee - Coconut Grove | 10/09/2006 | 6,982.95 |
| 1000002341 | *Billout 10/06 Customer Svce & Comment Card Progra | 10/11/2006 | 95.88 |
| 1000002336 | *ASP SDD Fees 10/06 Coconut Grove - Miami | 10/11/2006 | 450.00 |
| 1000002338 | *MIS Fees 10/06 2478 Miami Coconut Grove | 10/11/2006 | 868.04 |
| 1000002384 | Commissions-Pegasus 23September-06October2006 | 10/14/2006 | 1,296.30 |
| 1000002383 | *RCRD 09/06 REGIONAL COOP ADV FEE - WH - Coconut G | 10/15/2006 | 2,064.07 |
| 1000002383 | *RCRD 09/06 SALES ALLOC FEE - WH - Coconut Grove | 10/15/2006 | 4,128.13 |
| 1000002383 | *RCRD 09/06 MARKETING FEE - WH - Coconut Grove | 10/15/2006 | 6,192.20 |
| 1900002209 | | 10/16/2006 | 7.57 |
| 1900002219 | | 10/19/2006 | 699.60 |
| 1000002380 | *10/06 Cost Co Comm-not paid thru Pegasus | 10/20/2006 | 61.15 |

| | | | |
|---|---|---|---|
| 1900002252 | | 10/26/2006 | 14.06 |
| 1000002482 | * Coconut Grove Marketing True UP 4/06 | 10/31/2006 | -2,467.29 |
| 1000002482 | *Coconut Grove Sales True Up 4/06 | 10/31/2006 | -1,644.86 |
| 1000002482 | *Coconut Grove Reg COOP True Up 4/06 | 10/31/2006 | -822.43 |
| 1000002433 | *October 06 Airline Miles - Alaska | 10/31/2006 | 10.25 |
| 1000002446 | *October 06 Airline Miles - United | 10/31/2006 | 20.50 |
| 1000002434 | *SEP 2006 SPRINT WAN TRUE-UP | 10/31/2006 | 27.73 |
| 1000002432 | *October 06 Airline Miles - AirCanada | 10/31/2006 | 41.00 |
| 1000002437 | *October 06 Airline Miles - AmericanExpress | 10/31/2006 | 51.25 |
| 1000002439 | *October 06 Airline Miles - Continental | 10/31/2006 | 112.75 |
| 1000002444 | *October 06 Airline Miles - US Airways | 10/31/2006 | 174.25 |
| 1000002424 | *RCRD SEP 06 GO Leads - Melissa Lanouette - NALEO | 10/31/2006 | 184.00 |
| 1000002441 | *October 06 Airline Miles - Delta | 10/31/2006 | 348.50 |
| 1000002436 | *October 06 Airline Miles - American | 10/31/2006 | 451.00 |
| 1000002435 | *ACCR OCTT 2006 Sprint WAN - Grand Bay Coconut | 10/31/2006 | 1,200.00 |
| 1000002462 | Commissions-Pegasus 07October-October202006 | 10/31/2006 | 1,481.44 |
| 1000002450 | *CRO Wyndham Worldwide Coconut Grove  10/2006 | 10/31/2006 | 9,628.00 |
| 1000002452 | *Matthew Wood guest recov stay certA12470 | 11/02/2006 | 100.00 |
| 1000002452 | *Linda Molfetta guest recov stay certA12453 | 11/02/2006 | 100.00 |
| 1000002452 | *Cassandra Ward guest recov stay certA12414 | 11/02/2006 | 100.00 |
| 1000002452 | *Kathy Swezey guest recov stay certA12239 | 11/02/2006 | 100.00 |
| 1000002510 | *Billout 11/06 Customer Svce & Comment Card Progra | 11/07/2006 | 95.88 |
| 1000002507 | *BYREQUEST PROG 11/06 : GUEST RECOG | 11/07/2006 | 1,460.25 |
| 1000002516 | *10/06 Cost Co Comm-not paid thru Pegasus | 11/08/2006 | 79.40 |
| 1000002517 | *ASP SDD Fees 11/06 Coconut Grove - Miami | 11/08/2006 | 450.00 |
| 1000002524 | *MIS Fees 11/06 2478 Miami Coconut Grove | 11/09/2006 | 868.04 |
| 1000002548 | Commissions-Pegasus 21October-03November | 11/14/2006 | 2,366.24 |
| 1000002551 | *October 06 Purchasing Lees-Wynsource/SAP orders | 11/15/2006 | 5.32 |
| 1000002545 | *RCRD 10/06 REGIONAL COOP ADV FEE - WH - Coconut G | 11/15/2006 | 2,044.18 |
| 1000002545 | *RCRD 10/06 SALES ALLOC FEE - WH - Coconut Grove | 11/15/2006 | 4,088.35 |
| 1000002545 | *RCRD 10/06 MARKETING FEE - WH - Coconut Grove | 11/15/2006 | 6,132.53 |
| 1000002577 | Commissions-Pegasus 04November-17November | 11/28/2006 | 3,534.51 |
| | | | 469,954.42 |

**CIVIL COVER SHEET**

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I (a) PLAINTIFFS**

WYNDHAM HOTELS AND RESORTS, LLC,
a Delaware limited liability company,

**DEFENDANTS**

MERCO GROUP AT GB HOTEL, LC
a Florida limited liability company, and
UNIVERSITY AT 17TH AVENUE, LLC
a Florida corporation

06 22920

CIV-KING

MAGISTRATE JUDGE
GARBER

**(b)** County of Residence of First Listed Plaintiff **Morris, N.J.**
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant Miami-Dade
(IN U.S. PLAINTIFF CASES ONLY)
Note: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

*Dade 06-22920-CIV-King/Garber*

**(c)** Attorneys *(Firm Name, Address, And Telephone Number)*
Buchanan Ingersoll & Rooney, Mary Leslie Smith, Esq. 100 S.E. 2nd St. 34th Floor, Miami, FL 33131 (305) 347-4080

Attorneys *(If known)*

DEC 01 2006
CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. – MIAMI

**(d)** CIRCLE COUNTY WHERE ACTION AROSE:
DADE, MONROE, BROWARD, PALM BEACH, MARTIN, ST. LUCIE, INDIAN RIVER, OKEECHOBEE, HIGHLANDS

| **II. BASIS OF JURISDICTION** *(Place an X in one box only)* | | **III. CITIZENSHIP OF PRINCIPAL PARTIES** *(Place an X in one box for Plaintiff and one box for Defendant)* *(For Diversity Cases Only)* | | |
|---|---|---|---|---|
| ☐ 1 U.S. Government Plaintiff | ☐ 3 Federal Question (U.S. Government Not a Party) | | PTF DEF | PTF DEF |
| | | Citizen of this State | ☐ 1 ☐ 1 | Incorporated of Principal Place of Business in This State ☐ 4 ☒ 4 |
| ☐ 2 U.S. Government Defendant | ☒ 4 Diversity (Indicate Citizenship of Parties in item III) | Citizen of another State | ☐ 2 ☐ 2 | Incorporated and Principal Place of Business in Another State ☒ 5 ☐ 5 |
| | | Citizen or Subject of a Foreign Country | ☐ 3 ☐ 3 | Foreign Nation ☐ 6 ☐ 6 |

**IV. ORIGIN** *(PLACE AN X IN ONE BOX ONLY)*

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Refiled
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

**V. NATURE OF SUIT** *(PLACE AN X IN ONE BOX ONLY)*

| A CONTRACT | A TORTS | B FORFEITURE/PENALTY | A BANKRUPTCY | A OTHER STATUS |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 U.S.C. 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 U.S.C. 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | **A PROPERTY RIGHTS** | ☐ 450 Commerce/ICC Rates/etc |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 630 Liquor Laws | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 640 R.R. & Truck | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 650 Airline Regs | ☐ 840 Trademark | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 660 Occupational Safety/Health | **B SOCIAL SECURITY** | ☐ 850 Securities/Commodities/Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 690 Other | ☐ 861 HIA (1395ff) | ☐ 875 Customer Challenge 12 U.S.C. 3410 |
| ☒ 190 Other Contract | ☐ 360 Other Personal Injury | | ☐ 862 Black Lung (923) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | | ☐ 863 DIWC (405(g)) | ☐ 892 Economic Stabilization Act |
| | | | ☐ 863 DIWW (405(g)) | ☐ 893 Environmental Matters |
| | | | ☐ 864 SSID Title XVI | ☐ 894 Energy Allocation Act |
| | | | ☐ 865 RSI (405(g)) | ☐ 896 Freedom of Information Act |

| A REAL PROPERTY | A CIVIL RIGHTS | B PRISONER PETITIONS | A LABOR | A FEDERAL TAX SUITS | A OTHER STATUS |
|---|---|---|---|---|---|
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 710 Fair Labor Standards Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus** | ☐ 720 Labor/Mgmt. Relations | ☐ 871 IRS — Third Party 26 U.S.C. 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | | ☐ 890 Other Statutory Actions |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | ☐ 740 Railway Labor Act | | A or B |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | ☐ 750 Other Labor Litigation | | |
| ☐ 290 All Other Real Property | | ☐ 550 Civil Rights | ☐ 791 Employee Ret. Inc. Security Act | | |
| | | A or B | | | |

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE. (DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)

28 U.S.C. § 1332 for damages for breach of contract.

Length of Trial:
via 2-3 days estimated (for both sides) to try entire case

| **VII. REQUESTED IN COMPLAINT:** | CHECK IF THIS IS A ☐ CLASS ACTION UNDER F.R.C.P. 23 | DEMAND **in excess of $600,000.00** | Check YES only if demanded in complaint |
|---|---|---|---|
| | | JURY DEMAND: ☐ YES ☒ NO | |

**VIII. RELATED CASE(S) IF ANY** (See instructions):

JUDGE _____ DOCKET NUMBER _____

DATE 12/1/06

SIGNATURE OF ATTORNEY OF RECORD Mary Leslie Smith, Esq. Bar No. 774243

FOR OFFICE USE ONLY: Receipt # 150860 Amount 350 APPLYING IFP _____ JUDGE _____ MAG.JUDGE _____

36635- 865837-1; PGH1_General - (Rev. 12/96)